Melissa A. Fortunato (#319767)
Marion C. Passmore (#228474)
**BRAGAR EAGEL & SQUIRE, P.C.**
580 California Street, Suite 1200
San Francisco, California 94104
Telephone: (415) 568-2124
Email: fortunato@bespc.com
        passmore@bespc.com

*Counsel for Lead Plaintiff Kwok Kong*
*and the Proposed Class*

[Additional Counsel on Signature Page]

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| REENA SAINTJERMAIN, Individually and On Behalf of All Others Similarly Situated, | Case No. 4:20-cv-06617-PJH |
| Plaintiff, | **AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| v. | |
| FLUIDIGM CORPORATION, STEPHEN CHRISTOPHER LINTHWAITE, and VIKRAM JOG, | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

Court-appointed Lead Plaintiff Kwok Kong ("Lead Plaintiff"), individually and on behalf of all others similarly situated, by and through his undersigned counsel, alleges the following upon information and belief, except as to those allegations concerning Lead Plaintiff, which are alleged upon personal knowledge. Lead Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation, review and analysis of: (i) regulatory filings made by Fluidigm Corporation ("Fluidigm" or the "Company") with the U.S. Securities and Exchange Commission ("SEC"); (ii) press releases, news articles, and other public statements issued by or concerning Fluidigm and the Individual Defendants (defined below); (iii) transcripts of investor calls with Fluidigm senior management; (iv) analysts' reports and advisories about the Company; (v) interviews with former employees of the Company; and (vi) other publicly available information. Counsel's investigation into the factual allegations contained herein is continuing, and many of the facts supporting those allegations are known only to Defendants (defined below) and are exclusively within their custody or control. Lead Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE AND SUMMARY OF THE ACTION

1.      Lead Plaintiff brings this federal securities class action on behalf himself and a class consisting of all persons and entities that purchased or otherwise acquired Fluidigm securities between February 7, 2019 and November 5, 2019, inclusive (the "Class Period") against Fluidigm and certain of its senior officers. Lead Plaintiff brings this action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5 promulgated thereunder.

2.      Fluidigm manufactures and markets products and services that are used by researchers to study health and disease, identify biomarkers, and accelerate the development of therapies. The Company uses proprietary CyTOF and microfluidics technologies to develop its end-to-end solutions.

3.      Leading up to the Class Period, the Company's older microfluidics segment was faltering, and the Company was becoming increasingly dependent on revenues from the relatively newer mass cytometry segment. Unbeknownst to investors, Fluidigm's mass cytometry segment was also facing a plague of undisclosed material issues, and as a result, Defendants expected the mass cytometry revenues to decline.

4.     While touting increases in total revenue and mass cytometry revenue for 2018 and claiming to be "the global market leader" in imaging mass cytometry on February 7, 2019, the first day of the Class Period, Defendants knew, and failed to disclose, that 2019 mass cytometry sales revenues were going to suffer.

5.     As early as the third quarter of 2018, Fluidigm's Chief Executive Officer ("CEO"), defendant Stephen Christopher Linthwaite ("Linthwaite"), and Chief Financial Officer ("CFO"), defendant Vikram Jog ("Jog"), were told that sales forecasts for 2019 were unattainable.  The Company's mass cytometry products were over-priced; the marketing approach flawed; and a new competitor was cannibalizing sales and causing customers to pause in decision-making, resulting in longer sales cycles.  And yet, none of these known material adverse facts were disclosed to investors.

6.     On August 1, 2019, Fluidigm reported second quarter 2019 revenue of $28.2 million, well below analysts' expectations of $32 million, citing weaknesses in its microfluidics segment and weakness in sales in the Americas, including in the mass cytometry segment, purportedly due to "funding delays" that had pushed out a few sales.  Mass cytometry sales, while increasing year-over-year, increased by only 28%, a significant change from the previous four quarters which saw an average increase of 60%.

7.     On this news, Fluidigm's share price declined by $4.10 per share, or 33.74%, on heavier than usual trading volume, from a closing price on August 1, 2019 of $12.15, to close on August 2, 2019 at $8.05 per share.

8.     On November 5, 2019, after the market closed, the Company reported that third quarter 2019 revenue declined 8.5% year-over-year, primarily due to the loss of mass cytometry sales.

9.     On this news, Fluidigm's stock plummeted 50.88%, from a closing price of to $5.11 per share on November 5, 2019, to close at $2.51 per share on November 6, 2019, on unusually heavy trading volume.

10.     As alleged herein, as a result of Defendants' wrongful acts and omissions, and the precipitous share price decline in the market value of Fluidigm's securities, Lead Plaintiff and other Class (defined below) members have suffered and continue to suffer significant losses and damages.

AMENDED CLASS ACTION COMPLAINT

**JURISDICTION AND VENUE**

11.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

13.     Venue is proper in this District under Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Many of the acts and omissions that constitute the alleged violations of law, including the dissemination to the public of untrue statements of material facts, occurred in substantial part in this District.  In addition, the Company's principal executive offices are located in this District.

14.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

**PARTIES**

**Lead Plaintiff**

15.     Lead Plaintiff Kwok Kong purchased or otherwise acquired Fluidigm securities at artificially inflated prices during the Class Period, as set forth in his certification previously filed with the Court (ECF No. 21-1) and incorporated by reference herein, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

**Defendants**

16.     Defendant Fluidigm is incorporated under the laws of the state of Delaware with its principal executive offices located at 2 Tower Place, Suite 2000, South San Francisco, California 94080.  Shares of Fluidigm's common stock are traded on the NASDAQ exchange under the ticker symbol "FLDM."  Fluidigm describes itself as a "global company that improves life through comprehensive health insight" using CyTOF and microfluidics technologies to "create, manufacture,

AMENDED CLASS ACTION COMPLAINT

and market a range of products and services, including instruments, reagents and software that are used by researchers worldwide."

17.     Defendant Linthwaite has served as Fluidigm's President, CEO, and member of the Board of Directors since October 2016.  Linthwaite joined the Company in August 2016 as President and Chief Operating Officer.

18.     Defendant Jog has served as Fluidigm's CFO since February 2008.

19.     Linthwaite and Jog are sometimes referred to herein as the "Individual Defendants."

20.     Fluidigm and the Individual Defendants are referred to herein as "Defendants."

21.     The Individual Defendants, because of their positions within the Company, possessed the power and authority to control the contents of Fluidigm's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of the Company's SEC filings and press releases alleged herein to be false and/or misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with the Company, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### The Company and Its Business

22.     Fluidigm manufactures and markets products and services that are used by researchers to study health and disease, identify biomarkers, and accelerate the development of therapies.  The Company uses "proprietary CyTOF® and microfluidics technologies to develop innovative end-to-end solutions" for translational research and clinical research studies.

23.     The Company has two main categories of products and services: mass cytometry products and microfluidics (also known as genomics) products.  Both of these categories include sales of instruments and related software and sales of "consumables," as well as service-related income such as preventative maintenance plans and training.  Product revenue is recognized "at the point in time

when control of the goods passes to the customer and [the Company has] an enforceable right to payment" which generally occurs when the product is shipped or when it arrives to the customer.

24.     Fluidigm's microfluidics technologies enable "high-throughput molecular biomarker analysis, whether it be for the analysis of gene expression profiles, genotyping or library preparation in advance of gene sequencing" as well "single-cell genomic analysis." The Company offers several different sub-types of microfluidics instruments which are used for, *inter alia*, DNA sequencing, gene expression, and genotyping.

25.     Fluidigm's CyTOF mass cytometry systems "use a novel technological approach to enable single-cell researchers to dissect intracellular networks." These systems use "stable isotopes not normally found in biological systems to label antibodies and detect and quantify more than 100 different parameters per cell."

26.     During the Class Period, the Company offered three types of mass cytometry systems, or instruments: (i) Helios™; (ii) Hyperion™ Imaging System; and (iii) Hyperion™ Tissue Imager. The Helios system performs "high-parameter single-cell analysis using antibodies conjugated to metal isotopes." The Hyperion systems combine imaging capabilities with the CyTOF technology "to understand the composition of tissue microenvironments at a subcellular resolution."

27.     The "consumables" for both categories of instruments included, among other things, assays and reagents, products that examine chemicals and materials used in chemical reactions.

28.     The Company's products are mainly used to study data "to answer pressing questions about immune function across cancer, immunology, and immunotherapy." During the Class Period, Fluidigm's customers included academic research institutions, translational research and medicine centers, cancer centers, clinical research laboratories, and biopharmaceutical, biotechnology, and plant and animal research companies.

29.     The Company sells to markets globally, with the Americas being its largest market for the three years leading up to the Class Period. For 2018, total revenue received from customers in the Americas accounted for 48% of total revenue and the majority of the Company's long-lived assets were located within the United States, Singapore, and Canada. As of December 31, 2018, Fluidigm had 535

employees, with 190 in sales, technical support, and marketing; 103 in research and development; 107 in general and administrative; and, 135 in manufacturing.

**Fluidigm's Mass Cytometry Revenues Become Material as the Microfluidics Line Falters**

30.    Fluidigm was originally focused solely on microfluidics technologies, but in February 2014 acquired DVS Sciences, Inc. and its CyTOF technology.  Slowly, the mass cytometry line began to out-perform the older microfluidics technologies.  For 2016, microfluidics product revenue was $60.3 million compared to mass cytometry product revenue of $28.7 million.  For 2017, the balance was closer to 50/50 with microfluidics product revenue of $44.8 million and mass cytometry product revenue of $39.6 million.

31.    Furthermore, in the years leading up to the Class Period, Fluidigm began seeing decreasing microfluidics income which the Company attributed to increasing competition in the microfluidics market in 2016 with an overall decrease in microfluidics product sales by 19% compared to 2015.  In the first quarter of 2017, microfluidics product sales decreased 38% year-over-year.  This trend resulted in a strategic review and multiyear plan that shifted focus to the Company's relatively new mass cytometry products, as well as implementing an operational excellence plan and improvements to financial discipline and cost reductions.  One such "improvement" or cost reduction was the integration of commercial organization in late 2016, including merging the sales teams for microfluidics and mass cytometry.

32.    Although suffering the massive microfluidics income decrease and total revenue decrease of 12% compared to the first quarter of 2016, Fluidigm's mass cytometry revenues increased during the first quarter of 2017, in large part due to its new imaging technology with initial order fulfillments of the Hyperion system.  Throughout 2017 and 2018, the Company touted the robust adoption and strengthening of the mass cytometry line while continually presenting disappointing microfluidics results as can be seen in the following chart detailing product revenues:

AMENDED CLASS ACTION COMPLAINT

| Quarter | Mass Cytometry Revenues* (in millions) / Percent Change Year-over-year | Microfluidics Revenues (in millions) / Percent Change Year-over-year |
|---------|---------|---------|
| Q1 2017 | $9.9/39% | $11.4/(38%) |
| Q2 2017 | $8.6/9% | $10.9/(35%) |
| Q3 2017 | $10.3/102% | $10.3/(20%) |
| Q4 2017 | $10.8/26% | $12.3/(<1%) |
| Q1 2018 | $6.6/(33%) | $13.8/22% |
| Q2 2018 | $11.3/31% | $10.5/(3%) |
| Q3 2018 | $15.2/48% | $9.0/(12%) |
| Q4 2018 | $16.2/50% | $11/(11%) |

*Fluidigm initially provided only product revenue by market break-downs. Beginning in the first quarter of 2018, the market break-downs including both product revenue and total segment revenue comprised of instruments, consumables, and service revenues.  Only product revenues are listed here.

33.     Microfluidics sales continued to decline throughout the Class Period.   In fact, Confidential Witness ("CW") 1, a Marketing Specialist and Executive Assistant at the Company's corporate headquarters from December 2017 until September 2019, reporting to the Senior Vice President of Marketing, confirmed that Fluidigm was phasing out single-cell genomics (part of the microfluidics product line), stating that by March 2019, Franchise Director Mark Lynch was the only employee left from the genomics division amidst plummeting sales and that the consensus among executive leadership was that there was not enough genomics revenue to justify the salaries.

34.     CW2, an Associate Sales Director from March 2018 until September 2019 whose territories included Latin America and parts of the United States at varying times, reporting at first to the Chief Commercial Officer ("CCO") and then to the Sales Director, also noted the declining microfluidics revenue, attributing the issue to Fluidigm's outdated genotyping instrument which was "10 years old and very large" and could not compete with newer, sleeker, and less expensive models from competitors.  Thus, Fluidigm's future depended on its mass cytometry products.

**Defendants Knew the Mass Cytometry Segment was Plagued with Issues and Sales Slowing**

35.    Riding the increase in mass cytometry revenue due to the introduction of the Company's imaging products in early 2017, Defendants assured investors that such revenues would continue while knowing that the projected sales growth was faltering as early as the third quarter of 2018.

36.    CW3 served as Vice President of Commercial Operations at Fluidigm from November 2015 until June 2020 at the Company's headquarters, overseeing the sales division and all sales representatives in North America, as well as the marketing support services division.  CW3 was responsible for mass cytometry sales forecasts for North America with regular interaction with senior management, including the Individual Defendants.  CW3 produced updated sales forecasts at least monthly and participated in quarterly review meetings with senior management.

37.    CW3 detailed the sales forecasting process at Fluidigm.  The process began at least six months prior to the new year with sales representatives making their estimates, and each level of supervisor combining the forecasts, sometimes modifying them to meet Company goals.  The final combined forecast funneled through CW3 then went to the CCO.  CW3 continued to produce sales forecast reports throughout the year.

38.    CW3 was concerned about the 2019 sales early on and expressed such, stating, "I did not like my sales plan.  I disagreed with it 1000 percent."  CW3 stated that the 2019 sales forecast contained overly optimistic assumptions that were unattainable and during a quarterly business review meeting in the third quarter of 2018 presented a slide deck indicating such and explaining the reasoning.  The Individual Defendants were present at this meeting, as well as all other quarterly business review meetings, but no changes were made to the 2019 sales forecast.

39.    While Fluidigm did well the first quarter of 2019, CW3 was bracing for the anticipated sales drop off, and during the quarterly business review for the first quarter of 2019, which took place the third week of January 2019, adjusted the sales goals for the second quarter of 2019.  CW3 did this because there were increasing indications that the Company needed to lower the sales forecast for 2019.  CW3 believes there was pressure on employees to keep the original sales forecast despite the indications that sales would not be there, facing pressure to "find the business," noted CW3.  "If you

give up on the forecast at the beginning of the quarter, you're basically quitting or being asked to leave. It was unrealistic."

40.     With sales continuing to slip as CW3 knew they would by the third quarter of 2019, CW3 recalled going into a break-out room during the quarterly business review meeting with the CCO and finance department employees to develop "strategic pricing" that would allow CW3 to discount products for customers and move product without technically repricing product or using traditional marketing.

41.     Sales were lagging in 2019 for several reasons.  According to CW3, the Company's mass cytometry products were over-priced and the Company took too long to adjust.  "We were too high and that is not a secret.  By the time the company adjusted its price, maybe late 2019 or early 2020, it was too little, too late."  In addition, Fluidigm's products were specialized and required a marketing approach tailored specifically to emerging technologies, but the Company targeted the mainstream market instead.  CW3 stated:  "The technology had a strong positioning among early adopters, but the forecast plan, the sales plan, the language was all geared toward the mainstream market."  In addition, CW3 stated that there was significant new competition (*see infra*) and several "significant" deals fell apart.

42.     Defendants knew of these issues during the Class Period.  Defendant Linthwaite addressed his concerns with sales "all the time" in meetings CW3 participated in, specifically during the quarterly business review meetings.  According to CW3, defendant Linthwaite put pressure to "find the business," but failed to offer solutions to the day-to-day sales problems facing the Company. Defendants also knew of declining sales because CW3 provided regular sales updates throughout the quarter, usually every three weeks, which detailed the current number of orders in, how many the Company still needed to meet to its goals, which deals were being targeted and where they were in the sales process, what the date of the sales closing was, the probability of the sales closing, risk drivers, and any other mitigating factors.  *See also infra* Additional Scienter Allegations Section (discussing detailed reports).

43.     CW1 confirmed that all sales, not just microfluidics sales, were suffering in 2019, adding that the Individual Defendants discussed sales performance, and how it was falling short, on a

weekly basis.  "We were not going to hit our goal and that was something commonly known among the leadership," according to CW1.  Indeed, CW1 noted that **throughout 2019**, a cap was set on travel expenses, executive meals, and other expenses to compensate for lagging sales.

44.     CW2 believed sales quotas were unrealistic and continually missed.  According to CW2, at forecasting meetings (which happened as often as weekly near quarter ends), on sales conference calls, and at in-person sales meetings held once a quarter, disappointing sales were discussed.

45.     Although Defendants denied competitive pressures in the mass cytometry line during the Class Period (*see, e.g.*, ¶ 79), several confidential witnesses affirmatively connected Fluidigm's 2019 revenue losses to competition.

46.     CW4 was employed with Fluidigm as a Field Application Scientist from July 2017 until July 2020, supporting both sales staff and customers on the technical use of Fluidigm products, as well as troubleshooting current customer problems that arose, and focusing on the mass cytometry line. CW4 stated that in 2019, a new mass cytometry competitor, Cytek Biosciences Inc. ("Cytek"), caused disruption in Fluidigm's sales, pursuing the same customers as Fluidigm and causing them to pause, unsure if Fluidigm's technology was still optimal.  "We had a lot of cautious customers" and it "lengthened our sales cycle," stated CW4.  Some of these customers postponed sales to Q4 2019 or Q1 2020, and other sales that had been counted on prior to Cytek's product launch never materialized according to CW4.  Notably, CW4 confirmed that the introduction of the Cytek product was something everyone at the Company knew about.

47.     CW5 was employed with Fluidigm from November 2015 until June 2018 as Vice President of Cellular Proteomics, and then as Director of Mass Cytometry Market (CW5's job title changed due to the Company's restructuring, but job responsibilities were the same throughout CW5's tenure), serving as the chief support for the sales department on cytometric technical expertise, as well as assisting the marketing department and the research and development department, and recruiting key opinion leaders to speak on the Company's behalf.  CW5 also remarked on the wide-spread knowledge of Cytek's emerging competitive product due to the fact that at least twenty Fluidigm employees, including defendant Linthwaite, attended the June 2017 CYTO conference in Boston where the product was officially debuted.

48.     CW5 further explained that the Company's mass cytometry products were new technology, abandoning the industry use of florescent dye and instead using plasma to analyze cells, requiring customer education and persuasion on the merits of the technology, which sometimes made it difficult for sales.  Cytek's technology, on the other hand, used the industry known and accepted florescent technology, but improved on it.

49.     In fact, on December 20, 2018, Cytek announced that it had "shipped 100 of its advanced flow cytometry systems."  Less than one year later, while Fluidigm's mass cytometry sales were declining, on November 1, 2019, Cytek stated that "its advanced flow cytometry systems have been purchased by scientists in over 20 countries across five continents.  Additionally, robust global sales have led Cytek to expand operations in order to keep up with demand: the company has new offices in Tokyo and Amsterdam . . . ."

50.     CW3 also listed as one of the reasons for Fluidigm's 2019 sales decline significant new competition in the mass cytometry business, specifically in North America, stating that Cytek was one of the Company's new competitors.

51.     Defendants knowingly omitted all of the above-described material adverse issues with the Company's mass cytometry business line and 2019 sales projections in communications with investors, instead issuing the below materially false and/or misleading statements to investors.

**Materially False and/or Misleading Statements and Omissions Issued During the Class Period**

Fourth Quarter and Year End 2018

52.     On February 7, 2019, the first day of the Class Period, Fluidigm issued a press release, attached as Exhibit 99.1 to a Form 8-K filed with the SEC, titled "Fluidigm Announces Fourth Quarter and Full Year 2018 Financial Results," announcing the Company's financial results for the quarter and year ended December 31, 2018 (the "February 2019 Press Release").  The February 2019 Press Release stated in relevant part:

**Financial Highlights**

*Fourth Quarter 2018*

- Total revenue increased 17 percent to $32.3 million from $27.7 million in the fourth quarter of 2017, with mass cytometry revenue growth of 48 percent compared to the year ago period.

- GAAP [generally accepted accounting principles] net loss was $14.8 million, compared with a GAAP net loss of $10.5 million for the fourth quarter of 2017. GAAP net loss was higher in the fourth quarter of 2018 primarily due to non-cash interest associated with the convertible debt exchange in 2018 and the impact of a favorable litigation settlement in the fourth quarter of 2017.

- Non-GAAP net loss was $2.4 million, compared with a $3.0 million non-GAAP net loss for the fourth quarter of 2017.

*Full Year 2018*

- Total revenue increased 11 percent to $113.0 million from $101.9 million in full year 2017.

- GAAP net loss was $59.0 million, compared with a GAAP net loss of $60.5 million for the full year 2017.

- Non-GAAP net loss was $20.7 million, compared with a $30.2 million non-GAAP net loss for the full year 2017.

\*      \*      \*

"For the full year, we achieved double-digit revenue growth, ***expanding our markets and building recurring revenue through new content and partnerships***.[1]   Financial discipline has been an important pillar and we have strengthened our balance sheet this year through a convertible debt exchange and our recent equity offering. ***We are well-positioned to support accelerating growth in 2019*** as we execute on a multi-omic-based strategy to provide meaningful insights in health and disease."

\*      \*      \*

**Fourth Quarter 2018 Results**

\*      \*      \*

*Revenue by market:*

- Mass cytometry revenue, comprising instruments, consumables, and service, increased 48 percent to $19.1 million from $12.9 million in the prior year period. Mass cytometry product revenue increased 50 percent to $16.2 million from $10.8 million in the prior year.

- Microfluidics revenue, comprising instruments, consumables, and service, decreased 11 percent to $13.2 million from $14.8 million in the prior year period. Microfluidics product revenue decreased 11 percent to $11.0 million from $12.3

---

[1]  Unless otherwise noted, all emphasis is added.

AMENDED CLASS ACTION COMPLAINT

million in the prior year period due to lower sales of instruments, offset by consumables growth.

\*     \*     \*

**Full Year 2018 Results**

\*     \*     \*

*Revenue by market:*

- Mass cytometry revenue, comprising instruments, consumables, and service, increased 27 percent to $59.6 million from $46.8 million in the prior year period. Mass cytometry product revenue increased 25 percent to $49.3 million from $39.6 million in the prior year.

- Microfluidics revenue, comprising instruments, consumables, and service, decreased 3 percent to $53.4 million from $55.2 million in the prior year period. Microfluidics product revenue decreased 1 percent to $44.3 million from $44.8 million in the prior year period due to lower sales of single-cell microfluidics products and high throughput instruments, partially offset by a strong increase in sales of consumables.

\*     \*     \*

**First Quarter 2019 Guidance**

- ***Total revenue of $28 million to $31 million.***

- GAAP operating expenses of $29.5 million to $30.5 million.

- Non-GAAP operating expenses of $26.5 million to $27.5 million excluding stock-based compensation and depreciation and amortization expenses of approximately $2 million and $1 million, respectively.

- Total cash outflow of $20 million to $22 million, including total annual incentive compensation and retention bonus payments of $10.8 million, and a semi-annual interest payment of $2.8 million.

53.     That same day, Defendants held an earnings conference call during which the Individual Defendants reiterated the financial results for the quarter and year ended December 31, 2018, as well as the 2019 financial projections.  The Individual Defendants both touted the Company's revenue growth, stating that 19% was attributable to the Americas.  Defendant Linthwaite also stated, in relevant part:

As you will recall, we made significant changes in our sales organization during a tumultuous 2017.  Entering 2018, we signaled growing conviction around the new team and strategy, and they delivered results.

***Furthermore, our sales funnel health augers well for 2019 as more translational research centers seek transformative technologies.***

\*       \*       \*

***With over 50 commercial-grade Imaging Mass Cytometry systems sold, we are clearly the global market leader in this emerging field.  Our commercially-proven instrument, in contrast with the marketing claims of other potential market entrants, provide extraordinarily high quality and real images.***

54.     Defendant Jog provided the following guidance:

And now on to guidance for the first quarter of 2018 – '19.  ***Total revenue is projected to be between $28 million and $31 million.***  GAAP operating expenses are projected to be $29.5 million to $30.5 million.  Non-GAAP operating expenses are projected to be $26.5 million to $27.5 million excluding stock-based compensation of approximately $2 million and depreciation and amortization expense of approximately $1 million.

55.     Defendant Linthwaite also commented on revenues for 2019, stating, in relevant part:

***We entered 2019 -- or we enter 2019 with a solid backlog and exciting funnel of sales opportunities across academic, translational research, CROs and cancer centers.  There's ample headroom for growth across all of our lines of business, including mass cytometry*** where, for the third consecutive quarter, placements at new accounts represent about 2/3 of total unit sales in the period.

***We are a major market participant in powering immunome research via multi-omic platforms, including Helios***, Juno, Access Array, C1 and BioMark.  ***We are the clear market leader in multiplexed image analysis of tissue via Hyperion.***

56.     When questioned on placement of mass cytometry instruments with new versus existing customers, defendant Linthwaite responded:

Yes. ***I think the simplest answer is we're continuing – we're seeing a continuation of the 3-quarter trend in which we are continuing to recruit new customers to the technology base and there's not a material shift in the kind of forward-looking funnel as it relates to that mix.***  We really talked about relatively small numbers here so the percentages could shift from period to period, ***but the overall trend has been quite consistent.***  And it's extremely encouraging.  I think this kind of continues to reinforce our hypothesis that we're a -- we have a relatively small market share in a very large market that's got tremendous opportunity.  And it's probably expanding on 2 vectors, both the absolute out-of-the-market growth opportunities expanding as well as the total addressable market for us.

57.     Paul Knight, an analyst with Janney Montgomery Scott LLC, asked of defendant Linthwaite, "could you talk to the level of backlog build, nature of backlog as it – as you wrapped up the quarter?"  Defendant Linthwaite responded:

> We did not address that question or that topic specifically on our prepared remarks, ***but I can assure you that this was not a situation which we burn backlog.  Really, we feel very comfortable with what we're setting up to come into the year.***  And were just -- we have certainly strong growth throughout the back half of the year in general.
>
> And we talked about at the very beginning of the year of -- entering 2018 that we thought it was maybe a back end-loaded story.  ***We can see the opportunities building in the pipeline*** and we had a really good -- we did a really nice job in the back half of 2018 in turning those opportunities into sales.  And we didn't have to do it.  We've continued to add to the overall -- I think the volume, the breadth and the quality and the depth of the funnel.  So as we've kind of shared in the prepared comments, we're seeing around the world, multiple geographies, it's not a one-segment story.  We're seeing some more industrial players come online now.  We added an additional cancer center in the United States during the period although we didn't talk about that in the highlights.  So we're really pleased about the progress we're making.

58.     In the February 2019 Press Release and during the conference call, Defendants assured investors that mass cytometry revenues were growing and that for 2019 there was "a solid backlog" and no "material shift in the kind of forward-looking funnel."   In reality, Defendants knew that the 2019 mass cytometry sales forecast was unattainable, that sales were softening because Fluidigm's products were over-priced, and that Cytek's introduction of a competing product using technology customers were more comfortable with would lead to both a loss of sales and lengthening of sales cycles.

59.     Fluidigm filed its 2018 annual report on Form 10-K with the SEC on March 8, 2019 (the "2018 10-K").  The 2018 10-K was signed by the Individual Defendants and affirmed the previously reported financial results.  Additionally, the 2018 10-K included materially false and misleading risk factors.  The risk factors failed to account for the specific knowledge the Defendants had at that time regarding Fluidigm's 2019 mass cytometry revenues and that they had been told they were unattainable.  Instead, the risk factors were merely generalized boilerplate laundry lists of numerous issues that "could" occur when in fact several of those issues were already occurring – the risks were not a possibility but a reality.

60.     Under the "Risk Factors" section, 2018 10-K provided, in relevant part:

**Our financial results and revenue growth rates have varied significantly from quarter-to-quarter and year-to-year due to a number of factors, and a significant variance in our operating results or rates of growth, if any, could lead to substantial volatility in our stock price.**

. . . We are also increasingly dependent on our mass cytometry business, which is very capital intensive.  Variability in our quarterly or annual results of operations, mix of product revenue, including any decline in our mass cytometry revenue, or variability in rates of revenue growth, if any, may lead to volatility in our stock price as research analysts and investors respond to these fluctuations.  ***These fluctuations are due to numerous factors that are difficult to forecast, including:  fluctuations in demand for our products; changes in customer budget cycles and capital spending; seasonal variations in customer operations; tendencies among some customers to defer purchase decisions to the end of the quarter; the large unit value of our systems, particularly our proteomics systems; changes in our pricing and sales policies or the pricing and sales policies of our competitors; our ability to design, manufacture, market, sell, and deliver products to our customers in a timely and cost-effective manner; fluctuations or reductions in revenue from sales of legacy instruments that may have contributed significant revenue in prior periods; quality control or yield problems in our manufacturing operations; our ability to timely obtain adequate quantities of the materials or components used in our products, which in certain cases are purchased through sole and single source suppliers; new product introductions and enhancements by us and our competitors; unanticipated increases in costs or expenses; our complex, variable and, at times, lengthy sales cycle; global economic conditions; and fluctuations in foreign currency exchange rates.  Additionally, we have certain customers who have historically placed large orders in multiple quarters during a calendar year.  A significant reduction in orders from one or more of these customers could adversely affect our revenue and operating results, and if these customers defer or cancel purchases or otherwise alter their purchasing patterns, our financial results and actual results of operations could be significantly impacted.  Other unknown or unpredictable factors also could harm our results.***

*       *       *

**The life science markets are highly competitive and subject to rapid technological change, and we may not be able to successfully compete.**

. . . ***For example, companies such as 10X Genomics, Inc., Affymetrix, Inc. (now part of Thermo Fisher Scientific Inc.), Agena Bioscience, Inc., Agilent Technologies, Inc., Becton, Dickinson and Company, Bio-Rad Laboratories, Inc., Cellular Research, Inc. (now a part of Becton, Dickinson and Company), Danaher Corporation, Illumina, Inc., Life Technologies Corporation (now part of Thermo Fisher Scientific Inc.), LGC Limited, Luminex Corporation, Millipore Corporation, NanoString Technologies, Inc., PerkinElmer, Inc. (through its acquisition of Caliper Life Sciences, Inc.), RainDance Technologies, Inc. (acquisition by Bio-Rad Laboratories, Inc. pending), Roche Diagnostics Corporation, Sony Corporation, Thermo Fisher Scientific Inc., WaferGen Bio-systems, Inc., Cytek Biosciences, Inc.,***

*Akoya Biosciences, Inc., Innova Biosciences Ltd., QIAGEN N.V., 1CellBio, Inc., Berkeley Lights, Inc., and Mission Bio, Inc. have products that compete in certain segments of the market in which we sell our products.*  In addition, we have experienced increased competition in the single-cell genomics market, including new product releases from 10X Genomics, Inc. and WaferGen Bio-systems, Inc., as well as the acquisition of Cellular Research by Becton Dickinson and Company and an announced exclusive partnership between Illumina, Inc. and Bio-Rad Laboratories, Inc.  In addition, due to the release of our Hyperion imaging mass cytometry system, we now are exposed to competition from companies offering imaging-based systems, specialized reagents and/or services including Carl Zeiss Inc., Leica Biosystems, Nikon Corporation, Olympus America Inc., Roche Diagnostics Corporation, PerkinElmer, Inc., Agilent Technologies, Inc., IonPath Inc., Zellwerk GmbH, Bruker Corporation, Shimadzu Corporation, NanoString Technologies, Inc., and Neogenomics (Multiomyx).

First Quarter 2019

61.    On May 2, 2019, Fluidigm announced its first quarter 2019 earnings results in a press release titled, "Fluidigm Announces First Quarter 2019 Financial Results" (the "May 2019 Press Release"), attached as Exhibit 99.1 to a Form 8-K filed with the SEC.  The May 2019 Press Release stated, in relevant part:

**Financial Highlights**

*First Quarter 2019*

- Total revenue increased 19 percent to $30.1 million from $25.2 million in the first quarter of 2018, with mass cytometry revenue growth of 110 percent compared to the year ago period.

- GAAP net loss was $25.5 million, compared with a GAAP net loss of $13.2 million for the first quarter of 2018.  GAAP net loss was higher in the first quarter of 2019 primarily due to a loss of $9.0 million associated with extinguishment of $150 million principal value of convertible debt, as well as higher employee-related and business development expenses.

- Non-GAAP net loss was $8.2 million, compared with a $6.3 million non-GAAP net loss for the first quarter of 2018.

"Demand for Helios™ and Hyperion™ Imaging Systems was exceptional. In addition, the quarter featured new product innovation and movement to a stronger balance sheet," said Chris Linthwaite, President and CEO.

\*      \*      \*

*Revenue by market:*

- Mass cytometry revenue increased 110 percent to $18.8 million from $9.0 million in the prior year period.  Mass cytometry product revenue increased 134 percent

17                     Case No. 4:20-cv-06617-PJH

to $15.5 million from $6.6 million in the prior year due to higher sales of instruments and consumables.

- Microfluidics revenue decreased 30 percent to $11.4 million from $16.3 million in the prior year period.  Microfluidics product revenue decreased 32 percent to $9.4 million from $13.9 million in the prior year period due to lower sales of instruments and consumables.

*       *       *

**Second Quarter 2019 Guidance**

- ***Total revenue of $28 million to $31 million***.

- GAAP operating expenses of $29.5 million to $30.5 million.

- Non-GAAP operating expenses of $25.5 million to $26.5 million excluding stock-based compensation, including severance and depreciation and amortization expenses of approximately $3 million and $1 million, respectively.

- Total cash outflow of $4 million to $6 million.

62.    Defendants also held an earnings conference call for the first quarter 2019 financial results on May 2, 2019.  The Individual Defendants reiterated the financial results for the quarter ended March 31, 2019, as well as the second quarter 2019 financial projections.  Defendant Linthwaite stressed growth in the mass cytometry business, stating, in relevant part:

*We extended our streak of consecutive double-digit growth quarters to 4.  Mass cytometry adoption continues at a brisk pace, including an uptick in new customer adoption of the technology.*  Our customers are publishing new findings in leading peer-reviewed journals with a notable shift to translational- and clinical-oriented publications.  *We invested in innovation to sustain our competitive advantage.*  We significantly deleveraged the company balance sheet, reducing our debt obligations by 75% or $150 million while creating enhanced liquidity for stockholders.

*       *       *

*Shifting to the Americas.  The region delivered 20% growth.  Building on a now-familiar narrative, we had a strong quarter with mass cytometry systems leading the way.*

*       *       *

*We are a major market participant empowering immunome research via our multi-omic platforms.  We are the clear market leader in multiplexed image analysis of tissue via Hyperion, and we are demonstrating global adoption with a focus on translational and clinical research.  We continue to make great progress on our operational and*

*quality initiatives.*  We integrated our quality systems across 3 locations and began deployment of a leading-edge digital tool.  We passed a rigorous external audit with no adverse findings or deficiencies.

63.    Defendant Jog provided details on the guidance for the second quarter of 2019:

And finally, moving on to guidance for the second quarter of 2019.  ***Total revenue is projected to be between $28 million and $31 million.***  GAAP operating expenses are projected to be $29.5 million to $30.5 million.  Non-GAAP operating expenses are projected to be $25.5 million to $26.5 million, excluding stock-based compensation of approximately $3 million and depreciation and amortization expense of approximately $1 million.  Total cash outflow is projected to be between $4 million to $6 million.

64.    When questioned about the second quarter 2019 guidance, both of the Individual Defendants avoided and/or vaguely answered:

**Adam Joseph Wieschhaus Cowen and Company, LLC, Research Division – Associate**

This is Adam on for Doug.  We can get to the high end of your Q2 revenue guidance by simply setting instrument placements flat sequentially and full throughout the midpoint of the range.  So acknowledging that you don't provide placement guidance numbers, can you directionally or qualitatively frame how you expect the mass cytometry and genomics instrument segments to perform in Q2 relative to last quarter?

**Stephen Christopher Linthwaite Fluidigm Corporation - President, CEO & Director**

Well, Adam, thank you very much for the question. First off, so I think -- I have to think about that, I think as far as the mass cytometry instrument placements are concerned, as you said, we have not been giving kind of broken-down guidance as it relates to specific unit placements nor mix related to that.  As you well know, there's a significant -- there can be a bit of sensitivity related to the mix and ASPs related to the mix in which [they -- we place.]  So I think at this time, I just kind of wouldn't provide any additional color as it relates to the specific number of instrument placements over the period.

**Vikram Jog Fluidigm Corporation - CFO & Principal Accounting Officer**

Maybe, Adam -- hi, this is Vikram.  I think something to note, not specifically responding to your question on instruments per se, but we did make a statement about the mass cytometry consumables issue that we experienced in Q1 that should normalize in Q2. And then likewise, we talked about a blip in Europe in microfluidics consumables, which would also come back into more normal conditions.  So perhaps that might give you additional color as to the mix of revenues that we're expecting in Q2 should be slightly less instrument focused than it was in Q1.

65.    Later on, another analyst pressed the Individual Defendants on the same issue, with both of them denying any "sequential decline" in sales, as follows:

AMENDED CLASS ACTION COMPLAINT

**Sung Ji Nam BTIG, LLC, Research Division - Director**

Maybe kind of a different way to ask Adam's question earlier. *If you look at your second quarter guidance at the midpoint, it kind of implies a sequential decline.* And you talked about -- and there are a lot of moving pieces here, but you talked about mass cytometry consumable improvement and then also the EU microfluidics consumable should also normalize, et cetera. So I was curious as to kind of what's underlying that assumption of a sequential slight decline? Is that also due to the more [accounting] comp in Japan?

**Stephen Christopher Linthwaite Fluidigm Corporation - President, CEO & Director**

Well, we did signal as you said. I mean, Japan was a very strong period -- or a very strong quarter for us. It was a strong instrument placement quarter also in Japan in the first quarter, and there's no reason to anticipate -- generally second quarter is the weakest quarter of the year and will pull down the APAC number. So thus we had an inversion of particular cycle in which APAC exceeded EMEA in total sales for the first time for us, which is great, but it's not likely to be sustained in the near term. I think that's the short answer. I think there's a mix in the instruments. *There's no reason necessarily. We still have instrument placements that could be lumpy from cycle to cycle, but I think I understand that kind of root of your real question.*

**Vikram Jog Fluidigm Corporation - CFO & Principal Accounting Officer**

Yes, so Sung Ji, this is Vikram. Our guidance for Q1 was $28 million to $31 million, so the midpoint was $29.5 million and we came in at $30.1 million. So I think the numbers between the midpoint that would signal the decline, I think, are so small within the ASP of one instrument or even less. *So I wouldn't over-interpret the guidance as to signal a decline.* It's, I think, within the margin position that we can have given our mix of products and the relative ASPs.

**Stephen Christopher Linthwaite Fluidigm Corporation - President, CEO & Director**

That's one of the areas we stayed pretty disciplined on, was maintaining this kind of $3 million swing for the very reasons that Vikram highlighted. And so I could imagine if you deconstruct it, you could see -- would reach kind of some of the conclusions we are reaching, but again, *I'll fundamentally reassert what we said, we see strong and steady demand. We don't really reveal backlog numbers, but we continue to see very strong demand for our instruments.* And on the consumable side, we see no reason why the trend lines won't continue to revert back towards the norm. With the caveats, what we described with perhaps on the mass cytometry side, we've seen some impact from this significant introduction or wave of new to the technology users.

66.     An analyst with UBS Investment Bank asked for "color regarding Hyperion versus Helios" to which defendant Jog respond that the Company does not provide such, continuing to state:

But I'll point you to the information we provided at the beginning of the year relative to our installed base where we had talked about an installed base in mass cytometry of 240 systems, of which over 50 had been enabled with imaging capabilities. So rough order of magnitude, it's in the just over 1/5 of our systems have been enabled with imaging capabilities. *And we continue to be very encouraged by the demand that we've seen for imaging in Q1, and we would expect to get periodic updates on the lines of the information we provided at the beginning of the year.*

67.     In reporting the first quarter 2019 results and second quarter 2019 projections, Defendants again omitted the then-known issues plaguing Fluidigm's mass cytometry segment, claiming "strong and steady demand." Defendant Linthwaite stated that Fluidigm was a "major market participant" and "clear market leader" while knowing that Cytek's product was preferred by customers and causing, among other things, lengthening of the sales cycle. Analysts were concerned by the second quarter 2019 projections, but instead of disclosing the material adverse facts, the Individual Defendants denied any decline in sales.

68.     On May 7, 2019, Fluidigm filed its quarterly report for the period ending March 31, 2019 on Form 10-Q with the SEC (the "1Q19 10-Q"), signed by the Individual Defendants and affirming the information provided in the May 2019 Press Release and accompanying earnings conference call. The 1Q19 10-Q included identical statements regarding the "Risk Factors" as the 2018 10-K (*see* ¶¶ 59-60 above).

69.     The statements in ¶¶ 52-68 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors that: (i) the Company's mass cytometry sales were slowing down in several aspects; (ii) the Company's mass cytometry products were over-priced; (iii) the Company's mass cytometry marketing approach was flawed; (iv) a new competitor in mass cytometry was cannibalizing Fluidigm's sales; (v) as a result, Fluidigm was experiencing longer mass cytometry sales cycles; (vi) as a result, several sales were delayed and/or fell through,; (vii) as a result, the Company's mass cytometry revenue were declining; (viii) as a result, the sales forecasts and guidance for mass cytometry revenues during the Class Period were materially inaccurate; and, (ix) as a result of the foregoing, Defendants' positive statements about Fluidigm's business, operations, and prospects were materially misleading and/or lack a reasonable basis.

<u>Second Quarter 2019</u>

70.     On August 1, 2019, after the market closed, Fluidigm issued a press release, attached as Exhibit 99.1 to a Form 8-K filed with the SEC, announcing the Company's financial results for the quarter ended June 30, 2019, titled "Fluidigm Announces Second Quarter 2019 Financial Results" (the "August 2019 Press Release").[2]  It was revealed that second quarter 2019 revenue was only $28.2 million, well below analysts' expectations of $32 million.  The August 2019 Press Release stated, in relevant part:

**Financial Highlights**

*Second Quarter 2019*

- Total revenue increased 7 percent to $28.2 million from $26.4 million in the second quarter of 2018, with mass cytometry revenue growth of 28 percent compared to the year ago period.

- GAAP net loss was $13.8 million, compared with a GAAP net loss of $16.2 million for the second quarter of 2018.

- Non-GAAP net loss was $7.1 million, compared with a $6.8 million non-GAAP net loss for the second quarter of 2018.

\*          \*          \*

*Revenue by market*:

- Mass cytometry revenue increased 28 percent to $17.5 million from $13.7 million in the prior year period.  Mass cytometry product revenue increased 28 percent to $14.4 million from $11.3 million in the prior year due to higher sales of both instruments and consumables.

- Microfluidics revenue decreased 16 percent to $10.7 million from $12.8 million in the prior year period.  Microfluidics product revenue decreased 16 percent to $8.9 million from $10.5 million in the prior year period due to lower sales of both instruments and consumables.

\*          \*          \*

**Third Quarter 2019 Guidance**

- ***Total revenue of $27 million to $30 million***.

---

[2]  This press release was corrected and released again on August 2, 2019, "to correct a typographical error."

- GAAP operating expenses of $30 million to $31 million.

- Non-GAAP operating expenses of $26 million to $27 million excluding stock-based compensation, and depreciation and amortization expenses of approximately $3.5 million and $1 million, respectively.

- Total cash outflow of $7 million to $9 million.

71.     Defendants also participated in an earnings conference call on August 1, 2019, reiterating the financial results from the August 2019 Press Release, as well as adding color to the surprisingly low revenue, while continuing to make materially false and/or misleading statements and omitting material adverse facts.

72.     Defendant Linthwaite stated that "*[m]ass cytometry adoption is robust*" although purportedly "[t]he Americas lagged other regions in mass cytometry primarily due to timing of orders." Defendant Linthwaite added, in relevant part:

> *Clearly, mass cytometry is thriving*, but our efforts to generate new growth in microfluidics has so far been insufficient to offset legacy customer dynamics.
>
> *       *       *
>
> Finally, the Americas declined 11%.  *Speaking plainly, we were surprised and disappointed by this performance.*  We have focused our management attention and energy in this area.  The key takeaway is we do not see a structural problem, and microfluidics is the challenged area. *A few mass cytometry systems pushed out into the second half of the year, some linked to funding delays, but that funnel is, on the whole, very deep.*  Our microfluidics business was weak, but the drivers were not new.  The RNA-seq product configuration is a great fit for the larger genomics cores, which could include new Juno placements.

73.     Defendant Jog also purported to explain the revenue miss, stating, in relevant part:

> The Americas declined 11%, driven by mass cytometry instruments and weakness in microfluidics, partially offset by mass cytometry consumables. *Notably, mass cytometry consumables pull-through was significantly higher than our overall guidance range of $73,000 to $78,000.  Mass cytometry instrument weakness this quarter was primarily due to funding delays and related extension of sales cycles.*

74.     Defendant Jog stated that guidance for the third quarter of 2019 was as follows:

> *Total revenue is projected to be between $27 million and $30 million.*  GAAP operating expenses are projected to be between $30 million and $31 million.  Non-GAAP operating expenses are projected to be $26 million to $27 million, excluding stock-based compensation of approximately $3.5 million and depreciation and amortization expense

of approximately $1 million.  Total cash outflow is projected to be between $7 million and $9 million, including a semi-annual interest payment of $700,000 and working capital investments to support revenue growth.

75.    Defendant Linthwaite touted Fluidigm's market position, stating, in relevant part:

As a major market participant in Immunome Research, we are advancing our core technology, building content and providing complete workflows with matched informatics.  **_We are the clear market leader in multiplexed cellular analysis and multiplexed image analysis of tissue with demonstrated global adoption and a focus on translational and clinical research.  Our innovations are complemented by an excellent operations and quality organization._**

\*        \*        \*

From a shareholder perspective, **_I remain confident that our mix of innovation, revenue growth, financial discipline and operational excellence will drive tremendous value in the second half of 2019 and beyond._**

76.    When asked about the "sales funnel" for the mass cytometry line, defendant Linthwaite once again touted its strength:

**Robert Amparo - UBS Investment Bank, Research Division**

This is Rob on for Dan.  I know you guys don't give a precise breakdown between Helios and Hyperion, but I was wondering if you could give us some directional commentary with how those are placed in the quarter?  And also if you could provide some color about the sales funnel and kind of what the indicators you can share with us.

**Stephen Christopher Linthwaite - Fluidigm Corporation - President, CEO & Director**

Yes.  So thanks, Rob.  **_So I mean I think one of the key things we've got to keep putting attention on is that the mass cytometry portfolio has done outstanding.  When you step back and look at the performance through the first half of the year, mass cytometry is doing north of 60%, 65% growth, I think it's 67% specifically, but it's north of 65% growth.  And we're seeing growth across both platforms.  They're almost moving relatively lockstep.  So we're seeing really tremendous sustained adoption for Helios._**  In particular, that driver relates to kind of things like our Maxpar Direct Immune Profiling Panel, which is doing extraordinarily well and is bringing new users to the platform.  We had one of our recent user talks.  We had a profile high-volume flow core that has now, I think, successfully increased their recruitment up until something north of 80-or-so principal investigators on that platform, and so they keep triggering new consumptions.  **_Overall, we're really pleased with how unit volume on both platforms has been moving up._**  Unfortunately, we don't break out the 2 for you.  So I think overall, that's kind of how the status is on units.

**_Now as far as the funnel looks like, it's been really strong._**  It's in all 3 geographies.  So as we continue to reinforce, I mean, we saw net growth in the first half through the Americas.  We saw net growth in all 3 regions.  We had extraordinary growth in APAC.

You remember last quarter, Greater China and Japan had just extraordinary eye-popping numbers in the first quarter -- correction, in the first quarter.  And in the second quarter, we had Europe that did extraordinarily well, and China continued to do very well, and we placed new units in Korea in addition*.  So our funnel continues to mirror that pattern.  We're seeing really strong global funnel development across both platforms, both imaging and suspension.*

77.     The Individual Defendants responded to a question regarding guidance for the third quarter of 2019 as follows:

**William Robert Quirk - Piper Jaffray Companies, Research Division - MD and Senior Research Analyst**

Vikram, I guess first question for you on guidance.  At the midpoint for the third quarter, you're forecasting $28.5 million.  The Street is a little over $4 million higher than that.  And I appreciate that you guys don't get – don't tend to guide beyond the quarter, *but that's a pretty big disconnect.  So help us understand, I guess I'm just struggling here with that disconnect.*  And appreciate that there's some order slippage and such, but can you elaborate here on kind of, I guess, when you guys think that you could get some of these orders that slipped into the quarter.  And if it's not the third, is it the fourth?  Again, help us get comfortable with that.

**Vikram Jog - Fluidigm Corporation - CFO & Principal Accounting Officer**

Yes.  I can start and maybe Chris can jump in here.  *So just to set things in perspective, Bill, we've had 5 quarters of revenue growth, including 4 quarters of double-digit revenue growth.  I would like to reiterate that the mass cytometry franchise has grown extremely strongly.  As Chris pointed out, even in this year, we've grown over 60% for the year-to-date period.  And we've grown strongly 28% in the most recent quarter.  So we are now crossing the chasm and engaging a new class of customers that are -- that have longer decision cycles.  So that is something that we have factored in.*  And on the other hand, mass microfluidics remains volatile, and we are conscious of the volatility of that particular product.

*I'd also like to point out that the issues that we are addressing are fairly localized. It's in the Americas.*  The other regions, Europe and EMEA, grew very strongly even in this quarter.  But regardless, I think from a quarter-over-quarter basis, things are harder to predict given our unit pricing of our instruments, *but we remain confident about the growth prospects for the business overall.*

**Stephen Christopher Linthwaite - Fluidigm Corporation - President, CEO & Director**

Yes.  I think, Vikram, you covered most of it.  The primary thing for Q3 is it's typically not a super large instrument placement cycle.  So given the swings in 1, 2 or 3 systems, that's solid.  I think you're really reflecting here, *I think we're seeing no real trend change in the mass cytometry business overall.  When we step back, we've got uncertainty related to end-of-year funding for the NIH, which will wrap up, as you*

***know, in September, end of September.***  And then we think Q4, given what's setting up right now, is going to be a very strong cycle for placements of instruments and order placements for overall based upon end of year money.

78.     While knowing prior to the beginning of the Class Period that the mass cytometry sales forecast was incorrect and that sales would decline due to pricing issues, marketing issues, and competition, Defendants feigned surprise at the occurrence.  Instead of coming clean about the known problems, Defendants instead represented that the issues were "localized" and temporary, laying the blame on customer funding approval.

79.     Defendant Linthwaite also denied any issues of competition in the mass cytometry line while knowing that Cytek was a main cause for Fluidigm's faltering sales and instead stating that customers were taking longer to receive funding:

**William Robert Quirk - Piper Jaffray Companies, Research Division - MD and Senior Research Analyst**

And Chris, is there anything going -- I don't think there is, but obviously, ***we do have a couple of new competitive entrants.  Is that causing your customer base to slow down their ordering patterns or the deal funnel just because they're simply kicking the tires on some of these alternatives?***

**Stephen Christopher Linthwaite - Fluidigm Corporation - President, CEO & Director**

As always, this is very hard in the fog of war to understand exactly what's happening. ***We've had tremendous instrument placement cycle with mass cytometry, 67% growth to the first half of the year.  These market entrants have been in place during that cycle and have been marketing their products.  So there's not a fundamental change in the overall competitive landscape as we see it right now.***

***So I don't -- I can't -- we can't say that there's many new competitors that are necessarily extending out the ordering cycle.  Our ordering cycle does tend to be 6 to 9 months, and that's been what our historic trends have been, and I think it's kind of -- and we're also seeing one of the changes from last year to this year, which I think is actually more -- perhaps contributing more than the mix or the -- those competitive dynamics, is the mix between new users to our technology and people who are buying incremental capacity.  New people and technology take a little bit longer typically in the ordering cycle in the -- from the first meeting until the close and getting them up and running.***  And we saw a shift, as Vikram summarized, to the first half.  We effectively saw about 2/3 of our instrument placements were new to the technology. I think that's fantastic.  I think that bodes exceptionally well for the setup for the business over the long term.  But in the near term, it could have some impact on the close cycle.

*        *        *

**Adam Joseph Wieschhaus - Cowen and Company, LLC, Research Division – Associate**

This is Adam Wieschhaus on for Doug.  I just want to clarify an earlier question about the mass cytometry instrument that are pushed out of Q2.  Do you expect those slipped Q2 orders will fall into Q3 or will take longer?  And are they contractually complete at this point or there's still risk they may not close?

**Stephen Christopher Linthwaite - Fluidigm Corporation - President, CEO & Director**

Adam, this is Chris.  *So I think the better way to characterize this, it's not many systems we're talking about.  The systems that were involved happen to be in government institutions, and so some of them are waiting for final funding, I think, from the NIH, as I suspect.*  So -- and they have options for operating funds that they can use in the fourth quarter.  So we see multiple shots on goal for how that may play out.  Whether it's Q3 or Q4, we're not certain, but they certainly signaled their intent to purchase this year.

80.     On this news, the Company's share price declined by $4.10 per share, or 33.74%, on heavier than usual trading volume, from a closing price on August 1, 2019 of $12.15, to close on August 2, 2019 at $8.05 per share.

81.     On August 7, 2019, Fluidigm filed its quarterly report for the period ending June 30, 2019 with the SEC (the "2Q19 10-Q"), signed by the Individual Defendants and affirming the information provided in the August 2019 Press Release and accompanying earnings conference call. The 2Q19 10-Q included identical statements regarding the "Risk Factors" as the 2018 10-K (*see* ¶¶ 59-60 above).

82.     Although Defendants focused on the microfluidics line in reporting the disappointing results in the second quarter of 2019, the decline in microfluidics year-over-year was actually one-half of the decline year-over-year in the first quarter of 2019 and roughly equivalent to the year-over-year declines in the last two quarters of 2018 (*see, e.g.*, ¶¶ 32, 61, 70).  Further, the decline in microfluidics revenues was in-line with repeated statements by Defendants during the Class Period and prior to regarding the state of the microfluidics business (*see* ¶¶ 31-32, 61, 72).  As stated above (*see* ¶¶ 30-34), due to the softening of the microfluidics segment, Fluidigm's main focus had shifted to mass cytometry, and tellingly, the increase in revenues for mass cytometry significantly changed from the previous four quarters which saw an average increase of 60%, something not lost on the analysts who attended the earnings conference call.

83.     The statements in ¶¶ 70-79 continued to be materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors:  (i) the true reasons for the slowing of mass cytometry sales; (ii) that the Company's mass cytometry products were over-priced; (iii) that the Company's mass cytometry marketing approach was flawed; (iv) that a new competitor in mass cytometry was cannibalizing Fluidigm's sales; (v) that as a result, Fluidigm was experiencing longer mass cytometry sales cycles; (vi) that as a result, several sales were delayed and/or fell through,; (vii) that as a result, the Company's mass cytometry revenue was reasonably likely to decline; (viii) that as a result, the sales forecasts and guidance for mass cytometry revenues during the Class Period were materially inaccurate; and, (ix) that, as a result of the foregoing, Defendants' positive statements about Fluidigm's business, operations, and prospects were materially misleading and/or lack a reasonable basis.

**Disclosures at the End of the Class Period**

84.     On November 5, 2019, after the market closed, Fluidigm issued a press release announcing its financial results for the quarter ended September 30, 2019, attached as Exhibit 99.1 to a Form 8-K filed with the SEC, titled "Fluidigm Announces Third Quarter 2019 Financial Results" (the "November 2019 Press Release").  The November 2019 Press Release disclosed, *inter alia*, that the Company's third quarter 2019 revenue had declined year-over-year, primarily due to mass cytometry instrument sales, stating, in relevant part:

**Financial Highlights**

- ***Third quarter revenue decreased 8.5 percent to $26.5 million from $29.0 million***, with consumables revenue growth of 11 percent, compared to the third quarter of 2018.

- Year-to-date total revenue increased 5 percent to $84.8 million, and mass cytometry revenue increased 28 percent to $51.8 million, compared to the same period in 2018.

- GAAP net loss for the quarter was $12.9 million, compared with a GAAP net loss of $14.8 million for the third quarter of 2018.

- Non-GAAP net loss was $6.2 million for the quarter, compared with a $5.2 million non-GAAP net loss for the third quarter of 2018.

"***Total revenue in the third quarter declined primarily due to mass cytometry instrument sales in the Americas***, partially offset by growth in mass cytometry and microfluidics consumables.  Double-digit recurring revenue growth from consumables and service, as well as disciplined financial management, were highlights for the quarter," said Chris Linthwaite, President and CEO.

\*        \*        \*

*Revenue by market:*

- ***Mass cytometry revenue decreased 13 percent to $15.6 million from $17.9 million in the prior year period.  Mass cytometry product revenue decreased 23 percent to $11.8 million from $15.2 million in the prior year primarily due to lower sales of instruments*** partially offset by higher sales of consumables.

- Microfluidics (MFLU) revenue decreased 2 percent to $10.9 million from $11.1 million in the prior year period.  Microfluidics product revenue decreased 1 percent to $8.9 million from $9.0 million in the prior year period primarily due to lower sales of instruments partially offset by higher sales of consumables.

*Total revenue by geographic area:*

| Geographic Area | Revenue by Geography | Year-over-Year Change | % of Total Revenue |
|---|---|---|---|
| Americas | $11.1 million | (19%) | 42% |
| EMEA | $9.1 million | 4% | 34% |
| Asia-Pacific | $6.3 million | (4%) | 24% |

85.     That same day, the Individual Defendants held an earnings conference call to discuss the third quarter 2019 financial results.  During the call, defendant Linthwaite confirmed that Fluidigm's third quarter revenue fell below the Company's guidance, stating, among other things, that "***suspension mass cytometry unit placements in Americas fell short of [the Company's] projections.***"

86.     Defendant Jog disclosed that the decline in mass cytometry revenue was "***due to lower instrument revenues primarily in the United States***" and that the Company "***continue[d] to experience delays in mass cytometry instrument orders in the third quarter, similar to the previous quarter primarily due to longer sales cycles.***"

87.     Tellingly, when asked about competition being a factor in the declining revenue, ***unlike prior Class Period statements***, defendant Linthwaite did not deny competition as a factor and instead deflected, stressing other factors:

**Sung Ji Nam BTIG, LLC, Research Division - Director and Life Science & Diagnostic Tools Analyst**

And then just on the mass cytometry side, you talked about from the suspension side of -- suspension platform, seeing delays in terms of purchasing decisions, et cetera. I was curious, ***are there any competitive dynamics at play, recognizing obviously there might not be direct competitors?*** Or are customers also taking longer to evaluate platforms, just given there are potentially other alternative options out there?

**Stephen Christopher Linthwaite Fluidigm Corporation - President, CEO & Director**

From a -- so the question obviously relates to suspension of the dynamics related to suspension. ***And I think as we kind of made a comment in our prepared remarks, we have seen a shift in the last few quarters in particular and more scrutiny of expenses***

***above or capital equipment investments above the $500,000 mark. I think as we've been reflecting on some of the other prints that are coming out, it seems to be there may be other analytical instrument providers, different categories, but kind of similar price points maybe seeing some similar dynamics overall in their placements. So I think we can attribute it more overall to the general higher scrutiny across all categories of spend in this area versus direct competitive influences.***

88.     On this news, the Company's stock dropped plummeted 50.88%, from a closing price of to $5.11 per share on November 5, 2019, to close at $2.51 per share on November 6, 2019, on unusually heavy trading volume. The price of the Company's common stock continued to decline over the next few days, falling another $0.18, to close at $2.33 on both November 8, 2019 and November 11, 2019, an overall drop of 54.4% from November 5, 2019 and ***80.82%*** from the first partial disclosure on August 1, 2019.

## POST-CLASS PERIOD EVENTS

89.     As discussed above, Fluidigm's mass cytometry segment was suffering throughout the Class Period due to several then-known but undisclosed material adverse facts. These adverse facts and issues with Fluidigm's mass cytometry business have resulted in significant continuing declines to the business.

90.     Revenue for the fourth quarter of 2019 was flat year-over-year and revenue for the full year only increased 4% compared to an 11% increase in 2018. Mass cytometry product revenue only increased 10% year-over-year whereas between Q2 2018  and Q2 2019, such quarterly increases were

AMENDED CLASS ACTION COMPLAINT

as follows: 31%, 48%, 50%, 134%, 28%, respectfully.  The full effect of the undisclosed issues played out in 2020 with mass cytometry product revenue decreasing year-over-year each quarter as follows: (26%), (28%)[3], (3%), and (24%).

## ADDITIONAL SCIENTER ALLEGATIONS

91.    As alleged herein, each of the Individual Defendants acted with scienter in that they knowingly or recklessly disregarded that the information disseminated to the public contained materially false and/or misleading information and omitted material adverse information.  Throughout the Class Period, the Individual Defendants acted intentionally or in such a deliberately reckless manner as to constitute a fraud upon Lead Plaintiff and the Class.  Such actions caused the price of Fluidigm securities to be artificially inflated.

92.    In their respective roles as CEO and CFO of Fluidigm, the Individual Defendants were able to, and did, control the information disseminated to the investing public in the Company's various SEC filings, press releases, and other public statements during the Class Period.  As a result, each had the opportunity to falsify the information provided to the public regarding Fluidigm's business and performance.

### The Individual Defendants' Admitted Knowledge and Hands-On Involvement in Fluidigm's "Core Operations" During the Class Period

93.    The false and misleading statements and omitted material adverse facts at issue herein were part of the Company's core operations – sales revenue and forecasts.  Leading up to and throughout the Class Period, Defendants admitted that the microfluidics business line was experiencing weakness (*see, e.g.*, ¶¶ 31-32, 61, 70, 72), making Fluidigm's emerging and increasing revenues in the relatively new mass cytometry business line top priority and of substantial import to the success of the Company, and to investors.  Consequently, Defendants' scienter concerning such core operations may be reasonably inferred based on such, in addition to the following considerations.

---

[3]  For the second and third quarters of 2020, Fluidigm only reported mass cytometry product and service revenue together, failing to break-out product revenue as it had previously done.  A direct comparison of the combined product and service revenue for 2018 and 2019 for those quarters are as follows:  for Q2 and Q3 2018, increases of 32% and 50%, respectively; and for Q2 and Q3 2019, and increase of 28% and decrease of 13% (the final corrective disclosure), respectively.

94.     During the Class Period, Fluidigm was a relatively small company.  As disclosed in the Company's 2018 10-K, "[a]s of December 31, 2018, [Fluidigm] had 535 employees, of which 103 work in research and development, 107 work in general and administrative, 135 work in manufacturing, and 190 work in sales, technical support, and marketing."

95.     Because the Individual Defendants were the CEO and CFO of the Company during the Class Period, they had day-to-day operational control over and thorough knowledge of these core operations.  Defendants Linthwaite and Jog repeatedly admitted to having knowledge of Fluidigm's "core operations," and specifically its mass cytometry sales and sales forecasts, during the Class Period in connection with SEC filings and investor calls.

96.     Beyond the prepared remarks given by the Individual Defendants at earnings conference calls during the Class Period, each provided detailed descriptions of the Company's product, sales, customers, and forecasts in answering analyst questions, making clear their intimate familiarity with these topics. *See, e.g.*, ¶¶ 64-65, 76-77, 79.  Additionally, for example, during the second quarter 2019 earnings conference call held on August 1, 2019, the following exchange occurred:

**Sung Ji Nam - BTIG, LLC, Research Division - Director and Life Science & Diagnostic Tools Analyst**

Okay. Great. And then lastly, Vikram, if I heard correctly, I think you cited a few of your key customers contributing to the microfluidics weakness this quarter.  Could you kind of provide more color in terms of what might be going on?  Do you think -- is that temporary?  Or are they switching to other types of strategies or platforms?  Or do you expect that kind of potentially to return back to growth in the outer quarters?

**Vikram Jog - Fluidigm Corporation - CFO & Principal Accounting Officer**

Yes.  Thanks for the question, Sung Ji.  As we've been saying for the last couple of quarters, our entire microfluidics business is dependent on a few number of very high throughput customers, and there's a bit of both going on.  There is migration to other technologies, but also, there's buying behavior.  And particularly in the European ag-bio sector, which we have referred to in previous quarters, there was some bulk buying in the year ago quarters and maybe 5 quarters ago as well.  And more recently, they have been reducing their inventories.  So I would say it's a bit of both.  And as Chris mentioned in his remarks, what we've been lacking in the microfluidic platform is a key value proposition and an application that would really address big markets, and the RNA-seq application that we just announced earlier today is one such application.  It's really the first milestone in the plan to rejuvenate the microfluidic business.  So that is part of the proposition here, to put new applications and recruit new key accounts to replace customers that are migrating to other technologies.

**Stephen Christopher Linthwaite - Fluidigm Corporation - President, CEO & Director**

Yes.  I like to just clarify just to touch on that point, just maybe to elaborate a little further.  So in the ag-bio space in which we have a significant presence, there is an interplay between real-time PCR and next-generation sequencing.  So it's true, this is a macro trend that's been going on with some migration to genotyping by sequencing.  Now we can pick up that business in our Juno platform with -- and control that migration.  And many people also use real-time PCR for then different crop sizes and different strategies in their breeding cycle.  So there can be some play back and forth between the 2.  And what we have -- the primary driver for us in the ag-bio space, though, has been the inventory buildup and then the workdown of that inventory.  By far and away, that's the primary driver for us in the ag-bio space, which is why it's been the most problematic probably for us to forecast the projections for that particular customer segment.  There really hasn't been, outside of that, any major technology switch.  There's only 1 account

that I'm aware of that has gone through a related technology, of which we can participate.  And in fact, I think we have a good position to claw back some of that business.  So it's more of a characterization that their business models have been relatively flat.  It hasn't been necessarily a transfer to another technology.  It's been the unpredictability of their – we've talked about their -- some of them are CROs.  And so their CRO business itself has been struggling rather than our technology itself.

97.     Furthermore, during the first quarter 2019 earnings conference call held on May 2, 2019, defendant Linthwaite explicitly stated that he had "traveled extensively in all of [the Company's] major regions over the past months," that he had "recently visited [Fluidigm's] team [in China] and a number of large customers," and had "visited a lot of new accounts [for mass cytometry] in the last 2 quarters."

98.     Last, although repeatedly denying competition as an issue throughout the entire Class Period, contrary to the reports by CWs that competitor Cytek was partially causing the mass cytometry sales revenue decline during the Class Period (*see* ¶¶ 46-50), the explicit change in the competition risk warning from the 2018 10-K to the 2019 10-K provides adequate support that the Defendants knew Cytek was a factor in Fluidigm's declining mass cytometry sales revenues during the Class Period.

99.     More specifically, the 2018 10-K and the 10-Qs issued during the Class Period, each contained a ***laundry list of over twenty-five companies***, including Cytek, who "have products that compete in certain segments of the market in which [the Company] sell[s] [its] products."  In sharp contrast, the 2019 10-K directly states that ***only Cytek and one other company*** "are currently [Fluidigm's] principal competitors in the mass cytometry markets. . . . "

**Internal Meetings and Reports**

100.    As discussed in ¶¶ 36-51 above, the Individual Defendants had access to, and reviewed, certain reports and were involved in regular Company meetings where they were updated on crucial information indicating that the statements made herein were materially false and/or misleading and omitted material adverse facts.

101.    More specifically, CW1, as part of CW1's executive assistant duties, attended weekly meetings with defendant Linthwaite and Jog, as well as other senior management, where during 2019, sales performance, and how it fell short of budgeted revenue was discussed.  According to CW1, the Company was not meeting its goals and all the executives were well aware of this due to these weekly meetings.

102.    CW2 confirmed CW1's statements regarding the Individual Defendants' knowledge of weakening sales revenue, stating: "Everyone was aware of it.  [Sales problems] were discussed every time we met."  The meetings CW2 referred to were sales team meetings and calls.  According to CW2, sales team conference calls occurred regularly, sometimes as often as weekly when the end of a quarter was drawing near, and which always included the CCO and sometimes defendant Jog.  In-person meetings were also held once per quarter at the Company headquarters and occasionally during industry conferences and were attended by the CCO and defendant Linthwaite.  CW2 stated that during all of the conference calls and in-person meetings, disappointing sales were discussed and brainstorming about how to improve sales took place.

103.    CW2 explained that sales opportunities, progress, and preference were tracked electronically on Salesforce and sales staff were expected to keep it regularly updated so that leadership could generate a report with the click of a button.  "We were always told to put things in right away," stated CW2.  The information from Salesforce was then discussed during the conference calls according to CW2.  CW2 further explained that the information in Salesforce also included reasons why any deal fell through and it was often because Fluidigm lost out to a competitor.

104.    CW6, Senior Vice President of Global Business Operations from 2016 until 2018, reporting to defendant Jog (and employed with Fluidigm in other positions for 17 years), supervised business operations planning and set up the systems described herein which CW6 believes were in

place during the Class Period.  CW6 stated that sales and potential deals were monitored closely by the executives using the system CW6 set up, which included quarterly business review meetings held the third week after a new quarter began that examined the sales in the channel in exacting detail.  Teams from Fluidigm's finance department, marketing department, sales departments, as well as senior leadership, including the Individual Defendants, went over "every win, every loss, every number."  CW6 explained that "[i]t was a rich data set."

105.    As discussed above at ¶¶ 36, 38-39, 42, CW3 confirmed that these quarterly business review meetings, attended by the Individual Defendants, continued during the Class Period.  CW3 even presented a slide deck at the third quarter 2018 quarterly business review meeting, which the Individual Defendants attended, explaining why the Company's 2019 sales forecast was unattainable, but the forecast was not adjusted.

106.    There were also other updated sales projections sent to executive leadership and senior management three times a quarter according to CW6.  These updated sales projections included information about the likelihood of sales closing and where each deal was in the sales process.  CW6 stated that if a deal was falling apart, that would be communicated in a "probability index" on that report.

**Corporate Scienter**

107.    The Individual Defendants were responsible for signing the financial statements, along with certain directors.  The Individual Defendants acted with apparent authority to speak on behalf of the Company and their statements were made with the imprimatur of the Company that selected them to speak on its behalf.  Moreover, as CEO and CFO, the Individual Defendants were highly involved in the preparation, review, finalization, and issuance of the Company's financial statements, and investors relied on their honesty and integrity.

108.    Based on the foregoing, the Individual Defendants' actions and scienter are imputable to Fluidigm at all times during the Class Period.  Each of the Individual Defendants acted as an agent of Fluidigm, both with respect to SEC filings they signed and also with respect to the SEC filings and earnings releases that they assisted in preparing and/or that they oversaw or participated in the

accounting for.  Therefore, the Individual Defendants' states of mind are imputable to Fluidigm for all of the challenged statements in this Complaint, whether or not they personally signed those statements.

## LOSS CAUSATION

109.    During the Class Period, as detailed herein, Defendants engaged in a fraudulent scheme to deceive the market that artificially inflated the price of Fluidigm securities and operated as a fraud or deceit on Class Period purchasers of Fluidigm securities.

110.    Defendants' materially false and/or misleading statements and omissions concealed, *inter alia*, Fluidigm's longer sales cycles due to the undisclosed issues detailed herein, resulting in declining revenue.  As detailed above, when the truth was revealed, the price of Fluidigm securities declined significantly as the prior artificial inflation was removed from the Company's stock price.

111.    As a result of their purchases of Fluidigm securities during the Class Period, at artificially inflated prices, Lead Plaintiff and the Class suffered damages under the federal securities laws.

112.    The artificial inflation created by Defendants' misrepresentations and omissions was partially removed when on August 1, 2019, the Company reported second quarter 2019 revenue of $28.2 million, well below analysts' expectations of $32 million, citing declining microfluidics revenue and declining mass cytometry revenue in the Americas.  *See* ¶¶ 6, 70-79.  Following this partial disclosure, Fluidigm's share price declined by $4.10 per share, or 33.74%, on heavier than usual trading volume, to close on August 2, 2019 at $8.05 per share.

113.    On November 5, 2019, the truth was fully revealed and the risk fully materialized when the Company disclosed that its third quarter 2019 total revenue had declined 8.5% year-over-year, primarily due to mass cytometry instrument sales.  *See* ¶¶ 8, 84-87.  This announcement caused Fluidigm's share price to decline $2.60, or 50.88%, on heavier than usual trading volume, to close on November 6, 2019 at $2.51 per share.  The price of the Company's common stock continued to decline over the next few days, falling another $0.18, to close at $2.33 on both November 8, 2019 and November 11, 2019, an overall drop of 54.4% from November 5, 2019 and ***80.82%*** from the first partial disclosure on August 1, 2019.

114.     The timing and magnitude of the price decline in Fluidigm's stock on the date of the disclosures above negates any inference that the losses suffered by Lead Plaintiff and the Class were caused by changed market conditions, macroeconomic or industry facts, or Company-specific facts unrelated to Defendants' fraudulent conduct.

115.     The damages suffered by Lead Plaintiff and the Class were the direct and proximate result of Defendants' materially false and misleading statements and omissions that artificially inflated the Company's stock price and the subsequent significant decline in the value of the Company's stock when the truth concerning Defendants' prior misrepresentations and fraudulent conduct were revealed.

## CLASS ACTION ALLEGATIONS

116.     Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons and entities that purchased or otherwise acquired Fluidigm securities between February 7, 2019 and November 5, 2019, inclusive, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

117.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Fluidigm securities were actively traded on the NASDAQ exchange.  As of March 13, 2019, Fluidigm had over 68.9 million shares of common stock issued and outstanding. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Fluidigm or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

118.     Lead Plaintiff's claims are typical of the claims of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

119.    Lead Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel competent and experienced in class and securities litigation. Lead Plaintiff has no interests antagonistic to or in conflict with those of the Class.

120.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made (or omissions) by Defendants to the investing public during the Class Period misrepresented (or omitted) material facts about the business, operations, and management of Fluidigm;

- whether Defendants acted knowingly or recklessly in issuing false and misleading statements (or omissions);

- whether the prices of Fluidigm securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

- to what extent the members of the Class have sustained damages and the proper measure of damages.

121.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in managing this action as a class action.

## PRESUMPTION OF RELIANCE; FRAUD-ON-THE-MARKET

122.    The market for Fluidigm's securities was open, well-developed, and efficient at all relevant times. As a result of Defendants' materially false and/or misleading statements and material omissions, Fluidigm stock traded at artificially inflated prices during the Class Period. On March 19, 2019, the Company's share price closed at a Class Period high of $14.35 per share. Lead Plaintiff and the other members of the Class purchased or otherwise acquired the Company's securities relying on

the integrity of the market price of such securities and on publicly available market information relating to Fluidigm, and have been damaged thereby.

123.     During the Class Period, the artificial inflation of the value of Fluidigm's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint, thereby causing the damages sustained by Lead Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about the Company's business, prospects, and operations, causing the price of the Company's stock to be artificially inflated at all relevant times.  When the truth was disclosed, it drove down the value of the Company's securities, causing Lead Plaintiff and other Class members that had purchased the securities at artificially inflated prices to be damaged as a result.

124.     Lead Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Fluidigm's shares met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient market, and was covered by analysts;

- As a regulated issuer, Fluidigm filed periodic public reports with the SEC and/or the NASDAQ;

- Fluidigm regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Lead Plaintiff and members of the Class purchased, acquired, and/or sold Fluidigm securities between the time Defendants failed to disclose or misrepresented material

facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

125.    Based upon the foregoing, during the Class Period, the market for Fluidigm's securities promptly digested information regarding the Company from all publicly available sources and impounded such information into the price of Fluidigm's shares.  Therefore, Lead Plaintiff and the Class are entitled to a presumption of reliance upon the integrity of the market.

126.    Alternatively, Lead Plaintiff and the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## NO SAFE HARBOR

127.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the statements alleged to be false and/or misleading herein.  The statements complained of herein were historical statements or statements of then-existing facts and conditions at the time the statements were made and/or were material omissions.

128.    To the extent that statements alleged to be false and/or misleading could be construed as forward-looking, the statutory safe harbor does not apply to such statements because they were not sufficiently identified as "forward-looking statements" when made, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statements, and/or Defendants had actual knowledge that the forward-looking statements were materially false or misleading at the time each such statement was made.

## CAUSES OF ACTION

## COUNT I

### Violations of Section 10(b) of the Exchange Act
### and SEC Rule 10b-5 Promulgated Thereunder
### (Against All Defendants)

129.    Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

130.     During the Class Period, Defendants carried out a plan, scheme, and course of conduct, which was intended to, and throughout the Class Period, did:  (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Fluidigm securities; and (iii) cause Lead Plaintiff and other members of the Class to purchase or otherwise acquire Fluidigm securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

131.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period in an effort to maintain artificially high market prices for Fluidigm's securities in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

132.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal and misrepresent adverse material information about the Company's business, operations, and financial results, as specified herein.

133.     Pursuant to the above plan, scheme, and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases, and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Fluidigm securities.  Such reports, filings, releases, and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented Fluidigm's true condition.

134.     The Company and the Individual Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Lead Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal

the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

135.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As senior officers of Fluidigm, the Individual Defendants had knowledge of the details of Fluidigm's internal affairs.

136.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Fluidigm.  As senior officers of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Fluidigm's businesses, operations, financial condition, and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases, and public statements, the market price of Fluidigm securities was artificially inflated throughout the Class Period.   In ignorance of the adverse facts concerning Fluidigm's business and financial condition which were concealed by Defendants, Lead Plaintiff and the Class purchased or otherwise acquired Fluidigm securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

137.    During the Class Period, Fluidigm securities were traded on an active and efficient market.  Lead Plaintiff and the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued, or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Fluidigm securities at prices artificially inflated by Defendants' wrongful conduct.  Had Lead Plaintiff and the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Lead Plaintiff and the Class, the true value of Fluidigm securities was substantially lower than the prices paid by Lead Plaintiff and the Class.  The market price of Fluidigm securities

declined sharply upon public disclosure of the facts alleged herein to the injury of Lead Plaintiff and the Class.

138.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and SEC Rule 10b-5.

139.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the Class suffered damages in connection with their respective purchases, acquisitions, and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating material misrepresentations to the investing public.

## COUNT II

### Violations of Section 20(a) of the Exchange Act
### (Against the Individual Defendants)

140.    Lead Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

141.    During the Class Period, the Individual Defendants participated in the operation and management of Fluidigm, and conducted and participated, directly and indirectly, in the conduct of Fluidigm business affairs.  Because of their senior positions, they knew the adverse non-public information about Fluidigm's misstatements and omissions of material fact.

142.    As directors and senior officers of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Fluidigm's financial condition and results of operations, and to correct promptly any public statements issued by Fluidigm which had become materially false or misleading.

143.    Because of their positions of control and authority as directors and senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases, and public filings which Fluidigm disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Fluidigm to engage in the wrongful acts complained of herein.  The Individual Defendants therefore, were "controlling persons" of Fluidigm within the meaning of Section 20(a) of the Exchange Act.  In

this capacity, they participated in the unlawful conduct alleged herein which artificially inflated the market price of Fluidigm securities.

144.    Each of the Individual Defendants, therefore, acted as a controlling person of Fluidigm. By reason of their senior management positions and/or being a director of Fluidigm, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Fluidigm to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Fluidigm and possessed the power to control the specific activities which comprise the primary violations about which Lead Plaintiff and the other members of the Class complain.

145.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Fluidigm.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Lead Plaintiff prays for relief and judgment, as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiff as the Class representative;

B.    Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial;

C.    Awarding Lead Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees with interest, expert fees, and other costs; and

D.    Awarding such other and further relief as the Court deems just and proper.

**JURY TRIAL DEMANDED**

Lead Plaintiff hereby demands a trial by jury.

DATED: February 19, 2021            Respectfully submitted,

           **BRAGAR EAGEL & SQUIRE, P.C.**

           /s/ *Melissa A. Fortunato*
           Melissa A. Fortunato (#319767)
           Marion C. Passmore (#228474)
           580 California Street, Suite 1200
           San Francisco, California 94104
           Telephone: (415) 568-2124
           Email:  fortunato@bespc.com
                       passmore@bespc.com

                   - and -

           Lawrence P. Eagel (*pro hac vice* forthcoming)
           810 Seventh Avenue, Suite 620
           New York, New York 10019
           Telephone: (212) 308-5888
           Facsimile: (212) 504-3260
           Email:  eagel@bespc.com

           *Counsel for the Lead Plaintiff*
           *and the Proposed Class*