1  Melissa A. Fortunato (#319767)
   Marion C. Passmore (#228474)
2  **BRAGAR EAGEL & SQUIRE, P.C.**
3  580 California Street, Suite 1200
   San Francisco, California 94104
4  Telephone: (415) 568-2124
   Email: fortunato@bespc.com
5          passmore@bespc.com

6  *Counsel for Lead Plaintiff Kwok Kong*
7  *and the Proposed Class*

8  [Additional Counsel on Signature Page]

9              **UNITED STATES DISTRICT COURT**
10            **NORTHERN DISTRICT OF CALIFORNIA**

11 REENA SAINTJERMAIN, Individually and      Case No. 4:20-cv-06617-PJH
   On Behalf of All Others Similarly Situated,
12                                            CLASS ACTION
                    Plaintiff,
13                                            **LEAD PLAINTIFF'S MEMORANDUM
            v.                                IN OPPOSITION TO DEFENDANTS'**
14                                            **MOTION TO DISMISS THE**
15 FLUIDIGM CORPORATION, STEPHEN              **AMENDED CLASS ACTION COMPLAINT**
   CHRISTOPHER LINTHWAITE, and
16 VIKRAM JOG,                                Hearing Date:  July 22, 2021
                                             Time:  10:00 a.m.
17                  Defendants.               Courtroom:  3, Third Floor
                                             Judge:  Honorable Phyllis J. Hamilton
18

19

20

21

22

23

24

25

26

27

28
                                                    Case No. 4:20-cv-06617-PJH

# TABLE OF CONTENTS

I.      INTRODUCTION ..................................................................................................... 1

II.     STATEMENT OF FACTS ....................................................................................... 2

    A.      Fluidigm Was Increasingly Dependent on Its Mass Cytometry Segment ..................... 2

    B.      While Touting Mass Cytometry Revenue and Pipeline, Defendants Knew
        and Failed to Disclose Numerous Issues Plaguing the Mass Cytometry Segment ........ 3

    C.      The Individual Defendants Knew or Were Deliberately Reckless in Not Knowing ...... 4

    D.      Defendants are Forced to Disclose Declining Revenue ................................................. 5

III.    ARGUMENT ............................................................................................................ 6

    A.      The AC Satisfies the Applicable Pleading Standards ................................................... 6

    B.      The AC Adequately Alleges Falsity ............................................................................. 6

        1.      Defendants Concealed Mass Cytometry Sales Impediments and
               Declining Demand ............................................................................................. 7

        2.      The CW Statements are Properly Alleged and Verify the Allegations ........... 11

        3.      Statements Challenged as Puffery, Optimism, and Opinion are Actionable .... 15

        4.      No Safe Harbor Applies and the Risk Disclosures are Actionable
               Misstatements .................................................................................................. 17

    C.      The AC Raises a Strong Inference of Scienter ......................................................... 19

        1.      Defendants Knew Critical Facts Undermining the Truth of Their Public
               Statements ....................................................................................................... 20

        2.      Core Operations and Admitted Knowledge Support Scienter ......................... 22

        3.      The Absence of Stock Sales Is Irrelevant ....................................................... 24

        4.      Defendants Do Not Present an Equally, Let Alone More Compelling,
               Inference That Defendants Acted Without Scienter ........................................ 25

IV.     CONCLUSION ....................................................................................................... 25

# TABLE OF AUTHORITIES

**<u>Cases</u>**

*Alaska Elec. Pension Fund v. Pharmacia Corp.*,
554 F.3d 342 (3d Cir. 2009)................................................................................................11

*In re Apollo Grp. Inc. Sec. Litig.*,
395 F. Supp. 2d 906 (D. Ariz. 2005) ..................................................................................10

*In re Apple Sec. Litig.*,
No. 19-cv-02033-YGR, 2020 U.S. Dist. LEXIS 206298 (N.D. Cal. Nov. 4, 2020) ...............23, 24

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)............................................................................................................6

*In re Atossa Genetics Inc. Sec. Litig.*,
868 F.3d 784 (9th Cir. 2017) ..............................................................................................7

*Backe v. Novatel Wireless, Inc.*,
642 F. Supp. 2d 1169 (S.D. Cal. 2009) ..............................................................................7

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544, 555 (2007) ....................................................................................................6

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) .....................................................................................6, 8, 12

*Boston Ret. Sys. v. Uber Techs., Inc.*,
No. 19-cv-06361-RS, 2020 U.S. Dist. LEXIS 141724 (N.D. Cal. Aug. 7, 2020) ..................17, 19

*Brendon v. Allegiant Travel Co.*,
412 F. Supp. 3d 1244 (D. Nev. 2019) ..........................................................................12, 14

*Casella v. Webb*,
883 F.2d 805 (9th Cir. 1989) ..............................................................................................15

*In re CBT Grp. PLC Sec. Litig.*,
No. C-98-21014-RMW, 2001 U.S. Dist. LEXIS 27343 (N.D. Cal. Dec. 28, 2001) .....................10

*In re Celera Corp. Sec. Litig.*,
No. 5:10-cv-02604 EJD, 2013 U.S. Dist. LEXIS 125621 (N.D. Cal. Sept. 3, 2013) .................17

*In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*,
No. 17 Civ. 1580 (LGS), 2018 U.S. Dist. LEXIS 87991 (S.D.N.Y. May 24, 2018).....................16

*Constr. Workers Pension Tr. Fund v. Genoptix, Inc.*,
No. 10cv2502-CAB (DHB), 2013 U.S. Dist. LEXIS 49716
(C.D. Cal. Mar. 22, 2013) ....................................................................................................24

*Cutler v. Kirchner*,
696 F. App'x 809 (9th Cir. 2017) .......................................................................................18

*In re CV Therapeutics, Inc. Sec. Litig.*,
No. C 03-03709 SI, 2004 U.S. Dist. LEXIS 17419 (N.D. Cal. Aug. 5, 2004) ..............................17

*In re Daou Sys. Inc., Sec. Litig.*,
411 F.3d 1006 (9th Cir. 2005) .................................................................................7, 12, 20

*In re Diamond Foods, Inc. Sec. Litig.*,
No. C 11-05386 WHA, 2012 U.S. Dist. LEXIS 170704 (N.D. Cal. Nov. 30, 2012) ....................22

*Evanston Police Pension Fund v. McKesson Corp.*,
411 F. Supp. 3d 580 (N.D. Cal. 2019) ......................................................................................22

*In re Finisar Corp. Sec. Litig.*,
646 F. App'x 506 (9th Cir. 2016) .........................................................................................8, 24

*In re Gilead Scis. Sec. Litig.*,
536 F.3d 1049 (9th Cir. 2008) ................................................................................................6

*Hanon v. Data Prods. Corp.*,
976 F.2d 497 (9th Cir. 1992) ..................................................................................................15

*Hatamian v. Advanced Micro Devices, Inc.*,
87 F. Supp. 3d 1149 (N.D. Cal. 2015) ....................................................................................22

*Howard v. Everex Sys., Inc.*,
228 F.3d 1057 (9th Cir. 2000) ................................................................................................6

*In Re Immune Response Sec. Litig.*,
375 F. Supp. 2d 983 (S.D. Cal. 2005) .....................................................................................18

*Karinski v. Stamps.com, Inc.*,
No. CV 19-1828-MWF (SKx), 2020 U.S. Dist. LEXIS 10721
(C.D. Cal. Jan. 17, 2020) ...............................................................................................12, 16

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018) .....................................................................................2, 6, 10, 24

*Lloyd v. CVB Fin. Corp.*,
811 F.3d 1200 (9th Cir. 2016) ................................................................................................10

*Lorenz v. Safeway, Inc.*,
241 F. Supp. 3d 1005 (N.D. Cal. 2017) ....................................................................................6

*Loritz v. Exide Techs.*,
No. 2:13-cv-2607-SVW-Ex, 2014 U.S. Dist. LEXIS 111491
(C.D. Cal. Aug. 7, 2014) .......................................................................................................12

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
513 F.3d 702 (7th Cir. 2008) ...........................................................................................17, 25

*Mallen v. Alphatec Holdings, Inc.*,
861 F. Supp. 2d 1111 (S.D. Cal. 2012) ...................................................................................17

*In re MannKind Sec. Actions*,
835 F. Supp. 2d 797 (C.D. Cal. 2011) ....................................................................................22

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011) ...................................................................................................20, 25

*In re Merit Med. Sys.*,
   No. 8:19-02326 DOC (ADSx), 2021 U.S. Dist. LEXIS 60460
   (C.D. Cal. Mar. 29, 2021) ...................................................................................................13

*Meyer v. JinkoSolar Holdings Co.*,
   761 F.3d 245 (2d Cir. 2014) ...............................................................................................19

*Mulderrig v. Amyris, Inc.*,
   No. 19-CV-1765 YGR, 2020 U.S. Dist. LEXIS 185382 (N.D. Cal. Oct. 5, 2020) ...........15, 17, 22

*Mulligan v. Impax Labs, Inc.*,
   36 F. Supp. 3d 942 (N.D. Cal. 2014) ..............................................................12, 15, 16, 17

*No. 84 Emp'r-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
   320 F.3d 920 (9th Cir. 2003) ..............................................................................................2, 25

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
   380 F.3d 1226 (9th Cir. 2004) ...........................................................................................20

*Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*,
   780 F. App'x 480 (9th Cir. 2019) .........................................................................................9

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
   575 U.S. 175 (2015).............................................................................................................16

*Police Ret. Sys. of St. Louis v. Granite Constr. Inc.*,
   No. 3:19-cv-04744-WHA, 2020 U.S. Dist. LEXIS 88788
   (N.D. Cal. May 20, 2020) ..............................................................................11, 16, 22, 25

*Police Ret. Sys. v. Intuitive Surgical, Inc.*,
   759 F.3d 1051 (9th Cir. 2014) ...........................................................................................15

*Provenz v. Miller*,
   102 F.3d 1478 (9th Cir. 1996) ......................................................................................14, 18

*In re Qualcomm Inc. Sec. Litig.*,
   No. 17cv00121 JAH-WVG, 2019 U.S. Dist. LEXIS 44125
   (S.D. Cal. Mar. 18, 2019)....................................................................................................23

*In re Quality Sys.*,
   865 F.3d 1130 (9th Cir. 2017) ...................................................................................passim

*Rabkin v. Lion Biotechnologies, Inc.*,
   No. 17-cv-02086-SI, 2018 U.S. Dist. LEXIS 25326 (N.D. Cal. Feb. 15, 2018) ...................19, 22

*Reese v. Malone*,
   747 F.3d 557 (9th Cir. 2014) .........................................................................................22, 23

*Resh v. China Agritech, Inc.*,
   No. 2:14-CV-05083-RGK-PJW, 2019 U.S. Dist. LEXIS 42228
   (C.D. Cal. Jan. 8, 2019) .....................................................................................................25

*Robb v. Fitbit, Inc.*,
  No. 16-cv-00151-SI, 2017 U.S. Dist. LEXIS 7722 (N.D. Cal. Jan. 19, 2017) ........................ 10, 14

*Roberti v. OSI Sys.*,
  No. CV 13-9174-MWF(VBKx), 2015 U.S. Dist. LEXIS 24761
  (C.D. Cal. Feb. 27, 2015) ....................................................................................................... 17, 23

*Roberts v. Zuora, Inc.*,
  No. 19-cv-03422-SI, 2020 U.S. Dist. LEXIS 74648 (N.D. Cal. Apr. 28, 2020) ..................... 11, 15

*S. Ferry LP, No. 2 v. Killinger*,
  542 F.3d 776 (9th Cir. 2008) ............................................................................................. 20, 22, 23

*S. Ferry LP, No. 2 v. Killinger*,
  687 F. Supp. 2d 1248 (W.D. Wash. 2009) .............................................................................. 20, 23

*Schueneman v. Arena Pharm., Inc.*,
  840 F.3d 698 (9th Cir. 2016) ......................................................................................................2, 6

*Shenwick v. Twitter, Inc.*,
  282 F. Supp. 3d 1115 (N.D. Cal. 2017) .......................................................................................14

*In re Silver Wheaton Corp. Sec. Litig.*,
  No. CV15-5146-CAS(JEMx), 2016 U.S. Dist. LEXIS 74162
  (C.D. Cal. June 6, 2016) ..............................................................................................................13

*Siracusano v. Matrixx Initiatives, Inc.*,
  585 F.3d 1167 (9th Cir. 2009) .....................................................................................................19

*Skiadas v. Acer Therapeutics, Inc.*,
  No. 1:19-cv-6137-GHW, 2020 U.S. Dist. LEXIS 129104 (S.D.N.Y. July 21, 2020) ...................14

*In re Snap Sec. Litig.*,
  No. 2:17-cv-03679-SVW-AGR, 2018 U.S. Dist. LEXIS 97704
  (C.D. Cal. June 7, 2018) ........................................................................................................14, 18

*In re STEC Inc. Sec. Litig.*,
  No. SACV 09-1304 JVS (MLGx), 2011 U.S. Dist. LEXIS 75093
  (C.D. Cal. June 17, 2011) ..............................................................................................................6

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ....................................................................................................1, 20, 24, 25

*Todd v. STAAR Surgical Co.*,
  No. CV-14-05263-MWF-RZ, 2016 U.S. Dist. LEXIS 186511
  (C.D. Cal. Apr. 12, 2016) ............................................................................................................24

*Turocy v. El Pollo Loco Holdings, Inc.*,
  No. SACV 15-1343-DOC (KESx), 2017 U.S. Dist. LEXIS 123458
  (C.D. Cal. Aug. 4, 2017) ...........................................................................................................9, 20

*In re Twitter, Inc. Sec. Litig.*,
  No. 16-cv-05314-JST, 2020 U.S. Dist. LEXIS 86978 (N.D. Cal. Apr. 17, 2020) ........................24

*In re U.S. Aggregates, Inc. Sec. Litig.*,
  235 F. Supp. 2d 1063 (N.D. Cal. 2002) .......................................................................................24

*In re UTStarcom, Inc. Sec. Litig.*,
    617 F. Supp. 2d 964 (N.D. Cal. 2009) ..................................................................18, 22

*In re VeriFone Holdings, Inc. Sec. Litig.*,
    704 F.3d 695 (9th Cir. 2012) .....................................................................................22

*Warshaw v. Xoma Corp.*,
    74 F.3d 955 (9th Cir. 1996) .......................................................................................15

*Wochos v. Tesla, Inc.*,
    985 F.3d 1180 (9th Cir. 2021) ...................................................................................13

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) .....................................................................................12

## **Statutes**

15 U.S.C. § 78u-4(b)(1)(B).............................................................................................6

15 U.S.C. § 78u-5(c)(B)(i)............................................................................................18

15 U.S.C. § 78u-4(b)(2)................................................................................................19

Lead Plaintiff Kwok Kong ("Plaintiff"), respectfully submits this memorandum in opposition to Defendants' Motion to Dismiss the Amended Class Action Complaint (the "Motion" or "Mot.") (ECF No. 39).[1]

## I.      **INTRODUCTION**

Throughout the Class Period, Defendants touted Fluidigm's increasing gross revenue, and particularly its mass cytometry revenue, claiming to be the "global market leader" for mass cytometry systems.  Defendants knew, and failed to disclose, material adverse information showing that 2019 mass cytometry sales revenue was going to suffer and competition was increasing.  As early as the third quarter of 2018, when the first sales forecast for 2019 was created, Defendants were on notice of its forecast's unattainability but refused to make changes.  Each consecutive sales forecast, report, meeting, and sales conference call confirmed the same data and by the time the Company's six-to-nine-month sales cycle caught up with the dismal reality, Fluidigm's mass cytometry sales woes could no longer be kept hidden.  On November 5, 2019, after the market closed, it was revealed that mass cytometry revenue for the third quarter of 2019 had decreased 13%, with instrument sales revenue decreasing by 23%, and Defendants no longer denied that competition was an issue.  On this news, Plaintiff and the Class suffered substantial damages when the Company's ***stock price plummeted over 50%.***

This is a straight-forward case of Defendants knowing about substantially declining sales and increasing competition, but concealing those facts from the public until they were forced to disclose the true state of affairs.  To convince the Court that no allegations have been adequately plead, Defendants cherry-pick and mischaracterize the AC, plucking select portions of the allegations while ignoring others.  This sleight of hand fails, the AC must be considered "in its entirety."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).  Taken as a whole, the AC plainly and plausibly alleges that contemporaneous material adverse facts existed at the time of Defendants' statements

---

[1]  Defendants are defined herein as Fluidigm Corporation ("Fluidigm" or the "Company"), Christopher Linthwaite ("Linthwaite"), and Vikram Jog ("Jog," and together with Linthwaite, the "Individual Defendants").  "¶__" refers to paragraphs of the Amended Class Action Complaint ("AC").  ECF No. 36.  Unless otherwise indicated, capitalized terms shall have the same meaning as given in the AC, internal citations and quotations are omitted, and emphasis is added.

rendering them false and misleading.  Simply labelling allegations conclusory does not make them so.
Once Defendants chose to tout Fluidigm's mass cytometry sales, demand, and lack of competition, they
had a duty to do so in a "manner that wouldn't mislead investors, including disclosing adverse
information that cut[s] against the positive information."  *Khoja v. Orexigen Therapeutics, Inc.*, 899
F.3d 988, 1009 (9th Cir. 2018) (citing *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 705-06 (9th
Cir. 2016)).

Defendants spill much ink arguing that the CW accounts are not detailed enough to establish
falsity or scienter and are not connected to any false statement.  While it is true that CW accounts
require a certain level of specificity, the AC does just that.  The PSLRA was not meant to be an absolute
bar to securities claims as Defendants' demand, and dismissal is inappropriate "unless it appears beyond
a doubt that" Plaintiff "cannot prove any set of facts in support" of the claims.  *No. 84 Emp'r-Teamster
Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 931 (9th Cir. 2003); *Arena*,
840 F.3d at 710 (PSLRA "is not an impossible barrier; nor was it meant to be").  The who, what, where,
when and why are clearly laid out in the AC and supported by the CW allegations.  It is absurd to
suggest that the law requires, for example, the dates of every meeting when a CW fully describes the
fact that it was a weekly meeting, the normal attendants and issues discussed.  In fact, the CWs here
proffer more details than courts have required in many instances.  The CW allegations and other scienter
allegations, taken collectively, demonstrate that Defendants knew material contemporaneous facts
making the positive mass cytometry guidance, demand and sales statements false.

Accordingly, Defendants' Motion should be denied in its entirety.

## II.   STATEMENT OF FACTS

### A.   Fluidigm Was Increasingly Dependent on Its Mass Cytometry Segment

Fluidigm manufactures and markets products and services used by researchers to study health
and disease, identify biomarkers, and accelerate the development of therapies.  ¶¶2, 22, 28.  Prior to the
beginning of the Class Period, one of the Company's two main categories of products and services,
microfluidics, was faltering due to Fluidigm's aging technology and increasing competition with newer,
sleeker, and less expensive technology.  ¶¶3, 30-34.  Microfluidics product sales decreased 19% in

2016 compared to 2015, an average of 23% per quarter in 2017, and an average of 8.7% per quarter for the last three quarters of 2018.  ¶¶30-32.

While the Company's microfluidics revenues shrank, Fluidigm increasingly became evermore reliant on revenue from its newer mass cytometry segment.  ¶¶3, 30.  Fluidigm touted robust adoption and strengthening of its mass cytometry products throughout 2017 and 2018, with increasing revenue in every quarter except one, and merging the microfluidics and mass cytometry sales teams to improve costs.  ¶¶31-33.  In fact, on the first day of the Class Period, Defendants claimed to be "the global market leader" for imaging mass cytometry with mass cytometry revenue representing over 59% of the Company's total revenue for the quarter.  ¶¶4, 52-53.

### B.    While Touting Mass Cytometry Revenue and Pipeline, Defendants Knew and Failed to Disclose Numerous Issues Plaguing the Mass Cytometry Segment

Riding the increasing mass cytometry revenue, Defendants announced fourth quarter and full-year 2018 earnings on February 7, 2019, the first day of the Class Period.  ¶¶35, 52-58.  Defendants claimed, *inter alia*, that Fluidigm's "commercially-proven instrument, in contrast with the marketing claims of other potential market entrants, provide extraordinarily high quality and real images" and that there was a "solid backlog" and "ample headroom for growth."  ¶¶53-55.  Similar statements continued for most of 2019, with Defendants stating that the Company was "the clear market leader," was seeing "very strong demand for [its] instruments," that "mass cytometry is thriving," that the funnel was "really strong," that there was no "fundamental change in the overall competitive landscape," and denying any "sequential decline" in sales.  ¶¶62, 65, 72, 75, 76, 79.

While assuring investors that mass cytometry revenue would continue throughout 2019, Defendants knew, but omitted, material information which made the positive statements about Fluidigm's growing mass cytometry revenue, demand, and market-position false and misleading.  As early as the third quarter of 2018, Linthwaite and Jog were told that sales forecasts for 2019 were unattainable – but this information was hidden from investors.  ¶¶5, 38.  When second quarter 2019 sales goals were discussed in January 2019, CW3 (VP of Commercial Operations from November 2015 until June 2020) adjusted them lower but due to the fact that lowering sales goals "basically [meant you were] quitting or being asked to leave" the 2019 forecast was not changed.  ¶¶36, 39.

CW1, a Marketing Specialist and Executive Assistant from December 2017 to September 2019, confirmed sales were suffering in 2019 and that the Individual Defendants *discussed the revenue shortfall on a weekly basis*.  ¶¶33, 43.  According to CW2, an Associate Sales Director from March 2018 until September 2019, repeated sales misses were discussed at forecast meetings, on sales conference calls, and at in-person meetings.  ¶44.  CW3 recalled going into a break-out room during the quarterly business review meeting for the third quarter of 2019 with the CCO and finance department employees to develop "strategic" pricing that would allow CW3 to discount products for customers and move product without technically repricing or using traditional marketing.  ¶40.  In sum, the Company was desperate for sales.

CW3 explained that sales were lagging because the mass cytometry products were overpriced and the Company took too long to adjust its marketing approach.  ¶41.  In addition, Fluidigm's competitor, Cytek, was gaining market share using industry known, but updated, technology compared to Fluidigm's unique technology that required customer education and persuasion on the merits, causing Fluidigm's customers to pause, unsure if the Company's technology was still optimal, with many never making the purchase.  ¶¶45-50, 103.

### C.   The Individual Defendants Knew or Were Deliberately Reckless in Not Knowing

The Individual Defendants knew, or were deliberately reckless in not knowing, that demand for Fluidigm's mass cytometry instruments was waning and sales forecasts unattainable.  *First*, the Individual Defendants admitted to having intimate familiarity with the Company's products, sales, customers, and forecasts, not only in their prepared remarks, but also through their detailed answers to analyst questions.  ¶96.  Linthwaite even admitted during the first quarter 2019 earnings call that he visited large customers and new accounts.  ¶97.  *Second*, the mass cytometry segment was highly material to Fluidigm with its only other segment, microfluidics, rapidly shrinking prior to the Class Period.  ¶¶93-95.

*Third*, the Individual Defendants had access to and reviewed internal reports showing falling sales, and attended numerous meetings where sales declines were discussed.  ¶¶100-106.  One of these reports was a slide deck presented at quarterly business review meetings which were attended by the Individual Defendants and at which beginning in the third quarter of 2018 included explanations for

why the 2019 forecast was unattainable.   ¶105.   Fluidigm also used Salesforce to track sales opportunities, progress, and preference, including that the Company often lost out on deals to a competitor, which data was then discussed during sales conference calls which Jog attended at times. ¶103.   The Individual Defendants even attended weekly meetings with CW1 where sales performance falling short of budgeted revenue was discussed consistently during 2019.  ¶101.

*Fourth*, while the 2018 Form 10-K and each Form 10-Q filed during the Class Period contained a laundry list of over twenty-five companies competing with Fluidigm, the very next SEC financial filing following the end of the Class Period, the 2019 Form 10-K, stated that only Cytek and one other company were the "principal competitors."  ¶99.

### D.   Defendants are Forced to Disclose Declining Revenue

On August 1, 2019, after the market closed, the Company announced its financial results for the quarter ending June 30, 2019, as well as third quarter revenue guidance for 2019 of $27 million to $30 million.  ¶70.  Defendants also held an earnings call on the same day where analysts questioned the low revenue guidance and the Individual Defendants claimed a "fairly localized" issue of "longer decision cycles" due to "funding for the NIH", although according to Linthwaite the Company was "seeing no real trend change in the mass cytometry business overall."  ¶77.  On this news, the Company's share price declined by $4.10 per share, or 33.74%.  ¶80.

On November 5, 2019, after the market closed, Fluidigm announced its financial results for the quarter ending September 30, 2019, with total revenue decreasing 8.5%, mass cytometry revenue decreasing 13%, and mass cytometry product revenue decreasing 23%.  ¶84.  When questioned about competitors on the earnings call that same day, unlike the previous explicit denials of competition by the Individual Defendants earlier in the Class Period, Linthwaite deflected and attempted to stress other factors as causes for the abysmal revenue.  ¶87.  On this news, the Company's share price plummeted 50.88%, from a closing price of $5.11 per share on November 5, 2019, to close at $2.51 per share on November 6, 2019, on unusually high trading volume.  ¶88.

The full effect of the Company's undisclosed issues with mass cytometry sales continued to play out in 2020 with mass cytometry product revenue decreasing year-over-year each quarter as follows:  (26%), (28%), (3%), and (24%).  ¶¶89-90.

III.   **ARGUMENT**

A.   **The AC Satisfies the Applicable Pleading Standards**

The AC *plausibly* alleges violations of the Exchange Act when, as required, the allegations are viewed as a whole, accepted as true, and read in the light most favorable to Plaintiff.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.").  "A district court ruling on a motion to dismiss is not sitting as a trier of fact" and "so long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings."  *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 157 (9th Cir. 2008) (*reversing dismissal*).

The AC also satisfies Fed. R. Civ. P. Rule 9(b) and the PSLRA by pleading with particularity the "who, what, when, where, and how" of the fraud.  *Khoja*, 899 F.3d at 1008; 15 U.S.C. § 78u-4(b)(1)(B).  Defendants only challenge the sufficiency of Plaintiff's falsity and scienter allegations.[2]

B.   **The AC Adequately Alleges Falsity**

A statement is misleading if it "give[s] a reasonable investor the impression of a state of affairs that differs in a material way from one that actually exits."  *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008).  "Even if a statement is not false, it may be misleading if it omits material information."  *Khoja*, 889 F.3d at 1008-09.  If a company chooses to tout positive information, it must also "disclos[e] adverse information that cuts against the positive information."  *Arena*, 840 F.3d at 706.  Further, "[w]hether a public statement is misleading . . . is a mixed question to be decided by the trier of fact" and "appropriately resolved as a matter of law only if the adequacy of the disclosure . . . is so obvious that reasonable minds [could] not differ."  *In re STEC Inc. Sec. Litig.*, 2011 U.S. Dist. LEXIS 75093, at *25 (C.D. Cal. June 17, 2011).  The AC "should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible."  *Lorenz v. Safeway, Inc.*, 241 F. Supp. 3d 1005, 1023 (N.D. Cal. 2017).

---

[2]   Defendants sole argument against Plaintiff's Section 20(a) claim is that it must fail because the Section 10(b) claim fails.  Mot. at 25.  Because the AC adequately alleges a primary violation of Section 10(b) and control (*e.g.*, ¶¶21, 107, 141-43), the Section 20(a) claim is adequately pled as well.  *See Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### 1.   Defendants Concealed Mass Cytometry Sales Impediments and Declining Demand

Defendants created the materially misleading impression that Fluidigm's mass cytometry sales, the driver of the Company's revenue, were thriving and that as the "market leader," competition was no issue.  Throughout the Class Period, Defendants touted increasing revenue and mass cytometry sales.  ¶¶52, 54, 61-63, 70, 74.  In trumpeting the current and continuing success of Fluidigm's mass cytometry segment, Defendants affirmatively stated, *inter alia*:  "We are well-positioned to support accelerating growth in 2019" (¶52); "[W]e are clearly the global market leader in [mass cytometry]" (¶53); "[W]e enter 2019 with a solid backlog . . . There's ample headroom for growth" (¶55); "[W]e're seeing a continuation of the 3-quarter trend in which we are continuing to recruit new customers to the technology base and there's not a material shift in the kind of forward-looking funnel as it relates to that mix" (¶56); "We can see the opportunities building in the pipeline" (¶57); "I wouldn't over-interpret the guidance as to signal a decline" (¶65); "And we continue to be very encouraged by the demand that we've seen for imaging in Q1" (¶66); "Clearly, mass cytometry is thriving (¶72); We're seeing really strong global funnel development" (¶76); and, "I think we're seeing no real trend change in the mass cytometry business overall" (¶77).

It is well-established that Defendants can be liable for falsely representing increasing demand while failing to disclose contrary sales trends.  *See, e.g.*, *In re Quality Sys.*, 865 F.3d 1130 (9th Cir. 2017); *Backe v. Novatel Wireless, Inc.*, 642 F. Supp. 2d 1169, 1181 (S.D. Cal. 2009) (statements regarding demand false where losing "market share to [] competitors").  That is exactly what Defendants did here.  The above statements, and other similar statements (¶¶52-68, 70-81), were materially false and misleading at the time they were made because Defendants ***knew*** and did not disclose that internal sales forecasts showed declining mass cytometry sales due to the fact that Fluidigm's mass cytometry instruments were over-priced, their marketing approach was flawed, and a new competitor was cannibalizing Fluidigm's sales and causing other customers to delay making purchases as they considered the competitor's technology.  *In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784, 794-95 (9th Cir. 2017) (when statements "directly contradict" what defendants knew, falsity is pled); *In re Daou Sys. Inc., Sec. Litig.*, 411 F.3d 1006, 1020 (9th Cir. 2005) (falsity pled where alleges

LEAD PLAINTIFF'S MEM. IN OPP. TO DEFENDANTS'
MOT. TO DISMISS THE AMENDED CLASS ACTION COMPLAINT

discrepancy between positive statements and internal truth).  Defendants created the materially misleading "impression of a state of affairs" that "differ[ed] in a material way from" the truth, that numerous impediments affecting the Company's mass cytometry sales were causing the sales forecasts to be unattainable.  *Berson*, 527 F.3d at 985; *see also In re Finisar Corp. Sec. Litig.*, 646 F. App'x 506, 507 (9th Cir. 2016) (falsity pled where denied "inventory build-up and down-played concerns of a looming inventory bubble" while knowing inventory levels rising).

More specifically, the first combined sales forecast for 2019, which was completed during the third quarter of 2018 and funneled through CW3 and then the CCO, contained overly optimistic assumptions that were unattainable.  ¶¶37-38.  CW3 even presented a slide deck indicating that the 2019 forecast was unattainable and explaining the reasoning why to the Individual Defendants during the quarterly business review meeting for the third quarter 2018.  ¶38.  Based on increasing indications that the original sales forecast needed to be lowered, during the first quarter 2019 quarterly business review meeting that took place the third week of January 2019, CW3 again adjusted sales goals downward for the second quarter of 2019, but the pressure on employees to keep the original forecast, including the fact that not doing so meant "you're basically quitting or being asked to leave" resulted in no changes.  ¶39.  The disappointing and weakening sales were known throughout the Company, with CW2 stating "[e]veryone was aware of it.  [Sales problems] were discussed every time we met." ¶102.  CW2 also stated that during *all* sales team conference calls and in-person meetings, disappointing sales were discussed.  ¶¶44, 102.

The Individual Defendants did not just disagree with CW3's sales forecasts concerns (Mot. at 11), but had concerns of their own.  CW1 attended weekly meetings with the Individual Defendants and other senior management throughout 2019 where they discussed sales performance and how it was falling short, "[w]e were not going to hit our goal and that was something commonly known among leadership."  ¶¶43, 101.  In fact, to offset the expected, but undisclosed, decline in sales, throughout 2019 a cap was set on travel expenses, executive meals, and other expenses.  ¶43.

The AC details contemporaneous and particularized reasons for the decline in mass cytometry sales as well, all of which were undisclosed, and in the instance of competitive cannibalization, flat out denied by Defendants.  For example, CW3 explained that the price of Fluidigm's mass cytometry

instruments was "too high and that is not a secret.  By the time the company adjusted its price, maybe late 2019 or early 2020, it was too little, too late."  ¶41.  CW3 also explained that the Company's marketing approach was flawed and impinged on gaining sales because the Company's products were specialized and the marketing plan needed to be tailored to emerging technologies, but instead targeted the mainstream market.[3]  *Id.*  "The technology had a strong positioning among early adaptors, but the forecast plan, the sales plan, the language was all geared toward the mainstream market." *Id. See, e.g.*, *Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*, 780 F. App'x 480, 483 (9th Cir. 2019) ("companies mislead investors when they tout their products' capabilities but fail to disclose significant flaws that undercut those capabilities").

Three CWs affirmatively connected Fluidigm's 2019 revenue loss to competition, stating that Cytek had created an improved product using technology that buyers were familiar with compared to Fluidigm's new technology which caused customers to re-evaluate and take longer to make purchasing decisions, and in many instances led to no sale.  ¶¶45-50.  Indeed, CW3 confirmed that during 2019 several "significant" deals fell apart.  ¶41.

Defendants continued to mislead investors when reporting disappointing microfluidics sales and overall Americas sales, as well as revenue guidance for the third quarter of 2019.  ¶¶70-82.  Rather than admit that mass cytometry sales were declining and that the forecast was unattainable, Defendants continued to minimize the issue, falsely stating that "[a] few mass cytometry systems pushed out into the second half of the year, some linked to funding delay, ***but that funnel is, on the whole, very deep***" (¶72) and that "[w]e can't say that there's many new competitors that are necessary extending out the ordering cycle" (¶79), among other things.  *Turocy v. El Pollo Loco Holdings, Inc.*, 2017 U.S. Dist. LEXIS 123458, at *28-29 (C.D. Cal. Aug. 4, 2017) (statements were misleading where true facts "were being explained away or minimized" and "known causes of the [poor performance] were brushed off, minimized, or omitted altogether").

---

[3]  Defendants argue that this allegation is deficient because CW3 "does not actually contend that the marketing approach was 'flawed.'" Mot. at 16. Defendants' quibble over the language is incorrect.  A clear reading of CW3's statement it that Fluidigm's approach was "flawed."  CW3's statement is a sufficiently alleged particularized "fact."  *See* immediately below and Section III.B.2.

The law is clear, once Defendants chose to tout current and future strong sales, they were required to inform investors of adverse information cutting the other way.[4] *Khoja*, 899 F.3d at 1009; *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1209 (9th Cir. 2016) ("The omission of [] fact, combined with the reassurance that everything was fine . . . meets the pleading standard for a material omission."); *In re Apollo Grp. Inc. Sec. Litig.*, 395 F. Supp. 2d 906, 920 (D. Ariz. 2005). Further, denying competitive entrants and the effect on a business has been found to be false. *See, e.g.*, *In re CBT Grp. PLC Sec. Litig.*, 2001 U.S. Dist. LEXIS 27343, at *10 (N.D. Cal. Dec. 28, 2001) (representation that "saw very little competition" false and misleading where reported to defendants that losing customers to competitors). And, contrary to Defendants' contention (Mot. at 16), it is not required that Plaintiff quantify that impact. *Robb v. Fitbit, Inc.*, 2017 U.S. Dist. LEXIS 7722, at *23 (N.D. Cal. Jan. 19, 2017) ("The specificity [] defendants seek, such as the frequency of the alleged failures and the precise level of inaccuracy, crosses into territory better evaluated on a motion for summary judgment.").

The statements and facts at issue here are strikingly similar to those in *Quality Systems*, where it was alleged that defendants made false and misleading statements of projected growth which were "inconsistent with real-time financial information." 865 F.3d at 1144. The Ninth Circuit Court of Appeals found that statements such as "[t]here is nothing drying up and there is nothing slowing down," "[o]ur pipeline is deep," and a response to total market penetration of "[y]ou wouldn't know that by our pipeline" to be actionable when CWs recounted that at the same time the company's market "had become saturated" and the sales pipeline was slowing down. *Id.* at 1143-44. Just as in *Quality Systems*, here, Defendants provided concrete descriptions as well, stating for example, that the sales funnel included "opportunities across academic, transitional research, CROs and cancer centers" (¶55), that "for the third consecutive quarter, placements at new accounts represented about 2/3 of total unit sales in the period" (¶55), that the sales funnel includes "all 3 geographies" (¶76) and "continues to mirror [the past] pattern" (*id.*). *See also* ¶¶57, 64, 79.

---

[4] Plaintiff does not allege that the historical financial statements were false (Mot. at 16), but alleges Defendants omitted adverse facts when providing the information along with increasing revenue guidance and assurances of a solid backlog and pipeline.

For these reasons, Defendants' attempt at plucking certain facts from the AC while ignoring others to claim that nothing was false or omitted fails.[5]  Defendants' contention that the AC merely contains "conclusory explanations" with no specific facts or "connections" between facts and statements (Mot. 7-8) is absurd, ignoring or misconstruing all of the above.  *See, e.g.*, *Roberts v. Zuora, Inc.*, 2020 U.S. Dist. LEXIS 74648, at *27, *29-32 (N.D. Cal. Apr. 28, 2020) (denying similar contention where CWs provided "facts" regarding company's lack of system integration and other "problems that Zuora's customers experienced" including refusal to pay due to integration issues and such issues and statements were "link[ed]" to statements regarding growth).  Further, the astronomical stock price decline by over 50% when the true state of affairs was revealed (¶88), makes the materiality of Defendants' omissions undeniable.  *Alaska Elec. Pension Fund v. Pharmacia Corp.*, 554 F.3d 342, 352 (3d Cir. 2009) ("the materiality of the alleged misrepresentations [was] self-evident when we look at the market's negative reaction" upon disclosure of the truth).

### 2.     The CW Statements are Properly Alleged and Verify the Allegations

Defendants wrongly assert that there are no contemporaneous documents or information demonstrating the falsity of the allegations because none of the CW allegations are tied to statements[6] or claim the statements were false when made. Mot. at 9-10.  *First*, Defendants demand a higher burden than required for CW allegations, which must be accepted as true and construed in the light most

---

[5]  Similarly, Defendants incorrectly assert that there are no "facts" because the facts came from CWs. Mot. at 16; *see also* Mot. at 15, 17.  As discussed below, information from CWs can be relied upon as facts. Section III.B.2.  Further, the AC adequately answers Defendants' question as to why guidance was met in the first half of 2019. Mot. at 14, 16.  CW3 stated that the sales drop off was going to occur *in 2019*, not the first half, and was in fact bracing for it to come after the first quarter of 2019.  ¶39.  Additionally, the average sales cycle tended "to be 6 to 9 months" (¶79) so slowing sales would naturally take time to affect revenue.  *See also* ¶¶89-90 (showing the continuing revenue decline after the Class Period).

[6]  This argument is misplaced and misconstrues the AC, Plaintiff alleges that the statements were materially false and misleading because Defendants concealed adverse facts that cut against the positive information.  *See* Section III.B.1.  *See also Police Ret. Sys. of St. Louis v. Granite Constr. Inc.*, 2020 U.S. Dist. LEXIS 88788, at *16-17 (N.D. Cal. May 20, 2020) (rejecting similar argument, stating "[t]he complaint, in great detail, draws on the statements of the [CWs]" to show the statements were false when made).

favorable to Plaintiff. *See Daou*, 411 F.3d at 1013. *Second*, Defendants improperly dispute the CWs' statements which "must at least await discovery." *Berson*, 527 F.3d at 985.[7]

CWs must be described "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Quality Sys.*, 865 F.3d at 1145. "The Ninth Circuit has held that numbering the confidential witnesses and describing the witnesses' job description and responsibilities constitutes a 'large degree of specificity,' especially where the witnesses' exact title is used." *Mulligan v. Impax Labs, Inc.*, 36 F. Supp. 3d 942, 961 (N.D. Cal. 2014) (quoting *Daou*, 411 F.3d at 1016). This is exactly what the AC does here, providing title and tenure for each CW, as well as job descriptions. ¶¶33, 34, 46, 47, 104. Each CW relates particularized facts that one in their position would possess. *E.g.*, ¶¶34, 44, 102-03. *Quality Sys.*, 865 F.3d at 1145. In addition, the CWs provide "consistent accounts," corroborating each other across seniority levels and job positions, further supporting their reliability. *Impax*, 36 F. Supp. 3d at 962; *Brendon v. Allegiant Travel Co.*, 412 F. Supp. 3d 1244, 1259 (D. Nev. 2019). *See, e.g.*, ¶¶36-50, 101-03 (corroborating CW statements). "Once the Court determines that the [CWs] are reliable, it must take the statements as true for the purposes of ruling on a motion to dismiss." *Loritz v. Exide Techs.*, 2014 U.S. Dist. LEXIS 111491, at *30 (C.D. Cal. Aug. 7, 2014) (citing *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995-97 (9th Cir. 2009)).

Defendants demand more than required under the law for CW1 and CW2, asking for exact dates of meetings and specific content discussed at meetings, blatantly disregarding the pleadings. Mot. at 10. The meetings and calls were adequately described as "weekly" or "quarterly" (¶¶43, 44, 102), with the "content" being "sales performance, and how it was falling short" and "disappointing sales," which were discussed "every time we met" (¶¶43, 44, 102).[8] CW2, as well as CW3 and CW6, also detailed

---

[7] Defendants' reliance on purportedly supporting case law (Mot. at 9) is misplaced. Unlike those actions, here Plaintiff alleges both direct contact between the CWs and the Individual Defendants (*e.g.*, ¶¶38, 42, 43, 101, 105) and specific records presented to the Individual Defendants (*e.g.*, ¶¶38, 42, 104-06) pertaining to the matters alleged making their statements misleading.

[8] Defendants incorrectly state that CW2's allegations were merely a disagreement over internal quotas. Mot. at 10. CW2 related information about weekly and quarterly meetings where declining sales were discussed "every time," it was not just CW2's opinion. ¶¶44, 102. Likewise, CW3's "opinion" (Mot. at 11) that the sales forecast was unattainable and needed to be adjusted downwards is given more weight with the corroborating facts provided by the other CWs. *See also Karinski v. Stamps.com, Inc.*,

reports and presentations showing declining sales and losses to competitors, and that the Individual Defendants reviewed and/or had access to the reports (¶¶103-06).  *See Quality Sys.*, 865 F.3d at 1145 (CW statements "establish the existence of 'funnel reports' and sales forecasts . . . available to executives" and that senior executives monitored revenues and earnings).

Similarly, CW3 amply demonstrates the known issues with declining sales in 2019.  Due to the average sales cycle for Fluidigm being "6 to 9 months" (¶79), the Company began sales forecasting six months prior to the new year (¶37), thus for 2019, the period in question, forecasting done in preparation would be relevant despite Defendants' argument otherwise (Mot. 11-12).  CW3 presented the Individual Defendants with declining sales figures not only with the initial forecast in third quarter 2018, but repeatedly with provisions of updated sales forecasts at least monthly.  ¶¶36-39.  And, when the day of reckoning came as CW3 stated it would, CW3 was brought into a meeting to develop "strategic pricing" to allow for discounts without technically repricing the product.[9]  ¶40.  That CW3 prepared mass cytometry sales forecasts for North America only (Mot. at 11) does not diminish CW3's allegations as CW3 attended the quarterly business review where all sales were discussed (¶104).  *In re Silver Wheaton Corp. Sec. Litig.*, 2016 U.S. Dist. LEXIS 74162, at *9 n.3 (C.D. Cal. June 6, 2016) (reasonable to infer knowledge of "company-wide" practices even if CW worked in one region).  Further, the largest decrease in revenue occurred in the Americas and "primarily in the United States" (¶¶84, 86) and U.S. customers ***alone*** represented 37% of the Company's revenue (*id.*).[10]

---

2020 U.S. Dist. LEXIS 10721, at *41 (C.D. Cal. Jan. 17, 2020) (declining to accept defendants' argument that simple difference of opinion because "[w]hile Defendants may ultimately prove that this is the case, Plaintiff has not alleged such a set of facts").  For these reasons (and those explained throughout this brief), the CWs here are distinguishable from the CWs in *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1194 (9th Cir. 2021) (Mot. at 11), where only two CWs felt the goal was unachievable.

[9]  That the Company had to develop "strategic pricing" for the product to make sales in a quarter also supports the allegation that the products were over-priced, contrary to Defendants' claim that it was only CW3's opinion (Mot. at 15).

[10]  Mot. at 11.  To the extent Defendants assert a materiality argument in stating that guidance was only missed by 2% (Mot. at 11), this ignores the fact that third quarter 2019 revenue decreased by 8.5% with mass cytometry revenues decreasing by 13% and mass cytometry product revenues decreasing by 23% (¶84).  These are undoubtedly material amounts given that the mass cytometry segment was the Company's future with the microfluidics segment rapidly declining prior to and during the Class Period.  *See, e.g., In re Merit Med. Sys.*, 2021 U.S. Dist. LEXIS 60460, at *31-33 (C.D. Cal. Mar. 29, 2021) (finding material a revenue guidance miss of 0.3% where allegations premised on revenue relating to

CW3, CW4 and CW5's consistent competition allegations are also sufficient.[11]  They detail why Cytek's product was more appealing to customers than Fluidigm's (¶48), the effect of Cytek's new product entry on Fluidigm's customers (¶46), and that it was "one of the reasons for Fluidigm's 2019 sales decline" (¶50).  Defendants' demands for more granular details (Mot. at 11-13) have been repeatedly rejected by courts at the motion to dismiss stage.  *See, e.g.*, *Quality Sys.*, 865 F.3d at 1138-39, 1144 (finding falsity in part based on CW statements which did not quantify sales declines or specific deals that fell through); *Fitbit*, 2017 U.S. Dist. LEXIS 7722, at *23.

Finally, that CW5 and CW6 left prior to the Class Period does not negate their import.  Mot. at 13.  *Quality Sys.*, 865 F.3d at 1145 ("Although CW6 was not at QSI during the Class Period, as COO[,] CW6 had personal knowledge of executive level management" access to data); *Allegiant*, 412 F. Supp. 3d at 1260 ("Information from before the class period is relevant.").  CW6, Senior Vice President of Global Business Operations from 2016 until 2018, described the types of reports and reporting systems on sales that CW6 set up during CW6's tenure.  ¶¶104, 106.  These included the quarterly business review meetings, which CW3 confirmed were still in place during the Class Period (¶105).

---

single product which missed by 25% to 32%, and noting that "[i]mportantly, Plaintiffs challenged statements . . . are much broader than simply statements about 2019 revenue guidance").  "Whether an omission is 'material' is a determination that 'requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact'"  *Provenz v. Miller*, 102 F.3d 1478, 1489 (9th Cir. 1996).

[11]  In addition, Linthwaite's response to analysts' questions regarding competition drastically changed on the last day of the Class Period.  Instead of affirmatively denying any competitive pressures as before (¶79), he deflected, stressing other factors to be the cause of declining revenues (¶87).  Defendants disagree and insert their own interpretation of Linthwaite's statement (Mot. at 17), but when a statement can be read in more than one way, ambiguities are read in Plaintiff's favor.  *Skiadas v. Acer Therapeutics, Inc.*, 2020 U.S. Dist. LEXIS 129104, at *6-9 (S.D.N.Y. July 21, 2020); *see also In re Snap Sec. Litig.*, 2018 U.S. Dist. LEXIS 97704, at *16 (C.D. Cal. June 7, 2018) ("Defendants offer an alternative interpretation of [defendant's] alleged subsequent admissions . . . . regarding Snap's reliance on growth hacking.  But this only demonstrates that a factual dispute exists which cannot be resolved at the pleading stage."); *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1148 (N.D. Cal. 2017) (considering differences between "evasive responses" and strong statements as evidence of scienter).

### 3.       Statements Challenged as Puffery, Optimism, and Opinion are Actionable

Defendants also argue that certain alleged misstatements are non-actionable because they are statements of puffery or optimism.  Mot. at 8-9.  While true that vague, general statements are not usually actionable, "general statements of optimism, when taken in context, may form a basis for a securities fraud claim when those statements address specific aspects of a company's operation that the speaker knows to be performing poorly." *Quality Sys.*, 865 F.3d at 1143; *Zuora*, 2020 U.S. Dist. LEXIS 74648, at *32 ("[p]rojections and general expressions of optimism may be actionable under the federal securities laws") (quoting *Hanon v. Data Prods. Corp.*, 976 F.2d 497, 501 (9th Cir. 1992)).  "For example, the statement that a company 'anticipates a continuation of its accelerated expansion schedule,' while knowing that the expansion is already failing, is materially misleading." *Mulderrig v. Amyris, Inc.*, 2020 U.S. Dist. LEXIS 185382, at *38 n.12 (N.D. Cal. Oct. 5, 2020); *see also Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996) (statement that "everything [was] going fine" with FDA approval misleading where knew trials had failed).

Taken in context, the statements are materially misleading.  Thus, when touting such things as being the "market leader in [imaging mass cytometry]," that "mass cytometry adoption is robust" and that "[w]e're seeing really strong global funnel development," the statement must be examined in context of the Company's internal, but undisclosed, knowledge that mass cytometry sales (the core of its total revenue) were decreasing, in part due to a competitor, as the AC alleges.  *See* Section III.B.1.[12]

Furthermore, "[w]hat might be innocuous 'puffery' or mere statement of opinion standing alone may be actionable as an integral part of a representation of material fact when used to emphasize and induce reliance upon such a representation." *Impax*, 36 F. Supp. 3d at 966 (citing *Casella v. Webb*, 883 F.2d 805, 808 (9th Cir. 1989)).  "Accordingly, the Court may not assess the statements . . . in a vacuum . . . but rather [should] examine the entire statement and its circumstances to determine if it is actionable." *Id.*  This is what Defendants incorrectly ask the Court to do here.  Mot. at 8.  For example, "strong and steady demand" was an answer given in response to an analyst questioning whether the

---

[12]   *Police Ret. Sys. v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1060 (9th Cir. 2014), relied upon by Defendants (Mot. at 8) is inapposite for this reason.  There, when considering the context, the court found that the "market already knew of the difficulties facing Intuitive" and thus would have understood the "statements as mere corporate optimism." *Id.*

second quarter 2019 guidance implied a sequential decline, to which Linthwaite responded, "I'll fundamentally reassert what we said, we see strong and steady demand.  We don't really reveal backlog numbers, but we continue to see very strong demand for our instruments."  ¶65; *see also, e.g.*, ¶57 (answering question about backlog from analyst), ¶66 (responding to question about mass cytometry systems); ¶76 (responding to question asking for "some color about the sales funnel"); ¶77 (responding to question regarding disconnect between street guidance and Company guidance); ¶79 (responding to question about competition).  *Quality Sys.*, 865 F.3d at 1143-44 (assurances that pipeline "full and growing" went beyond "feel good" optimism).[13]

Defendants' argument that Linthwaite's statements during the August 1, 2019 earnings call are inactionable statements of opinion also fails.  Mot. at 16-17.  The statements are not opinions.  Linthwaite did not state he did not believe that competitors were not an issue, he affirmatively represented that "[t]here's not a fundamental change in the overall competitive landscape as we see it right now" and "we can't say that there's many new competitors that are necessarily extending out the ordering cycle."  ¶79.  *See Granite*, 2020 U.S. Dist. LEXIS 88788, at *21 ("the statements misrepresented *existing*, rather than future, overruns.  The Supreme Court has explicitly placed statements about *existing* things in the realm of 'fact.,' rather than 'opinion.'") (emphasis in original).  Even if these two misstatements could be considered opinions, they are not protected where, as here, they were not believed and objectively untrue.  *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 185-87, 194 (2015).  As alleged, at the time of the statements, Fluidigm's sales were decreasing and the Individual Defendants were discussing such internally on a weekly basis (*e.g.*, ¶¶43, 101) and reviewing reports showing potential sales going to competitors (*e.g.*, ¶103), thus statements denying changes to competitive landscape were objectively untrue and not believed by the

---

[13] *See also Stamps.com*, 2020 U.S. Dist. LEXIS 10721, at *35 (statement that USPS "very happy" with company actionable because USPS investigating company's resellers and thus "affirmatively create[d] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]"); *Impax*, 36 F. Supp. 3d at 966 ("[i]n deeming a statement puffery at the motion to dismiss stage, courts must exercise great caution"); *In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, 2018 U.S. Dist. LEXIS 87991, at *26 (S.D.N.Y. May 24, 2018) (statement that "continue[s] to make progress" not puffery where no qualifiers such as "aims to" or "wants to").

Defendants.  *See* Sections III.B.1 and III.C.; *see also Boston Ret. Sys. v. Uber Techs., Inc.*, 2020 U.S. Dist. LEXIS 141724, at *27 (N.D. Cal. Aug. 7, 2020).

### 4. No Safe Harbor Applies and the Risk Disclosures are Actionable Misstatements

Defendants' argument that many statements are shielded by the safe harbor (Mot. at 18-20) overlooks the fact that the AC clearly alleges falsity through omissions of ***historical or then-present*** facts regarding declining sales and sales impediments.  For example, the statement that the "sales funnel augers well for 2019" (¶53) is false and misleading because it failed to disclose that internal sales forecasts showed declining sales and increasing loss of deals to Cytek (*e.g.*, ¶¶46, 103).  "The safe harbor applies to forward-looking statements only, and not to material omissions of present facts." *In re Celera Corp. Sec. Litig.*, 2013 U.S. Dist. LEXIS 125621, at *7 (N.D. Cal. Sept. 3, 2013) (declining safe harbor protection for financial projections as they were "too closely related to this omitted, material, and historical fact"); *Amyris*, 2020 U.S. Dist. LEXIS 185382, at *43 (safe harbor did not apply where defendants "failed to disclose the material facts undermining [the] projections"); *Roberti v. OSI Sys.*, 2015 U.S. Dist. LEXIS 24761, at *23 (C.D. Cal. Feb. 27, 2015) ("to the extent Plaintiffs [] challenge Defendants' *alleged omission of present facts* . . . the PSLRA's safe harbor does not apply"); *In re CV Therapeutics, Inc. Sec. Litig.*, 2004 U.S. Dist. LEXIS 17419, at *33 (N.D. Cal. Aug. 5, 2004).

In addition, for several of the statements, the "allegation[s] of falsehood relate[] to non-forward-looking aspects of the statement[]." *Quality Sys.*, 865 F.3d at 1142.  For example, "we enter 2019 with a solid backlog" (¶55), "we can see the opportunities building" (¶57), and "we continue to see very strong demand for our instruments" (¶65) refer to a present facts, and are not forward-looking. *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 705 (7th Cir. 2008) (finding statement that sales "still going strong" not forward-looking because it "was saying both that current sales were strong and that they would continue to be so, at least for a time, since the statement would be misleading if [defendant] knew that its sales were about to collapse"); *Impax*, 36 F. Supp. 3d at 965 ("statements of past or present *facts* are not covered by the safe harbor provision-even when they are inextricably tied to forward-looking statements") (emphasis in original); *Mallen v. Alphatec Holdings, Inc.*, 861 F. Supp. 2d 1111, 1126 (S.D. Cal. 2012) (statements "[w]e have *already begun* to realize synergies" and "we

anticipate that our revenues through the balance of 2010 *will continue to grow*" are "based on representation of historical or current facts" and not forward-looking, to "continue" necessarily means "that they have *already been growing*") (emphasis in original).

Although the safe harbor is inapplicable to all of the statements referenced by Defendants (Mot. at 18-19) because they omit material adverse facts, assuming arguendo that the safe harbor could be applied to the forward-looking portion of mixed statements, Fluidigm's cautionary language fails. *First*, the risks had already transpired, defendants knew that sales were ***already*** declining due to an over-priced product, a flawed marketing plan and Cytek's market entrance. *Cutler v. Kirchner*, 696 F. App'x 809, 813 (9th Cir. 2017) (risk disclosures misleading where disclosed "a risk in the abstract . . . that [] had already come to fruition"). *Second*, throughout the Class Period, Defendants affirmatively stated that demand and the sales funnel were strong and in-line with previous quarters and continually denied competition cannibalization, counteracting any effect the "cautionary language" may have had. *See, e.g.*, *Provenz*, 102 F.3d at 1494 (rejecting application of bespeaks caution doctrine and noting that assurances during conference call "led the analysts to believe that the second quarter earnings would be similar to the first quarter earnings"); *Snap*, 2018 U.S. Dist. LEXIS 97704, at *17 (defendants "statements could have misleadingly reassured investors . . . thus operat[ing] as a rebuttal of any" negative impact to the company's results); *In Re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1033, 1035 (S.D. Cal. 2005) ("the cautionary statement must discredit the alleged misrepresentations to such an extent that 'the risk of deception drops to nil'").

Lastly, the safe harbor also does not protect forward-looking statements when the defendants have actual knowledge of the statements' falsity. 15 U.S.C. § 78u-5(c)(B)(i); *In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 972-73 & n.12 (N.D. Cal. 2009) (denying application of safe harbor where alleged defendants knew of "declining demand, declining margins, operational difficulties, increased costs, and internal control problems" at the time made "optimistic guidance statements" and stating "[a]t the very least, Plaintiffs have alleged that [defendants] were aware of undisclosed facts tending seriously to undermine the accuracy of their financial guidance"). As set forth in Section III.C. *infra*, Defendants knew from the start of the Class Period that demand for mass cytometry products was decreasing for a number of reasons that were not disclosed to investors. *See also* Section III.B.1.

For the reasons above, the risk disclosures in the Company's SEC filings themselves (¶¶59, 60, 68, 81) were misleading as well.  Defendants listed "numerous factors" which they claimed ***could*** cause "[v]ariability in our quarterly or annual results" and "***may*** lead to volatility in our stock price," and stated that the Company "***may*** not be able to successfully compete" against a list of over twenty-five companies (¶60).  There was "no indication that the risk may already have come to fruition." *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1181-82 (9th Cir. 2009) (misleading "risk factors" actionable because risk already occurring).  Defendants' cherry-pick a few terms out of the risk disclosures in an attempt to negate Plaintiff's argument that they merely suggested what "could" occur.  Mot. at 14-15.  Stating that results "have varied" and that the Company "will continue to face increased competition ***in the future***" does not save Defendants.  *Id.*  Those terms in no way relay that at the time of the statements, Defendants ***knew*** that the risks had already affected the Company in a negative manner.  *See Meyer v. JinkoSolar Holdings Co.*, 761 F.3d 245, 251 (2d Cir. 2014) ("A generic warning of risk will not suffice when undisclosed facts on the ground would substantially affect a reasonable investor's calculations of probability."); *Uber*, 2020 U.S. Dist. LEXIS 141724, at *15-18, *26 (holding that even though risk factors "neither 'terse' nor 'generic'" "what was disclosed . . . was not enough to render what was *not* disclosed, not misleading" because [it] did "not suggest that any of those scenarios already exist").  Similarly, merely stating that Cytek was a competitor does not save Defendants.  Mot. at 15.  Cytek was included in a list of over twenty-five companies who "compete in certain segments of the market in which we sell our products" (¶60).  That information does not provide any indication to investors that Cytek was cannibalizing Fluidigm's mass cytometry sales at a rapid pace and in large amounts.  *Rabkin v. Lion Biotechnologies, Inc.*, 2018 U.S. Dist. LEXIS 25326, at *26-28 (N.D. Cal. Feb. 15, 2018) ("The risk disclosures were not vague, generalized statements. They were specific, particularized showings that demonstrate the omission of this particular risk disclosure was not wholly innocent.").

## C.    The AC Raises a Strong Inference of Scienter

To plead scienter, a plaintiff must state particularized facts "giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).  A court must "accept all factual allegations in the complaint as true" and determine "whether *all* of the facts alleged,

taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs.*, 551 U.S. at 322-24 (emphasis in original); *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 48 (2011) ("In making [the scienter] determination, the court must review all allegations holistically.").  The AC readily satisfies this standard.

### 1. Defendants Knew Critical Facts Undermining the Truth of Their Public Statements

The AC contains particularized facts, including accounts by six CWs, alleging Defendants' knowledge of facts and access to information that contradicted their public statements.  Allegations like those here of "contemporaneous reports or data, available to the party, which contradict the statement[s]" are "[t]he most direct way" to show scienter.  *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004); *see also S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 786 (9th Cir. 2008) (allegations of "actual access to the disputed information" "may independently satisfy the PSLRA"); *El Pollo Loco*, 2017 U.S. Dist. LEXIS 123458, at *49 (where defendants "had access to and . . . used data tracking in real time the decline of sales and transactions" a strong inference of scienter raised).

Despite Defendants' best efforts to characterize the CW allegations as "vague" and lacking specificity (Mot. at 21-22), the CWs confirm that the ongoing and increasing sales declines and increasing competitive cannibalization were brought to the Defendants' attention continuously via reports, meetings, and discussions.[14]  These meetings and internal reports include the following:

- Linthwaite and Jog attended weekly meetings with CW1 and other senior management where, during 2019, sales performance, and how it fell short of budgeted revenues was discussed every time (¶¶43, 101);

---

[14]  Defendants' purported case law in support of their argument (Mot. at 22) is misplaced.  Here, Plaintiff alleges direct contact between the CWs and the Individual Defendants and that negative information was provided to them.  *See also* Section III.B.2. (describing, *inter alia*, the Ninth Circuit's requirements for CWs and showing that the CWs meet those requirements).  Defendants' contention that none of the CWs had "personal knowledge about the mental states" of the Individual Defendants (Mot. at 21) is irrelevant as courts have clearly stated that it is not necessary to do so.  *See S. Ferry LP No. 2 v. Killinger*, 687 F. Supp. 2d 1248, 1254 (W.D. Wash. 2009) (because "it is difficult to find facts regarding an adversarial party's state of mind . . . Plaintiffs may point to either direct or circumstantial evidence to show" scienter); *see also Daou*, 411 F.3d at 1016.

- According to CW2, during all sales team conference calls and meetings, disappointing sales were discussed. Sales teams call occurred regularly, as often as weekly near quarter ends, and the CCO always attended as did Jog at times. In-person meetings were also held once per quarter at the Company headquarters and occasionally during industry conferences and were attended by the CCO and Linthwaite (¶¶44, 102);

- Fluidigm used Salesforce to track sales opportunities, progress, and preferences and sales personnel were expected to regularly update it so that leadership would have access to the reports and data. The Salesforce information was also discussed during the sales conference calls and included reasons why any deal fell through, which happened often due to losses to a competitor (¶103);

- CW3 attended quarterly business review meetings with the Individual Defendants and beginning with the third quarter 2018 meeting, where the 2019 sales forecast was initially presented, continually pointed to weakening sales and unattainability of the positive sales forecast. CW3 also produced updated sales forecasts and sales updates at least monthly which detailed current number of orders in, how many more were needed to meet goals, and other information (¶¶36-39, 42, 105); and

- CW6, who set up the systems and reports as described in the AC, explained that sales and potential deals were monitored closely by the executives using the systems and reports which CW6 describes in detail (*i.e.*, reports included the likelihood of deals closing and where each sale was in the process and if a deal was falling apart that it be in the "probability index"); that updated sales projections were sent to executive leadership and senior management three times a quarter and included likelihood of deals closing; and, that the Individual Defendants went over "every win, every loss, every number" (¶¶ 104, 106).

All of these meetings and internal reports are probative of scienter.[15] *See, e.g.*, *Reese v. Malone*, 747 F.3d 557, 572 (9th Cir. 2014) (scienter based on "data to which [defendant] had access"); *Quality Sys.*,

---

[15] Contrary to Defendants' claim, Mot. at 21-22, the information relayed in the reports and meetings directly contradicts Defendants' public statements as discussed at length in Section III.B. above.

865 F.3d at 1145 ("[P]articularlized allegations that defendants had actual access to disputed information . . . raise a strong inference of scienter.") (ellipsis in original); *Amyris*, 2020 U.S. Dist. LEXIS 185382, at \*57 (same).

In addition to the foregoing, that the CW allegations corroborate each other supports scienter. ¶¶ 36-40, 42-44, 101-06 (detailing declining sales calls and meetings by CWs 1, 2, 3, and 6); ¶¶ 45-48, 50, 103 (competitor issues described by CWs 2, 3, 4, and 5). *See Hatamian v. Advanced Micro Devices, Inc.*, 87 F. Supp. 3d 1149, 1163 (N.D. Cal. 2015) (corroborating witness statements and defendants' presence at meetings where topics discussed supports finding that scienter standard met); *UTStarcom*, 617 F. Supp. 2d at 975 (where undisclosed practices "were well known throughout the Company" inference of scienter).

At minimum, "defendants "[r]ecklessly turn[ed] a 'blind eye' to [the] impropriety [which] is equally culpable conduct" and supports a finding of scienter. *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 695, 708 (9th Cir. 2012).

## 2. Core Operations and Admitted Knowledge Support Scienter

The law is clear that an inference of scienter arises where the fraud involves the company's "core operations" as it does here. *See S. Ferry*, 542 F.3d at 786 (inference of scienter "where the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter"); *Rabkin*, 2018 U.S. Dist. LEXIS 25326, at \*35 ("small size of the company" and "importan[ce] of the promotional scheme" supports inference of scienter). Fluidigm, a small company with only 535 employees (¶94)[16], entered the Class Period with its microfluidics

---

"Defendants' generic and misplaced characterization of Plaintiffs' complaint does not in any way rebut the allegations that Defendants' statements were made" with scienter. *In re MannKind Sec. Actions*, 835 F. Supp. 2d 797, 810 (C.D. Cal. 2011). Defendants' claim that knowing the above does not prove that Defendants believed sales were declining is a red-herring. Besides the fact that CW1 stated that the Individual Defendants themselves discussed the topic, such contentions have been expressly rejected by courts. *See, e.g.*, *Evanston Police Pension Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 602 (N.D. Cal. 2019) (rejecting argument that "knowledge of pricing is insufficient to allege knowledge of price-fixing" given defendants "access to information"); *Granite*, 2020 U.S. Dist. 88788, at \*25 (similar); *In re Diamond Foods, Inc. Sec. Litig.*, 2012 U.S. Dist. LEXIS 170704, at \*27-28 (N.D. Cal. Nov. 30, 2012) (similar).

[16] The Company can be viewed as even smaller when taking into consideration who would know about sales and Fluidigm's financial condition. Of the 535 employees, 107 worked in general and

segment failing, and thus the newer mass cytometry segment its main source of future revenue and top priority for continued success. *E.g.*, ¶¶31-32, 61, 70, 72, 93; *In re Apple Sec. Litig.*, 2020 U.S. Dist. LEXIS 206298, at *24 (N.D. Cal. Nov. 4, 2020) (scienter adequately alleged through core operations where market was "highest growth market" and accounted for "nearly 20% of Apple's revenues"). Given that Fluidigm's future depended on its mass cytometry products and ability to continue with sales in the face of competitive pressure, Defendants continually stressed Fluidigm's purported "market leader" position in mass cytometry (*e.g.*, ¶53), strong sales funnel (*e.g.*, ¶¶65, 76), and lack of any competitive pressure (*e.g.*, ¶79). Thus, it is "absurd to suggest" that the Individual Defendants did not have intimate knowledge of the mass cytometry sales figures and any issues undermining potential sales.

Linthwaite and Jog repeatedly demonstrated their firsthand knowledge of Fluidigm's mass cytometry segment, its "sales funnel," customers, and financial condition throughout the Class Period. Defendants "'bridge[d] the [scienter] gap' . . . by referencing the data directly" and "[i] is unclear what further facts [Plaintiff] would need to plead to create a stronger inference that [they] had access to [the] information [they] discussed publicly." *Reese*, 747 F.3d at 572 (quoting *S. Ferry*, 542 F.3d at 783); *see also OSI*, 2015 U.S. Dist. LEXIS 24761, at *30 ("an inference of scienter can be established by the fact that the Defendants touched on the specific issues . . . in their public statements").

Linthwaite and Jog gave great details on the Company's mass cytometry segment, including its revenues (¶¶64, 73, 76, 77) and customers (¶¶55, 56, 62), breaking down numbers of instruments sold (¶53), geographies (¶¶57, 62, 65, 76, 77), and even specific deals (¶¶72, 77, 79). Moreover, a large number of the alleged misstatements were in response to analyst questions and designed to reassure analysts and investors that there were no concerns with demand, the sales funnel, or competition. *E.g.*, ¶¶57, 65, 66, 76-79; *see In re Qualcomm Inc. Sec. Litig.*, 2019 U.S. Dist. LEXIS 44125, at *33 (S.D. Cal. Mar. 18, 2019) (that defendants "issued specific [statements] … in response to questions from analysts and investors" contributed to strong inference of scienter); *S. Ferry*, 687 F. Supp. 2d at 1259 (when defendant "repeatedly reassured investors—in the face of *direct questioning*" evidence of

administrative and 190 worked in sales, technical support, and marketing, the remainder worked in either research and development or manufacturing.  ¶94.

"knowledge of the" issues inferred) (emphasis in original); *In re Finisar Corp. Sec. Litig.*, 2017 U.S. Dist. LEXIS 66229, at \*22 (N.D. Cal. May 1, 2017) (scienter found where "analysts had been speculating about the possibility of an inventory build-up for months, providing further incentive for Defendants to seek out or pay attention to such information").

Linthwaite even admitted that he "traveled extensively in all of [Fluidigm's] major regions over the past months" during the first quarter 2019 earnings call, and had "recently visited [Fluidigm's] team [in China] and a number of large customers" as well as "a lot of new accounts [for mass cytometry] in the last 2 quarters." ¶97; *Apple*, 2020 U.S. Dist. LEXIS 206298, at \*24 (noting in scienter analysis that defendant "frequently travels to China to track business there"). All the while, Defendants withheld the fact that the Company was experiencing declining mass cytometry sales and the reasons therefore.

Lastly, the first financial report after the Class Period, the 2019 Form 10-K, drastically changed Fluidigm's risk disclosures regarding competitors. The lengthy Class Period risk factors included a laundry list of over twenty-five competitors, but the new risk factor merely stated that Cytek and one other company were competitors. ¶99. Contrary to Defendants' arguments otherwise (Mot. at 24 n.8), post-class period events can support scienter.[17]  *See, e.g.*, *Todd v. STAAR Surgical Co.*, 2016 U.S. Dist. LEXIS 186511, at \*23 (C.D. Cal. Apr. 12, 2016); *Constr. Workers Pension Tr. Fund v. Genoptix, Inc.*, 2013 U.S. Dist. LEXIS 49716, at \*22-23 (C.D. Cal. Mar. 22, 2013).

### 3.     The Absence of Stock Sales Is Irrelevant

Plaintiff need not plead motive (Mot. at 22-23). *Tellabs*, 551 U.S. at 321, 325. The Individual Defendants' absence (and even purchase of)[18] of stock sales is not relevant at the motion to dismiss stage and does not support any compelling innocent inference. *In re Twitter, Inc. Sec. Litig.*, 2020 U.S. Dist. LEXIS 86978, at \*45 (N.D. Cal. Apr. 17, 2020) ("absence of stock sales by [defendants] is

---

[17] This is true for falsity as well. *See, e.g.*, *In re U.S. Aggregates, Inc. Sec. Litig.*, 235 F. Supp. 2d 1063, 1067 n.3 (N.D. Cal. 2002) (permitting allegations of post-class period conduct to support falsity, stating "[a]ny information that sheds light on whether class period statements were false or materially misleading is relevant.").

[18] While Plaintiff does not oppose Defendants' request for judicial notice, Plaintiff asserts that the contents of the documents should not be accepted for the truth of the matters asserted therein or used to resolve disputes of fact. *Khoja*, 899 F.3d at 998-99 (admonishing "the unscrupulous use of extrinsic documents to resolve competing theories").

insufficient to show a lack of scienter as a matter of law") (citing *No. 84 Emp'r Teamster Joint Council Pension Tr. Fund*, 320 F.3d at 944 ("Scienter can be established even if the officers who made the misleading statements did not sell stock during the class period. . . .  In other words, the lack of stock sales by a defendant is not dispositive as to scienter."); *Resh v. China Agritech, Inc.*, 2019 U.S. Dist. LEXIS 42228, at *17 (C.D. Cal. Jan. 8, 2019) (argument that no financial motive alleged "neither supports nor negates scienter" a "failure to allege motive is not fatal") (citing *Matrixx*, 563 U.S. at 48).

### 4.     Defendants Do Not Present an Equally, Let Alone More Compelling, Inference That Defendants Acted Without Scienter

Plaintiff is not required to show that the inference of fraudulent intent is "irrefutable, *i.e.*, of the 'smoking gun' genre or even the 'most plausible of competing inferences'" but only "at least as compelling" as any opposing inference.  *Tellabs*, 551 U.S. at 324; *see also Granite*, 2020 U.S. Dist. LEXIS 88788, at *26 (PSLRA "does not require the complaint to disprove every conceivable innocent explanation").   Defendants offer no opposing inference other than to reiterate their tireless and unsupported assertions that the AC contains no particularized facts; there were no stock sales by the Individual Defendants; and Fluidigm met its revenue guidance for the first two quarters of 2019 and merely "found itself operating in a challenging environment."  Mot. at 25.  Against the amalgamation of scienter allegations, with corroborating CW accounts, such a belief is far from compelling.  *See, e.g.*, *Makor*, 513 F.3d at 710 (denying similar reasoning, stating "[t]he argument confuses expected with realized benefits.").  As detailed in the AC and herein, the particularized facts show knowledge of slowing sales and increasing competition, among other things, that came to a head in the third quarter of 2019 (and not in the first two quarters because of the 6 to 9 month sales cycle for mass cytometry products) and unsurprisingly continued throughout 2020.  Defendants concealed the reality until forced to do otherwise.

## IV.     <u>CONCLUSION</u>

For the foregoing reasons, the Motion should be denied in its entirety.  If the Court grants the Motion, in whole or in part, Plaintiff respectfully requests leave to amend.

DATED: May 20, 2021

Respectfully submitted,

**BRAGAR EAGEL & SQUIRE, P.C.**

/s/ *Melissa A. Fortunato*
Melissa A. Fortunato (#319767)
Marion C. Passmore (#228474)
580 California Street, Suite 1200
San Francisco, California 94104
Telephone: (415) 568-2124
Email: fortunato@bespc.com
          passmore@bespc.com

- and -

Lawrence P. Eagel
810 Seventh Avenue, Suite 620
New York, New York 10019
Telephone: (212) 308-5888
Facsimile: (212) 504-3260
Email: eagel@bespc.com

*Counsel for Lead Plaintiff
and the Proposed Class*