UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

KWOK KONG, et al.,

           Plaintiffs,

    v.

FLUIDIGM CORPORATION, et al.,

           Defendants.

Case No.  20-cv-06617-PJH

**ORDER GRANTING DEFENDANTS'
MOTION TO DISMISS**

Re: Dkt. No. 39

    Defendants' motion to dismiss plaintiff's amended complaint came on for hearing
before this court on July 22, 2021.  Plaintiff appeared through his counsel, Lawrence
Eagel and Marion Passmore.  Defendants appeared through their counsel, Ignacio
Salcedo and Diane Walters.  Having read the papers filed by the parties and carefully
considered their arguments and the relevant legal authority, and good cause appearing,
the court hereby **GRANTS** defendants' motion, for the following reasons.

## I.    Background

    Defendant Fluidigm Corporation ("Fluidigm") manufactures and markets products
and services that are used by researchers to study health and disease, identify
biomarkers, and accelerate the development of therapies.  Fluidigm is incorporated in
Delaware, headquartered in South San Francisco, and publicly traded on Nasdaq.
Defendant Stephen Christopher Linthwaite has served as Fluidigm's President, CEO, and
member of the Board of Directors since October 2016.  Defendant Vikram Jog has
served as Fluidigm's CFO since February 2008.  Together, Linthwaite and Jog are
referred to as the "individual defendants."  Lead plaintiff Kwok Kong seeks to represent a

United States District Court
Northern District of California

1   class on behalf of persons and entities that purchased or otherwise acquired Fluidigm

2   securities during the proposed class period, between February 9, 2019, and November 5,

3   2019.

4       Plaintiff alleges that defendants made materially false or misleading statements

5   and failed to disclose material adverse facts about the company's business, operations,

6   and prospects.  See [First] Amended Complaint ("FAC") (Dkt. 36) ¶ 7.  During the

7   proposed class period, plaintiff alleges that defendants' statements misled the market,

8   artificially inflating the market price of Fluidigm securities such that the price tumbled

9   upon subsequent public disclosures, leading to plaintiff's losses.  FAC ¶¶ 109-115.

10      Fluidigm has two main categories of products and services: mass cytometry and

11  microfluidics (also known as genomics).  FAC ¶ 23.  Since 2017, the company's

12  revenues from microfluidics decreased and Fluidigm relied more heavily on increasing

13  revenues from mass cytometry.  FAC ¶ 30-34.  Some Fluidigm employees, recognizing

14  the company's exposure on the mass cytometry front, began voicing concerns in the third

15  quarter of 2018 that the sales projections for mass cytometry were overly optimistic.  FAC

16  ¶ 38.

17      The allegedly false or misleading statements giving rise to this lawsuit took place

18  over a series of quarterly reports in 2019.  The company's third-quarter 2019 sales

19  apparently slumped for numerous reasons, including (1) over-priced products, (2) an

20  overly-general marketing strategy for highly-specialized products, (3) several "significant"

21  deals fell through, and (4) significant new competition.  FAC ¶ 41.  Cytek, Fluidigm's

22  competitor, gained market share using industry known, but updated, technology

23  compared to Fluidigm's unique technology that required customer education and

24  persuasion, leading to some delays and losses in purchases for Fluidigm.  FAC ¶¶ 45-50,

25  103.  Plaintiff alleges that this significant new competition posed a serious threat to

26  Fluidigm revenues over the period and that the individual defendants failed to articulate

27  the threat.  FAC ¶¶ 45-51.

28

United States District Court
Northern District of California

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### A.    Timeline of Public Statements

#### 1.    Fourth Quarter and Financial Year 2018 Reporting – February

On February 7, 2019, the start of the putative class period, Fluidigm announced financial results for fiscal year 2018, with revenue of $113 million, an increase of 11 percent over FY2017.  FAC ¶52.  Fluidigm also recapped results from the fourth quarter of 2018 and projected revenue guidance for the first quarter of 2019.  FAC ¶ 52. Fluidigm made these announcements through a press release and the individual defendants provided further explanation of the results during a conference call with financial analysts and investors on the same day.  FAC ¶¶ 52-59.

On March 18, 2019, Fluidigm filed its 2018 annual report on SEC Form 10-K, with detailed disclosures concerning the risks it faced.  FAC ¶¶ 59-60.  Among the cautions expressed, the report highlighted varied quarterly financial results and revenue growth rates, fluctuations in demand for the company's products, changes in customer budget cycles and capital spending, new product introductions and enhancements by Fluidigm and its competitors, and a complex and lengthy sales cycle.  FAC ¶ 60.  The report lists over 20 competitors.  FAC ¶ 60.

#### 2.    First Quarter 2019 Reporting – May

On May 2, 2019, Fluidigm announced its first quarter 2019 earnings results in a press release and again held a conference call with financial analysts and investors on the same day to provide further explanation of the earnings.  FAC ¶ 61-62.  In the first quarter of 2019, Fluidigm reported double-digit growth for the fourth consecutive quarter, particularly attributable to the mass cytometry line of business.  FAC ¶ 62.  The company issued its guidance for the second quarter alongside this report of first quarter results. FAC ¶ 61.  The second quarter guidance was additionally discussed on the conference call that day.  FAC ¶ 64.  Fluidigm filed a corresponding report regarding the first quarter earnings on SEC Form 10-Q on May 7, 2019, which disclosed numerous risks while reiterating and affirming the information provided via the May 2019 press release and accompanying earnings conference call.  FAC ¶ 68.

United States District Court
Northern District of California

Plaintiff charges that these May statements and reports were materially false and misleading where defendants failed to disclose to investors the following:

> (i) the Company's mass cytometry sales were slowing down in several aspects;
> (ii) the Company's mass cytometry products were over-priced;
> (iii) the Company's mass cytometry marketing approach was flawed;
> (iv) a new competitor in mass cytometry was cannibalizing Fluidigm's sales;
> (v) as a result, Fluidigm was experiencing longer mass cytometry sales cycles;
> (vi) as a result, several sales were delayed and/or fell through;
> (vii) as a result, the Company's mass cytometry revenue were [sic] declining;
> (viii) as a result, the sales forecasts and guidance for mass cytometry revenues during the Class Period were materially inaccurate; and
> (ix) as a result of the foregoing, Defendants' positive statements about Fluidigm's business, operations, and prospects were materially misleading and/or lack a reasonable basis.

FAC ¶ 69.

### 3.   Second Quarter 2019 Reporting – August

On August 1, 2019, Fluidigm reported second quarter 2019 revenue through a press release, holding a conference call with analysts and investors on the same day to provide further explanation.  FAC ¶¶ 70-71.  In the second quarter of 2019, Fluidigm reported revenue of $28.2 million, below analysts' expected revenue of $32 million.  FAC ¶ 70.  Revenues missed the double-digit growth rate for the first time in over a year, still returning an increase in revenues of seven percent (7%) over the same period the previous year.  FAC ¶ 70.  The company issued its guidance for the third quarter alongside this report of second quarter results.  FAC ¶¶ 70, 74.  In the FAC, plaintiff highlights the instances from the call transcript where the individual defendants discuss the "sales funnel" and anticipated sales.  See FAC ¶¶ 72, 76, 77.

The following day, the company's share price fell $4.10 or 34% in trading and closed at $8.05 per share.  FAC ¶ 80.

Fluidigm filed a corresponding report regarding the second quarter earnings on SEC Form 10-Q on August 7, 2019.  FAC ¶ 81.  This filing restated previously disclosed

United States District Court
Northern District of California

risks while reiterating and affirming the information provided via the August 2019 press release and accompanying earnings conference call.  FAC ¶ 81.

Plaintiff charges that these statements and reports were materially false and misleading where defendants failed to disclose to investors the following:

> (i) the true reasons for the slowing of mass cytometry sales;
> (ii) that the Company's mass cytometry products were over-priced;
> (iii) that the Company's mass cytometry marketing approach was flawed;
> (iv) that a new competitor in mass cytometry was cannibalizing Fluidigm's sales;
> (v) that as a result, Fluidigm was experiencing longer mass cytometry sales cycles;
> (vi) that as a result, several sales were delayed and/or fell through;
> (vii) that as a result, the Company's mass cytometry revenue was reasonably likely to decline;
> (viii) that as a result, the sales forecasts and guidance for mass cytometry revenues during the Class Period were materially inaccurate; and
> (ix) that, as a result of the foregoing, Defendants' positive statements about Fluidigm's business, operations, and prospects were materially misleading and/or lack a reasonable basis.

FAC ¶ 83.

### 4.    Third Quarter 2019 Reporting – November

On November 5, 2019, the last day of the proposed class period, Fluidigm reported third quarter 2019 revenue through a press release, holding a conference call with analysts and investors on the same day to provide further explanation.  FAC ¶¶ 84-85.  In the third quarter of 2019, Fluidigm reported revenue of $26.5 million, two percent (2%) below the August guidance and an eight and one-half percent (8.5%) decrease from the same period the previous year.  FAC ¶ 84.  In the FAC, plaintiff highlights the instances from the call transcript where the individual defendants avoid acknowledging the impact of market competition.  FAC ¶ 87.

The next day, the company's share price fell about 51% in trading and closed at $2.51 per share.  FAC ¶ 9.

United States District Court
Northern District of California

### B.      Additional and Specific Pleading

#### 1.      Scienter

Plaintiff alleges that scienter can be inferred where the individual defendants knew of Fluidigm's "core operations" but failed to disclose the realities of those operations, misleading the public.  FAC ¶¶ 93-96.  Plaintiff alleges that scienter can be inferred by the individual defendants' intimate knowledge of internal meetings and reports.  FAC ¶¶ 100-101.  Through these internal channels, the individual defendants were provided with updated information about how sales performance fell short of projections.  FAC ¶¶ 100-106.

Plaintiff additionally alleges that the individual defendants knew of the competitive threat posed to Fluidigm's mass cytometry sales by Cytek, but only mentioned the company as a potential competitor in a list of some 24 other companies.  FAC ¶¶ 98-99.

Lastly, plaintiff alleges that "corporate scienter" may be imputed to Fluidigm as an entity, where its corporate officers (the individual defendants) acted with authority to speak on behalf of the company through the public statements and SEC filings.  FAC ¶¶ 107-108.

#### 2.      Loss

Plaintiff alleges that the statements made by the individual defendants artificially inflated the stock price of Fluidigm by concealing the realities of the company's difficulties.  Plaintiff further identifies that Fluidigm's stock prices decreased dramatically following the defendants' reporting statements.  First, following the August 1, 2019, report disclosing lower-than-anticipated revenues, the "share price declined by $4.10 per share, or 33.74%, on heavier than usual trading volume, to close on August 2, 2019 at $8.05 per share."  FAC ¶ 112.  Second, following the November 1, 2019, report disclosing decreased revenues, the share price declined "$2.60, or 50.88%, on heavier than usual trading volume, to close on November 6, 2019 at $2.51 per share."  FAC ¶ 113.  Overall, the share price declined "***80.82%*** from the first partial disclosure on August 1, 2019."  FAC ¶ 113 (emphasis original).  Based on the timing of the declines in relation to the

6

1    announcements, they say, the plaintiff's losses were clearly related to the fraudulent

2    statements and cannot be attributed to more generic excuses such as market conditions.

3    FAC ¶ 114.

4              **3.    Class Claims**

5              Plaintiff brings this action as a putative class action, proposing a class "consisting

6    of all persons and entities that purchased or otherwise acquired Fluidigm securities

7    between February 7, 2019 and November 5, 2019, inclusive, and who were damaged

8    thereby."  FAC ¶ 116.  Plaintiff identifies the following questions of law and fact common

9    to the proposed class:

10                      • whether the federal securities laws were violated by
                        Defendants' acts as alleged herein;
11                      • whether statements made (or omissions) by Defendants to the
                        investing public during the Class Period misrepresented (or
12                      omitted) material facts about the business, operations, and
                        management of Fluidigm;
13                      • whether Defendants acted knowingly or recklessly in issuing
                        false and misleading statements (or omissions);
14                      • whether the prices of Fluidigm securities during the Class
                        Period were artificially inflated because of Defendants' conduct
15                      complained of herein; and
                        • to what extent the members of the Class have sustained
16                      damages and the proper measure of damages.

17   FAC ¶ 120.

18             **C.    Confidential Witnesses**

19             Plaintiff alleges the statements about internal operations and the individual

20   defendants' knowledge of the company's difficulties can be corroborated by confidential

21   witnesses.  The witnesses and their previous roles are listed here:

22             1.     Confidential Witness ("CW") 1 – a Marketing Specialist and

23                    Executive Assistant at the Company's corporate headquarters from

24                    December 2017 until September 2019, reporting to the Senior Vice

25                    President of Marketing.  FAC ¶ 33.

26             2.     CW 2 – an Associate Sales Director from March 2018 until

27                    September 2019 whose territories included Latin America and parts

28                    of the United States at varying times, reporting at first to the Chief

Commercial Officer ("CCO") and then to the Sales Director.  FAC ¶ 34.

3.   CW 3 – served as Vice President of Commercial Operations at Fluidigm from November 2015 until June 2020 at the Company's headquarters, overseeing the sales division and all sales representatives in North America, as well as the marketing support services division.  FAC ¶ 36.

4.   CW 4 – a Field Application Scientist from July 2017 until July 2020, supporting both sales staff and customers on the technical use of Fluidigm products, as well as troubleshooting current customer problems that arose, and focusing on the mass cytometry line.  FAC ¶ 46.

5.   CW 5 – served as Vice President of Cellular Proteomics, and then Director of Mass Cytometry Market (CW5's job title changed due to the Company's restructuring, but job responsibilities were the same throughout CW5's tenure), serving as the chief support for the sales department on cytometric technical expertise, as well as assisting the marketing department and the research and development department from November 2015 until June 2018.  FAC ¶ 47.

**D.    Procedural History**

The original complaint in this putative class action was filed on September 9, 2021, by Reena Saintjermain.  Dkt 1.  Saintjermain issued public notice of the lawsuit, and both Prakash Patel and Kwok Kong filed motions asking the court to appoint themselves lead plaintiffs.  Dkt. 14, 18, & 19.  The court appointed Kong as lead plaintiff by order entered December 14, 2020.  Dkt. 31.

The amended complaint ("FAC"), the subject of this motion to dismiss, was filed on February 19, 2021.  Dkt. 36.  It identifies the following causes of action: (1) violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder (against

United States District Court
Northern District of California

1    all defendants), and (2) violations of Section 20(a) of the Exchange Act (against the

2    individual defendants).

3            Defendants filed the instant motion to dismiss plaintiff's amended complaint on

4    April 5, 2021.  Dkt. 39.  Alongside, they filed a "notice of incorporation by reference and

5    request for judicial notice."  Dkt. 40.  Plaintiff filed an opposition on May 20, 2021.  Dkt.

6    41.  Defendants replied on June 21, 2021.  Dkt. 42.

7    **II.    Request for Judicial Notice**

8            In connection with their motion to dismiss, defendants request judicial notice of

9    press releases, transcripts of quarterly earnings calls, and reports submitted to the SEC

10   by Fluidigm, all from the putative class period.

11           "Although generally the scope of review on a motion to dismiss for failure to state a

12   claim is limited to the Complaint, a court may consider evidence on which the complaint

13   necessarily relies if: (1) the complaint refers to the document; (2) the document is central

14   to the plaintiffs' claim; and (3) no party questions the authenticity of the copy attached to

15   the 12(b)(6) motion."  Daniels-Hall v. Nat'l Educ. Ass'n, 629 F.3d 992, 998 (9th Cir. 2010)

16   (internal quotation marks and citations omitted).  The court may "treat such a document

17   as 'part of the complaint, and thus may assume that its contents are true for purposes of

18   a motion to dismiss under Rule 12(b)(6).'"  Marder v. Lopez, 450 F.3d 445, 448 (9th Cir.

19   2006) (quoting United States v. Ritchie, 342 F.3d 903, 908 (9th Cir. 2003)).

20           Here, the FAC refers to and quotes from the following SEC reports filed by

21   Fluidigm: Form 8-K filed on February 7, 2019 (Exhibit 1); excerpts from Form 10-K for FY

22   2018 filed on March 18, 2019 (Exhibit 3); Form 8-K filed on May 2, 2019 (Exhibit 4);

23   excerpts from Form 10-Q for the Q1 2019 filed on May 7, 2019 (Exhibit 6); Form 8-K filed

24   on August 1, 2019 (Exhibit 7); excerpts from Form 10-Q for Q2 2019 filed on August 7,

25   2019 (Exhibit 9); Form 8-K filed on November 5, 2019 (Exhibit 10); and excerpts from

26   Form 10-K for FY 2019 filed on February 27, 2020 (Exhibit 12).  Plaintiff does not dispute

27   the authenticity of these documents.  Therefore, judicial notice of the reports is

28   appropriate.

United States District Court
Northern District of California

United States District Court
Northern District of California

1     In addition, the FAC refers to and quotes from the following Fluidigm quarterly

2   earnings calls: Q4 2018 earnings call dated February 7, 2019 (Exhibit 2); Q1 2019

3   earnings call dated May 2, 2019 (Exhibit 5); Q2 2019 earnings call dated August 1, 2019

4   (Exhibit 8); and Q3 2019 earnings call dated November 5, 2019 (Exhibit 11).  Plaintiff

5   does not dispute the authenticity of these transcripts.  Therefore, judicial notice of the

6   transcripts is appropriate.

7     Defendants also request judicial notice of SEC reports that are not referenced in

8   the FAC.  "The court may judicially notice a fact that is not subject to reasonable dispute

9   because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can

10  be accurately and readily determined from sources whose accuracy cannot reasonably

11  be questioned."  Fed. R. Evid. 201(b).  District courts regularly take judicial notice of SEC

12  filings in the context of securities litigation.  See Metzler Inv. GMBH v. Corinthian Colls.,

13  Inc., 540 F.3d 1049, 1064 n.7 (9th Cir. 2008).  Defendants request that the court take

14  notice of the following SEC reports for evaluating defendants' transactions in company

15  securities: form 4 filed with the SEC on behalf of Stephen Christopher Linthwaite on

16  August 27, 2019 (Exhibit 13); excerpts from Fluidigm's Form DEF 14A, filed with the SEC

17  on April 23, 2019 (Exhibit 14); and excerpts from Fluidigm's Form 10-K for the fiscal year

18  2017, filed with the SEC on March 8, 2018 (Exhibit 15).  Plaintiff does not oppose

19  defendants' request.  Because their authenticity is not disputed, and because, as noted

20  above, courts routinely take judicial notice of these types of documents, judicial notice of

21  these SEC filings is also appropriate.

22     Plaintiff specifically states, "While Plaintiff does not oppose Defendants' request

23  for judicial notice, Plaintiff asserts that the contents of the documents should not be

24  accepted for the truth of the matters asserted therein or used to resolve disputes of fact."

25  Opp Br. (Dkt. 41) at 24 n.18 (citing Khoja v. Orexigen Therapeutics, Inc., 899 F.3d 988,

26  998-99 (9th Cir. 2018) (admonishing "the unscrupulous use of extrinsic documents to

27  resolve competing theories")).  The court agrees.  To the extent any facts contained

28  within these documents are reasonably disputed, the court does not take judicial notice of

1   those facts.  See Lee v. City of Los Angeles, 250 F.3d 668, 689 (9th Cir. 2001) (overruled

2   on other grounds by Galbraith v. County of Santa Clara, 307 F.3d 1119 (9th Cir. 2002)).

3   **III.    Motion to Dismiss**

4        Defendants seek dismissal of the amended complaint pursuant to the Private

5   Securities Litigation Reform Act of 1995 ("PSLRA") and Federal Rules of Civil Procedure

6   12(b)(6), 8, and 9(b).

7        **A.    Legal Standard**

8        A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests for the

9   legal sufficiency of the claims alleged in the complaint.  Ileto v. Glock, 349 F.3d 1191,

10  1199-1200 (9th Cir. 2003).  Under Federal Rule of Civil Procedure 8, which requires that

11  a complaint include a "short and plain statement of the claim showing that the pleader is

12  entitled to relief," a complaint may be dismissed under Rule 12(b)(6) if the plaintiff fails to

13  state a cognizable legal theory or has not alleged sufficient facts to support a cognizable

14  legal theory.  Somers v. Apple, Inc., 729 F.3d 953, 959 (9th Cir. 2013).

15       While the court accepts as true the factual allegations in the complaint, legally

16  conclusory statements not supported by actual factual allegations need not be accepted.

17  Ashcroft v. Iqbal, 556 U.S. 662, 678–79 (2009).  The complaint must proffer sufficient

18  facts to state a claim for relief that is plausible on its face.  Bell Atlantic Corp. v. Twombly,

19  550 U.S. 544, 555, 558–59 (2007).

20       "A claim has facial plausibility when the plaintiff pleads factual content that allows

21  the court to draw the reasonable inference that the defendant is liable for the misconduct

22  alleged."  Iqbal, 556 U.S. at 678 (citation omitted).  "[W]here the well-pleaded facts do not

23  permit the court to infer more than the mere possibility of misconduct, the complaint has

24  alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' "  Id. at 679

25  (quoting Fed. R. Civ. P. 8(a)(2)).  Where dismissal is warranted, it is generally without

26  prejudice, unless it is clear the complaint cannot be saved by any amendment.  Sparling

27  v. Daou, 411 F.3d 1006, 1013 (9th Cir. 2005).

28       Securities fraud claims under § 10(b) of the Securities Exchange Act of 1934 and

Securities Exchange Commission Rule 10b-5 promulgated thereunder must "meet the higher, [more] exacting pleading standards of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act (PSLRA)." Or. Pub. Emp. Ret. Fund v. Apollo Group Inc., 774 F.3d 598, 603-04 (9th Cir. 2014). Under Rule 9(b), claims alleging fraud are subject to a heightened pleading requirement—that a party "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). And private securities fraud complaints are subject to the "more exacting pleading requirements" of the PSLRA, which require that both falsity and scienter be pled with particularity. Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 990 (9th Cir. 2009).

To state a claim for securities fraud under § 10(b) and Rule 10b-5, a plaintiff must allege particularized facts showing (1) a material misrepresentation or omission of fact; (2) made with scienter; (3) a connection with the purchase or sale of a security; (4) reliance or "transaction causation;" (5) economic loss; and (6) loss causation (causal connection between the material misrepresentation and the loss). Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 341-42 (2005); see also Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 37-38 (2011). In order to properly allege falsity, "a securities fraud complaint must . . . specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." In re Rigel Pharm., Inc. Sec. Litig., 697 F.3d 869, 877 (9th Cir. 2012) (internal quotation marks and alteration omitted). In addition, in order to "adequately plead scienter under the PSLRA, the complaint must state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." Id. (internal quotation marks omitted).

**B.    Analysis**

Plaintiff alleges two causes of action: (1) violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder (against all defendants), and (2) violation of Section 20(a) of the Exchange Act (against the individual defendants).

Defendants do not argue that plaintiff failed to allege the following four elements: (1) the connection between the misrepresentations or omissions and the purchase or

1   sale of a security, (2) reliance, (3) economic loss, or (4) loss causation.  The court

2   therefore does not address these elements.  However, defendants contend that plaintiff

3   failed to allege (1) material misrepresentations or omissions and (2) scienter.  Both

4   elements are discussed in turn below.

1.   **Falsity – material misrepresentations or omissions**

6   In assessing the falsity of defendants' statements, the court considers whether the

7   allegations establish defendants' statements as false when made, whether the

8   statements amount to non-actionable corporate puffery, and whether the PSLRA's Safe

9   Harbor applies to shield the challenged statements.

a.   **Whether the CW allegations establish the challenged**
**statements as false when made**

12   Falsity is adequately alleged "when a plaintiff points to [the] defendant's

13   statements that directly contradict what the defendant knew at that time."  Khoja, 899

14   F.3d at 1008 (citing In re Atossa Genetics Inc. Sec. Litig., 868 F.3d 784, 794-96 (9th Cir.

15   2017)).  To plead falsity, a plaintiff must "specify each statement alleged to have been

16   misleading" and the "reasons why the statement is misleading[.]" 15 U.S.C. § 78u-

17   4(b)(1)(B); Zucco, 552 F.3d at 990-91.  A statement is misleading "if it would give a

18   reasonable investor the impression of a state of affairs that differs in a material way from

19   the one that actually exists."  Retail Wholesale & Dep't Store Union Local 338 Ret. Fund

20   v. Hewlett-Packard Co., 845 F.3d 1268, 1275 (9th Cir. 2017) (internal quotation marks

21   omitted).  Similarly, "an omission is material 'when there is a substantial likelihood that

22   the disclosure of the omitted fact would have been viewed by the reasonable investor as

23   having significantly altered the total mix of information available.'" Markette v. XOMA

24   Corp., No. 15-cv-03425-HSG, 2017 WL 4310759, at *7 (N.D. Cal. Sept. 28, 2017)

25   (quoting Matrixx, 563 U.S. at 38).  But omissions are actionable only where they "make

26   the actual statements misleading": it is not sufficient that an investor "consider the omitted

27   information significant."  Id. at *7 (internal quotation marks omitted).

28   Here, plaintiff contends that defendants falsely represented demand for the

13

United States District Court
Northern District of California

1  company's mass cytometry products while they knew that sales were projected to decline

2  in light of increased competition.  Plaintiff argues that the following statements were

3  misleading where the CW testimony makes clear defendants' knowledge of increased

4  competition: "[t]here's not a fundamental change in the overall competitive landscape as

5  we see it right now" and "we can't say that there's many new competitors that are

6  necessarily extending out the ordering cycle."  FAC ¶79.  However, plaintiff fails to

7  specifically connect these statements to the testimony offered by the CWs regarding what

8  the individual defendants knew and when they knew it.  The general allegations of

9  Cytek's cannibalization of sales, themselves lacking detail, simply do not suffice to

10  establish that defendants' statements regarding competition were misleading.  See, e.g.,

11  FAC ¶ 69.

12       Among other items allegedly not disclosed by defendants, plaintiff describes that

13  "the Company's mass cytometry products were over-priced" and "the Company's mass

14  cytometry marketing approach was flawed."  FAC ¶ 69.  Neither of these accusations are

15  supported by any fact.  These accusations only arise from CW opinion, disconnected

16  from any statements by defendants or any standard to show their behavior was somehow

17  inappropriate.  Plaintiff and the CWs' shared belief that defendants omitted or

18  inadequately articulated the competitive threat posed by Cytek does not establish that

19  defendants' statements were misleading.

20       And in stark contrast to plaintiffs' charges regarding defendants' poor performance

21  and loss of business, Fluidigm exceeded revenue guidance for two of the quarters in the

22  class period, and it missed revenue guidance by a mere two percent in the final quarter of

23  the class period.  These results, largely on point to projections, cut sharply against

24  plaintiff's charge that defendants' statements were misleading.

25       Plaintiff asks this court to review the allegations in the FAC in totality to discern the

26  falsity of defendants' statements, but falsity must be pleaded with particularity.  Plaintiff's

27  FAC fails to establish that defendants' statements were false when made.

28

United States District Court
Northern District of California

**b.    Whether the statements amount to non-actionable corporate puffery**

Plaintiff challenges many statements in defendants' public reporting that defendants argue constituted corporate optimism.  Multiple courts have held that statements of corporate puffery are not actionable.  See, e.g., In re Cutera Sec. Litig., 610 F.3d 1103, 1111 (9th Cir. 2010) (defendants' statement that "we believe our employee relations are good" was not actionable, even though many employees were leaving the company, because "[w]hen valuing corporations . . . investors do not rely on vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers"). Courts in this district regularly find statements of corporate puffery to be non-actionable statements in the securities fraud context.   See, e.g., City of Royal Oak Retirement System v. Juniper Networks, Inc., 880 F. Supp. 2d 1045, 1064 (N.D. Cal. 2012) (statements that company has "strong demand metrics and good momentum," and "our demand indicators are strong, our product portfolio is robust" were non-actionable statements of mere corporate optimism); In re Fusion-io, Inc. Sec. Litig., No. 13-CV-05368-LHK, 2015 WL 661869, at *15 (N.D. Cal. Feb. 12, 2015) (statements that "we are well positioned to capture a significant share of the opportunity from enterprise to hyperscale over the next few years" and "we exited fiscal 2013 with a significantly more diversified customer and product base, which we believe provides a sound basis for business expansion going forward" were non-actionable).

However, broadly optimistic statements, taken in context, may still form a basis for a securities fraud claim when those statements "address specific aspects of a company's operation that the speaker knows to be performing poorly."  See In re Quality Sys., Inc. Sec. Litig., 865 F.3d 1130, 1143 (9th Cir. 2017); see also Warshaw v. Xoma Corp., 74 F.3d 955, 959 (9th Cir. 1996) (telling investors FDA approval was "going fine" when the company knew approval would never come was materially misleading); Fecht v. Price Co., 70 F.3d 1078, 1081 (9th Cir. 1995) (saying the company "anticipates a continuation of its accelerated expansion schedule" when the expansion already failed was

1   misleading).

2         Here, several challenged statements are nothing but optimism regarding growth,

3   market position, and Fluidigm's sales outlook.  See, e.g., FAC ¶ 52 ("[w]e are well-

4   positioned to support accelerating growth in 2019"); ¶ 53 ("our sales funnel health augurs

5   well"; "we are clearly the global market leader in [imaging mass cytometry systems]";

6   "extraordinarily high quality and real images"); ¶ 55 ("we enter 2019 with a solid backlog

7   and exciting funnel of sales opportunities"; "ample headroom for growth"; "[w]e are a

8   major market participant in powering immunome research"; "clear market leader in

9   multiplexed images analysis of tissue"); ¶ 57 ("we feel very comfortable with what we're

10  setting up to come into the year"; "[w]e can see the opportunities building in the pipeline").

11  These are similar to statements deemed not actionable by other courts in this district.  In

12  re Calpine Corp., 288 F. Supp. 2d 1054, 1088 (N.D. Cal. 2003) (holding that words such

13  as "strong," "healthy," and "solid" could not form a basis for the plaintiffs' Exchange Act

14  claims).  These statements are not actionable because they are vague assessments that

15  "represent the 'feel good' speak that characterizes 'non-actionable puffing.'"  Intuitive

16  Surgical, 759 F.3d at 1060 (citing Cutera, 610 F.3d at 1111).  Plaintiff fails to plead their

17  falsity.

18                  **c.**     **Whether the Safe Harbor applies to shield the challenged**

19                        **statements**

20        The PSLRA carves out a safe harbor from liability for statements that are identified

21  as "forward-looking" and are "accompanied by meaningful cautionary statements."  15

22  U.S.C. § 78u-5(c)(1)(A)(i).  A forward-looking statement is "any statement regarding

23  (1) financial projections, (2) plans and objectives of management for future operations,

24  (3) future economic performance, or (4) the assumptions 'underlying or related to' any of

25  these issues."  No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding

26  Corp., 320 F.3d 920, 936 (9th Cir. 2003) (citing § 78u-5(i)).  "[I]f a forward-looking

27  statement is identified as such and accompanied by meaningful cautionary statements,

28  then the state of mind of the individual making the statement is irrelevant, and the

United States District Court
Northern District of California

1    statement is not actionable regardless of the plaintiff's showing of scienter."  Cutera, 610

2    F.3d at 1112.  Alternatively, if a forward-looking statement is not identified as such or is

3    unaccompanied by meaningful cautionary statements, then the statement is actionable

4    only if the plaintiff proves that the forward-looking statement "was made with actual

5    knowledge by that person that the statement was false or misleading."  15 U.S.C. § 78u-

6    5(c)(1)(B); see Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc., 759 F.3d 1051,

7    1058 (9th Cir. 2014).  Statements, for example, touting contemporary status of a sales

8    pipeline despite defendant corporate officers' awareness of negative trends in the

9    pipeline are not forward-looking and are not protected by the safe harbor.  Intuitive

10   Surgical, 759 F.3d at 1143-44.

11         Here, defendants argue that many of the statements identified in the FAC are

12   forward-looking and therefore protected under the Safe Harbor.  The court agrees.

13         Plaintiff challenges the following statements as misleading when compared to the

14   negative trends internally known and relayed by the CWs: "We are well-positioned to

15   support accelerating growth in 2019" (FAC ¶52); "[W]e are clearly the global market

16   leader in [mass cytometry]" (¶53); "[W]e're seeing a continuation of the 3-quarter trend in

17   which we are continuing to recruit new customers to the technology base and there's not

18   a material shift in the kind of forward-looking funnel as it relates to that mix" (¶56); "We

19   can see the opportunities building in the pipeline" (¶57); "I wouldn't over-interpret the

20   guidance as to signal a decline" (¶65); "And we continue to be very encouraged by the

21   demand that we've seen for imaging in Q1" (¶66); "Clearly, mass cytometry is thriving"

22   (¶72); "We're seeing really strong global funnel development" (¶76); and "I think we're

23   seeing no real trend change in the mass cytometry business overall" (¶77).  These

24   statements regarding future operations and economic opportunities are forward-looking

25   on their face.  See 15 U.S.C. § 78u5(i) (forward-looking statements include any statement

26   regarding "future economic performance" and the assumptions underlying those); see

27   also In re Pivotal Sec. Litig., No. 3:19-CV-03589-CRB, 2020 WL 4193384, at *15 (N.D.

28   Cal. July 21, 2020) (finding statements concerning future operations and economic

opportunities forward-looking).

Plaintiff advances that defendants concealed mass cytometry sales impediments and declining demand from the public, but defendants' statements were accompanied with specific cautionary statements.  For example, in Fluidigm's 2018 10-K, defendants report in part, "financial results and revenue growth rates have varied significantly from quarter-to-quarter"; "[t]hese fluctuations are due to numerous factors that are difficult to forecast";[1] "[w]e are also increasingly dependent on our mass cytometry business"; and "We anticipate that we will continue to face increased competition."  Ex. 3 at 13-14 (Dkt. 39-2 at 44-45).  Among these disclosures, defendants list Cytek as one of several competitors.  Id. at 14 (Dkt. 39-2 at 45).  Similarly, before each call with investors, defendants warned participants of future-looking statements and associated risks, and they directed participants back to the 10-K for more information about risks and uncertainties.  See, e.g., Ex. 5 at 2 (Dkt. 39-2 at 85).

The cautionary statements used by defendants are almost identical to language approved by the Ninth Circuit in instances in which forward-looking statements were immunized by the PSLRA Safe Harbor.  See, e.g., Intuitive Surgical, 759 F.3d at 1059-60 (approving cautionary language in earnings call that warned that comments may contain forward-looking statements, that such statements may differ based on "certain risks and uncertainties," and referring investors to "the company's [SEC] filings"); Cutera, 610 F.3d at 1112 (approving cautionary language at beginning of quarterly earnings call that the conversation would contain forward-looking statements "concerning future financial performance and guidance," and that "Cutera's ability to continue increasing sales performance worldwide could cause variance in the results.") (internal quotation marks

---

[1] A more complete quote: "These fluctuations are due to numerous factors that are difficult to forecast, including: fluctuations in demand for our products; changes in customer budget cycles and capital spending; seasonal variations in customer operations; tendencies among some customers to defer purchase decisions to the end of the quarter; the large unit value of our systems, . . . changes in our pricing and sales policies or the pricing and sales policies of our competitors;. . . new product introductions and enhancements by us and our competitors; . . . our complex, variable and, at times, lengthy sales cycle . . ."  Ex. 3 at 13 (Dkt. 39-2 at 44).

United States District Court
Northern District of California

1    omitted).  Defendants' cautionary language is therefore sufficient to bring the forward-

2    looking statements into the PSLRA Safe Harbor.  The forward-looking statements are not

3    actionable.

4              **2.      Scienter**

5         A complaint must "state with particularity facts giving rise to a strong inference that

6    the defendant acted" with scienter.  See 15 U.S.C. § 78u-4(b)(2)(A); Tellabs, Inc. v.

7    Makor Issues & Rts., Ltd., 551 U.S. 308, 321 (2007).  Scienter is "a mental state

8    embracing intent to deceive, manipulate, or defraud."  Tellabs, 551 U.S. at 308; see also

9    Metzler, 540 F.3d at 1061.  To demonstrate scienter, a complaint must allege that the

10   defendants made "false or misleading statements either intentionally or with deliberate

11   recklessness."  See Zucco, 552 F.3d at 991; Ronconi v. Larkin, 253 F.3d 423, 432 (9th

12   Cir. 2001).  In contrast to the particularity considered necessary for falsity, discussed

13   above, "The Supreme Court has emphasized that courts 'must review all the allegations

14   holistically' when determining whether scienter has been sufficiently pled.  The relevant

15   inquiry is 'whether all of the facts alleged, taken collectively, give rise to a strong

16   inference of scienter, not whether any individual allegation, scrutinized in isolation, meets

17   that standard.'"  Reese v. Malone, 747 F.3d 557, 569 (9th Cir. 2014) (citing Tellabs, 551

18   U.S. at 323).

19        In assessing scienter here, the court considers whether the testimony of the CWs

20   gives rise to a strong inference of scienter, whether the "core operations" inference

21   supports finding scienter, and whether the allegations of scienter fail holistically.

22              **a.      Whether the testimony of the CWs gives rise to strong**

23                        **inference of scienter**

24        The FAC relies on statements from CWs to plead the requisite mental state.  A

25   complaint relying on CW testimony to establish scienter must satisfy a two-part test to

26   meet the PSLRA pleading requirements: (1) CWs must be described with sufficient

27   particularity to establish reliability and personal knowledge, and (2) CW statements must

28   themselves be indicative of scienter.  Zucco, 552 F.3d at 995; see also Daou, 411 F.3d at

United States District Court
Northern District of California

1015.

On the first prong, "The Ninth Circuit has held that numbering the confidential witnesses and describing the witnesses' job description and responsibilities constitutes a 'large degree of specificity,' especially where the witnesses' exact title is used." Mulligan v. Impax Labs, Inc., 36 F. Supp. 3d 942, 961 (N.D. Cal. 2014) (quoting Daou, 411 F.3d at 1016). The FAC achieves this standard, providing title and tenure for each CW, as well as job descriptions. FAC at ¶¶ 33, 34, 46, 47, 104.

Regarding the second prong, plaintiff relies on statements from CWs to indicate the individual defendants' participation in meetings and their receipt of reports to establish scienter. General allegations of defendants' "interaction with other officers and employees, their attendance at meetings, and their receipt of weekly or monthly reports are insufficient" to create an inference of scienter "more cogent or compelling than an alternative innocent inference." Daou, 411 F.3d at 1022; Zucco, 552 F.3d at 999; see also Intuitive Surgical, 759, F.3d at 1062 (rejecting scienter claims relying on "the impressions of witnesses who lacked direct access to the executives but claim that the executives were . . . familiar with the contents of the software-generated reports because the substance of the reports was discussed in meetings.").

Here, the CW allegations are insufficient to give rise to an inference of scienter. The CW accounts of Fluidigm's internal strategies allegedly illustrate that there were issues with over-pricing and an overly general marketing strategy for the mass cytometry products. FAC ¶ 41. CW3, CW4, and CW5 described how Cytek emerged as a market competitor, endangering Fluidigm sales. FAC ¶¶ 46-47, 50. CW1 and CW2 recount participating in "weekly" or "quarterly" meetings and calls (¶¶43, 44, 102), with the "content" being "sales performance, and how it was falling short" and "disappointing sales," which were discussed "every time we met" (¶¶43, 44, 102). CW2, CW3, and CW6 described how the individual defendants either received or had access to reports and presentations showing declining sales and losses to competitors. FAC at ¶¶ 36-39, 103-6. This narrative, even considered in sum, does not satisfy the second prong. See

United States District Court
Northern District of California

Pivotal, 2020 WL 4193384, at *17 (where CW reports of access to reports and internal disagreements about strategy did not indicate scienter).  An unsuccessful sales strategy and disagreement within the company over its approach to selling the mass cytometry line does not support an allegation that Fluidigm misled investors or was somehow reckless with projections.  The CWs do not relay any statements made by the individual defendants that are themselves indicative of scienter.  The CW statements do not establish a strong inference of scienter.

b.     **Whether the "core operations" inference supports finding scienter**

Under the core operations doctrine, a court can infer scienter if the fraud is based on facts "critical to a business's core operations," such that the company's key officers would know of those facts.  S. Ferry LP, No. 2 v. Killinger, 542 F.3d 776, 783-84 (9th Cir. 2008) (internal quotation marks omitted).  Courts applying the core operations doctrine have required plaintiffs to plead "details about the defendants' access to information within the company" related to the fraud.  Id. at 785.  In Nursing Home Pension Fund, Local 144 v. Oracle Corp., 380 F.3d 1226 (9th Cir. 2004), the plaintiffs relied on the core operations doctrine to demonstrate a CEO's scienter as to false statements regarding the company's sales, where the CEO stated that: "All of our information is on one database. We know exactly how much we have sold in the last hour around the world."  Id. at 1231. However, finding scienter under the core operations doctrine "is not easy," and requires "either specific admissions by one or more corporate executives of detailed involvement in the minutia of a company's operations, such as data monitoring, or witness accounts demonstrating that executives had actual involvement in creating false reports."  Intuitive Surgical, 759 F.3d at 1062; see also Zucco, 552 F.3d at 1000 (finding "allegations that senior management . . . closely reviewed the accounting numbers generated . . . each quarter . . . and that top executives had several meetings in which they discussed quarterly inventory numbers" insufficient to establish scienter).

The situation here is not entirely different than Oracle.  CW2 specifically recalls

21

how "sales opportunities, progress, and preference were tracked electronically on Salesforce and sales staff were expected to keep it regularly updated so that leadership could generate a report with the click of a button."  FAC ¶ 103.  This echoes the instantaneous reporting giving rise to a core operations inference in Oracle; however, there is no "specific admission" that the individual defendants were involved in the minutia of the company's operations.  The FAC includes allegations that the individual defendants participated in weekly meetings discussing sales (FAC ¶ 101), and they attended quarterly business review meetings where sales were discussed in "exacting detail" (FAC ¶ 104).  Linthwaite travelled to visit the company's major regions, visiting the company's team in China along with large customers and new accounts.  FAC ¶ 97.  However, there is no allegation the individual defendants participated in preparation of any false reports, in contrast to one of the circumstances framed in Intuitive Surgical.

While this is similar to the circumstances in Oracle, the pleading of the individual defendants' behavior does not show such intimate control of the business that an intent to mislead should be attributed to their public statements.  Further, plaintiff has not established the falsity of their statements sufficient to conclude that what defendants said publicly misrepresented their knowledge of the company's challenges.  For these reasons, the court concludes that plaintiffs have not alleged sufficient facts supporting the core operations inference—they fail to show the fraudulent intent or deliberate recklessness of individual defendants' statements.  See Webb, 884 F.3d at 857.

### c.    Whether the allegations of scienter fail holistically

The court must also "consider the complaint in its entirety" to determine if "all of the facts alleged, taken collectively, give rise to a strong inference of scienter" that is "at least as compelling as an alternative innocent explanation."  Tellabs, 551 U.S. at 322-23; Zucco, 552 F.3d at 1006.

As the Ninth Circuit has most recently recognized, "a lack of stock sales can detract from a scienter finding."  Webb v. SolarCity Corp., 884 F.3d 844, 856 (9th Cir. 2018); Eckert v. Paypal Holdings, Inc., 831 F. App'x 366, 367 (9th Cir. 2020) (plaintiff's

United States District Court
Northern District of California

1    failure to plead a compelling inference of scienter was "underscored by the absence of

2    any allegation in the complaint that any defendant sold stock during the relevant time

3    period").  In fact, "[t]he absence of insider trading by a defendant is highly relevant and

4    undermines any inference of scienter."  In re Pixar Sec. Litig., 450 F. Supp. 2d 1096,

5    1107 (N.D. Cal. 2006); see also Rigel, 697 F.3d at 884; In re Dynavax Sec. Litig., No.

6    4:16-cv-06690-YGR, 2018 WL 2554472, at *9 (N.D. Cal. June 4, 2018).

7        Here, there are no allegations of insider trading or suspicious stock sales.  To the

8    contrary, Linthwaite purchased Fluidigm shares in August 2019 (Ex. 13), undermining an

9    inference of scienter.  See In re Worlds of Wonder Sec. Litig., 35 F.3d 1407, 1424-25 (9th

10   Cir. 1994) (if defendants knew a company's stock price was overvalued, they "probably

11   would have bailed out" rather than incur the same "losses as . . . Plaintiffs"), superseded

12   by statute on other grounds, 15 U.S.C. § 78u-4(b)(2).  Plaintiff cites cases for the premise

13   that the absence of stock sales is irrelevant (Dkt. 41 at 31-32), but in each of those, the

14   plaintiffs sufficiently articulated the falsity of defendants' statements and the courts

15   opined that a lack of stock sales was not dispositive on the issue of scienter.  See, e.g.,

16   No. 84 Emp.-Teamster Joint Council Pension Tr. Fund, 320 F.3d at 944 (in case where

17   plaintiffs sufficiently pleaded falsity, Ninth Circuit held, "[s]cienter can be established even

18   if the officers who made the misleading statements did not sell stock during the class

19   period. . . . In other words, the lack of stock sales by a defendant is not dispositive as to

20   scienter").  Plaintiff here fails to sufficiently allege the falsity of the defendants' statements

21   and offers nothing that would explain how or why the defendants intended to deceive the

22   public.

23        Taking all allegations of the FAC into consideration, together they still do not

24   produce an inference that is as cogent or compelling as an alternative.  Even though

25   Fluidigm faced competitive challenges and strategic disagreements, there is no showing

26   of a specific intent to deceive investors.  A fall in Fluidigm's stock price does not alone

27   constitute fraud.  See Pivotal, 2020 WL 4193384, at *18; In re Lexar Media Sec. Litig.,

28   2005 WL 1566534, at *3.  The court therefore concludes that, on the whole, plaintiff's

1  narrative of fraud "is simply not as plausible as a nonfraudulent alternative."  Webb, 884

2  F.3d at 858 (citing ESG Capital Partners, LP v. Stratos, 828 F.3d 1023, 1035 (9th Cir.

3  2016)).

### 3.    Second Cause of Action – § 20

5         Congress has established liability in § 20(a) for "[e]very person who, directly or

6  indirectly, controls any person liable" for violations of the securities laws.  15 U.S.C. §

7  78t(a).  To establish a prima facie case under § 20(a), a plaintiff must prove: (1) "a

8  primary violation of federal securities law;" and (2) "that the defendant exercised actual

9  power or control over the primary violator."  Howard v. Everex Sys., Inc., 228 F.3d 1057,

10  1065 (9th Cir. 2000).

11         Because plaintiff has failed to plead a primary securities law violation, plaintiff has

12  also failed to plead a violation of § 20(a).  See Cutera, 610 F.3d at 1113 n.6 (holding that

13  § 20(a) claim was properly dismissed because § 10(b) claim had already been

14  dismissed).  Accordingly, plaintiff also fails to state a claim under § 20(a).

### IV.    Conclusion

16         For the foregoing reasons, the court rules as follows.  The court **GRANTS**

17  defendants' request for judicial notice as detailed above.  The court **GRANTS**

18  defendants' motion to dismiss plaintiff's amended complaint with leave to amend.

19  Plaintiff shall have 21 days from the date of this order to file a second amended complaint

20  to cure the deficiencies noted in this order.  No new claims or parties may be added

21  without leave of court or the agreement of all parties.  Upon the filing of any amended

22  complaint, plaintiff must also file a redline clearly demarcating its changes from the

23  existing complaint.

24         **IT IS SO ORDERED.**

25  Dated: August 4, 2021

26                                                    */s/ Phyllis J. Hamilton*
                                                    PHYLLIS J. HAMILTON
27                                                    United States District Judge

28

                                                    24