Marion C. Passmore (#228474)
Melissa A. Fortunato (#319767)
**BRAGAR EAGEL & SQUIRE, P.C.**
580 California Street, Suite 1200
San Francisco, California 94104
Telephone: (415) 568-2124
Email: passmore@bespc.com
        fortunato@bespc.com

*Counsel for Lead Plaintiff Kwok Kong
and the Proposed Class*

[Additional Counsel on Signature Page]

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| REENA SAINTJERMAIN, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>FLUIDIGM CORPORATION, STEPHEN CHRISTOPHER LINTHWAITE, and VIKRAM JOG,<br><br>Defendants. | Case No. 4:20-cv-06617-PJH<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

SECOND AMENDED CLASS ACTION COMPLAINT

Court-appointed Lead Plaintiff Kwok Kong ("Lead Plaintiff"), individually and on behalf of all others similarly situated, by and through his undersigned counsel, alleges the following upon information and belief, except as to those allegations concerning Lead Plaintiff, which are alleged upon personal knowledge. Lead Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation, review and analysis of: (i) regulatory filings made by Fluidigm Corporation ("Fluidigm" or the "Company") with the U.S. Securities and Exchange Commission ("SEC"); (ii) press releases, news articles, and other public statements issued by or concerning Fluidigm and the Individual Defendants (defined below); (iii) transcripts of investor calls with Fluidigm senior management; (iv) analysts' reports and advisories about the Company; (v) interviews with former employees of the Company; and (vi) other publicly available information. Counsel's investigation into the factual allegations contained herein is continuing, and many of the facts supporting those allegations are known only to Defendants (defined below) and are exclusively within their custody or control. Lead Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE AND SUMMARY OF THE ACTION

1. Lead Plaintiff brings this federal securities class action on behalf of himself and a class consisting of all persons and entities that purchased or otherwise acquired Fluidigm securities between February 7, 2019 and November 5, 2019, inclusive (the "Class Period") against Fluidigm and certain of its senior officers. Lead Plaintiff brings this action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5 promulgated thereunder.

2. Fluidigm manufactures and markets products and services that are used by researchers to study health and disease, identify biomarkers, and accelerate the development of therapies. The Company uses proprietary CyTOF and microfluidics technologies to develop its end-to-end solutions.

3. Leading up to the Class Period, the Company's older microfluidics segment was faltering, and the Company was becoming increasingly dependent on revenue from the relatively newer mass cytometry segment. Unbeknownst to investors, prior to the Class Period, Defendants knew that Fluidigm's mass cytometry segment pipeline was weakening and revenue was predicted to decline beginning in the second half of 2019. As described herein, during the Class Period, Defendants made

materially false and misleading statements, and omitted material facts, about the state of Fluidigm's pipeline and used those statements to support positive guidance about the Company's future prospects and projected growth.

4.     Critically, Fluidigm's sales cycles normally took six to twelve months, allowing Defendants to have a clear picture of revenue two to four quarters in advance.  Prior to the Class Period, Defendants were provided with multiple internal reports showing revenue declining in the second half of 2019.  Those reports were reinforced during the Class Period.  Given the lengthy sales cycle, there was no reason for Fluidigm to expect additional revenue for the second half of 2019.

5.     Although Defendants knew that revenue would decline, Defendants continued to tout the Company's mass cytometry segment and inflated revenue expectations.  Defendants generalized warning in Fluidigm's SEC filings that revenue "may" vary from quarter-to-quarter and that a laundry list of basic fluctuation issues common to all companies "could" affect results, did not disclose what Defendants knew at the time regarding the existing pipeline and that revenue was expected to decline in the second half of 2019.

6.     The mass cytometry segment was a costly investment increasing the Company's need for cash in order to continue operations.  This need resulted in public offerings of common stock in August 2017 and again immediately prior to the Class Period, in December of 2018, with another shelf registration statement filed soon after the start of the Class Period, indicating another imminent public offering and giving Defendants motivation to maintain a false sense of the Company's pipeline.

7.     Fluidigm's first quarter 2019 results were positive as expected as the Company's internal reports and long sales cycle did not show the decline until the second half of 2019.  But, the known decrease for the second half of 2019 began to show during second quarter of 2019 even though Fluidigm still met its quarterly earnings projections.

8.     Specifically, on August 1, 2019, Fluidigm reported *second* quarter 2019 revenue of $28.2 million, well below analysts' expectations of $32 million, citing weaknesses in its microfluidics segment and weakness in sales in the Americas, including in the mass cytometry segment, purportedly due to "funding delays" that had pushed out *a few sales*.  Mass cytometry sales, while increasing year-

SECOND AMENDED CLASS ACTION COMPLAINT

over-year, increased by only 28%, a significant change from the previous four quarters which saw an average increase of 60%.

9.      On this news, Fluidigm's share price declined by $4.10 per share, or 33.74%, on heavier than usual trading volume, from a closing price on August 1, 2019 of $12.15, to close on August 2, 2019 at $8.05 per share.

10.     Defendants continued to mislead investors with the August 1, 2019 news, omitting yet again that they knew revenue for the balance of 2019 was going to decline and that they had known for *multiple quarters* that customers were extending the already lengthy sales cycle.

11.     On November 5, 2019, after the market closed, the Company reported what Defendants knew all along, that third quarter 2019 revenue declined 8.5% year-over-year, primarily due to the loss of mass cytometry sales.

12.     On this news, Fluidigm's stock plummeted 50.88%, from a closing price of to $5.11 per share on November 5, 2019, to close at $2.51 per share on November 6, 2019, on unusually heavy trading volume.

13.     The full effect of the undisclosed known expected revenue decline continued in the first quarter of 2020 (and thereafter) with mass cytometry product revenue declining in the first quarter of 2020 by 26% year-over-year.

14.     As alleged herein, as a result of Defendants' wrongful acts and omissions, and the precipitous share price decline in the market value of Fluidigm's securities, Lead Plaintiff and other Class (defined below) members have suffered and continue to suffer significant losses and damages.

## JURISDICTION AND VENUE

15.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

16.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

17.     Venue is proper in this District under Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Many of the acts and omissions that constitute the alleged violations of law,

including the dissemination to the public of untrue statements of material facts, occurred in substantial part in this District.  In addition, the Company's principal executive offices are located in this District.

18.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## **PARTIES**

**Lead Plaintiff**

19.     Lead Plaintiff Kwok Kong purchased or otherwise acquired Fluidigm securities at artificially inflated prices during the Class Period, as set forth in his certification previously filed with the Court (ECF No. 21-1) and incorporated by reference herein, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

**Defendants**

20.     Defendant Fluidigm is incorporated under the laws of the state of Delaware with its principal executive offices located at 2 Tower Place, Suite 2000, South San Francisco, California 94080.  Shares of Fluidigm's common stock are traded on the NASDAQ exchange under the ticker symbol "FLDM."   Fluidigm describes itself as a "global company that improves life through comprehensive health insight" using CyTOF and microfluidics technologies to "create, manufacture, and market a range of products and services, including instruments, reagents and software that are used by researchers worldwide."

21.     Defendant Christopher Linthwaite ("Linthwaite") has served as Fluidigm's President, Chief Executive Officer ("CEO"), and member of the Board of Directors since October 2016. Linthwaite joined the Company in August 2016 as President and Chief Operating Officer.

22.     Defendant Vikram Jog ("Jog") has served as Fluidigm's Chief Financial Officer ("CFO") since February 2008.

23.     Linthwaite and Jog are sometimes referred to herein as the "Individual Defendants."

24.     Fluidigm and the Individual Defendants are referred to herein as "Defendants."

25.     The Individual Defendants, because of their positions within the Company, possessed the power and authority to control the contents of Fluidigm's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of the Company's SEC filings and press releases alleged herein to be false and/or misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with the Company, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### The Company and Its Business

26.     Fluidigm manufactures and markets products and services that are used by researchers to study health and disease, identify biomarkers, and accelerate the development of therapies.  The Company uses "proprietary CyTOF® and microfluidics technologies to develop innovative end-to-end solutions" for translational research and clinical research studies.

27.     The Company has two main categories of products and services: mass cytometry products and microfluidics (also known as genomics) products.  Both of these categories include sales of instruments and related software and sales of "consumables," as well as service-related income such as preventative maintenance plans and training.  Product revenue is recognized "at the point in time when control of the goods passes to the customer and [the Company has] an enforceable right to payment" which generally occurs when the product is shipped or when it arrives to the customer.

28.     Fluidigm's microfluidics technologies enable "high-throughput molecular biomarker analysis, whether it be for the analysis of gene expression profiles, genotyping or library preparation in advance of gene sequencing" as well "single-cell genomic analysis."  The Company offers several different sub-types of microfluidics instruments which are used for, *inter alia*, DNA sequencing, gene expression, and genotyping.

29.     Fluidigm's CyTOF mass cytometry systems "use a novel technological approach to enable single-cell researchers to dissect intracellular networks." These systems use "stable isotopes not normally found in biological systems to label antibodies and detect and quantify more than 100 different parameters per cell."

30.     During the Class Period, the Company offered three types of mass cytometry systems, or instruments:  (i) Helios™; (ii) Hyperion™ Imaging System; and (iii) Hyperion™ Tissue Imager. The Helios system performs "high-parameter single-cell analysis using antibodies conjugated to metal isotopes." The Hyperion systems combine imaging capabilities with the CyTOF technology "to understand the composition of tissue microenvironments at a subcellular resolution."

31.     The "consumables" for both categories of instruments included, among other things, assays and reagents, products that examine chemicals and materials used in chemical reactions.

32.     The Company's products are mainly used to study data "to answer pressing questions about immune function across cancer, immunology, and immunotherapy." During the Class Period, Fluidigm's customers included academic research institutions, translational research and medicine centers, cancer centers, clinical research laboratories, and biopharmaceutical, biotechnology, and plant and animal research companies.

33.     The Company sells to markets globally, with *the Americas being its largest market for the three years leading up to the Class Period*.  For 2018, total revenue received from customers in the Americas accounted for 48% of total revenue and the majority of the Company's long-lived assets were located within the United States, Singapore, and Canada.

34.     As of December 31, 2018, Fluidigm had 535 employees, with 190 in sales, technical support, and marketing; 103 in research and development; 107 in general and administrative; and, 135 in manufacturing.

**The Company's Increasing Reliance on Mass Cytometry**

35.     Fluidigm was originally focused solely on microfluidics technologies, but in February 2014 acquired DVS Sciences, Inc. ("DVS") and its CyTOF technology. Slowly, the mass cytometry line began to out-perform the older microfluidics technologies. For 2016, microfluidics product revenue was $60.3 million compared to mass cytometry product revenue of $28.7 million. For 2017,

the balance was closer to 50/50 with microfluidics product revenue of $44.8 million and mass cytometry product revenue of $39.6 million.

36.     Furthermore, in the years leading up to the Class Period, Fluidigm began seeing decreasing microfluidics income which the Company attributed to increasing competition in the microfluidics market in 2016 with an overall decrease in microfluidics product sales by 19% compared to 2015.  Indeed, in the first quarter of 2017, microfluidics product sales decreased 38% year-over-year.

37.     This trend resulted in a strategic review and multiyear plan that shifted focus to the Company's relatively new mass cytometry products, as well as implementing an operational excellence plan and improvements to financial discipline and cost reductions.  One such "improvement" or cost reduction was the integration of commercial organization in late 2016, including merging the sales teams for microfluidics and mass cytometry.

38.     Although suffering the massive microfluidics income decrease and total revenue decrease of 12% compared to the first quarter of 2016, Fluidigm's mass cytometry revenue increased during the first quarter of 2017, in large part due to its new imaging technology with initial order fulfillments of the Hyperion system.

39.     Throughout 2017 and 2018, the Company's mass cytometry line strengthened while disappointing microfluidics results continued as can be seen in the following chart detailing product revenue:

SECOND AMENDED CLASS ACTION COMPLAINT

| Quarter | Mass Cytometry Revenue* (in millions) / Percent Change Year-over year | Microfluidics Revenues (in millions) / Percent Change Year-over-year |
|---|---|---|
| Q1 2017 | $9.9/39% | $11.4/(38%) |
| Q2 2017 | $8.6/9% | $10.9/(35%) |
| Q3 2017 | $10.3/102% | $10.3/(20%) |
| Q4 2017 | $10.8/26% | $12.3/(<1%) |
| Q1 2018 | $6.6/(33%) | $13.8/22% |
| Q2 2018 | $11.3/31% | $10.5/(3%) |
| Q3 2018 | $15.2/48% | $9.0/(12%) |
| Q4 2018 | $16.2/50% | $11/(11%) |

*Fluidigm initially provided only product revenue by market break-downs. Beginning in the first quarter of 2018, the market break-downs including both product revenue and total segment revenue comprised of instruments, consumables, and service revenues.  Only product revenues are listed here.

40.     Microfluidics sales continued to decline throughout the Class Period.  In fact, Confidential Witness ("CW") 1, a Marketing Specialist and Executive Assistant at the Company's corporate headquarters from December 2017 until September 2019, reporting to the Senior Vice President ("SVP") of Marketing, confirmed that Fluidigm was phasing out single-cell genomics (part of the microfluidics product line), stating that by March 2019, Franchise Director Mark Lynch was the only employee left from the genomics division amidst plummeting sales and that the consensus among executive leadership was that there was not enough genomics revenue to justify the salaries.

41.     CW2, an Associate Sales Director from March 2018 until September 2019 whose territories included Latin America and parts of the United States at varying times, reporting at first to the Chief Commercial Officer ("CCO") and then to the Sales Director, also noted the declining microfluidics revenue, attributing the issue to Fluidigm's outdated genotyping instrument which was "10 years old and very large" and could not compete with newer, sleeker, and less expensive models from competitors.  Thus, Fluidigm's future depended on its mass cytometry products.

42.     Defendants continually touted Fluidigm's new line of revenue prior to and throughout the Class Period.  For example, during the fourth quarter and year-end 2017 earnings conference call held on February 8, 2018, Linthwaite touted the mass cytometry line as "again a great growth story." In an August 2, 2018 press release, Linthwaite attributed positive second quarter 2018 results to the "exceptional top-line revenue growth in mass cytometry and total consumables."  The third quarter 2018 earnings press release issued on November 1, 2018, quoted Linthwaite stating: "We are pleased with the strong operational performance this quarter driven by revenue growth around the world, led by mass cytometry."  And, during the first quarter 2019 earnings conference call on May 2, 2019, Linthwaite stated: "The clear standout number of the quarter is the impressive 110% growth in mass cytometry powered by sales at instrument systems . . . ."

43.     Similarly, analysts and investors recognized the import of Fluidigm's mass cytometry revenue.  The Company's average closing stock price increased from $5.18 for 2017 to $6.79 for 2018, increasing to an average closing price of $11.64 for 2019 until the second quarter 2019 results were announced on August 1, 2019.  UBS Investment Bank initiated coverage of Fluidigm in March 2019, expecting the mass cytometry instruments to "yield a significant addressable market opportunity" for the Company.  And, after missing top-line estimates for the second quarter of 2019, Piper Jaffray "acknowledge[d] the continued strength and opportunity in mass cytometry . . . ."

44.     Riding the increase in mass cytometry revenue due to the introduction of the Company's imaging products in early 2017, Defendants assured investors that such revenue would continue while knowing that the sales pipeline was faltering as early as the third quarter of 2018.

**Defendants' Fraudulent Class Period Conduct**

*Defendants Knew Before the Class Period That Sales for the Second Half of 2019 Would Decline*

45.     The Company's typical ordering cycle of six to twelve months meant that the Company could accurately forecast the Company's sales pipeline in forthcoming quarters.

46.     Thus, the Defendants began the yearly forecasting process *six months prior* to the new year according to CW3 who served as Vice President of Commercial Operations at Fluidigm from November 2015 until June 2020 at the Company's headquarters, overseeing the sales division and all sales representatives in North America, as well as the marketing support services division.  CW3 was

responsible for mass cytometry sales forecasts for North America with regular interaction with senior management, including the Individual Defendants.  CW3 produced updated sales forecasts at least monthly and participated in quarterly review meetings with senior management.

47.     The initial phase of the forecast process started with sales representatives making their estimates, and each level of supervisor combining the forecasts, sometimes modifying them to meet Company goals.  The final combined forecast funneled through CW3 then went to the CCO.  CW3 continued to produce sales forecast reports throughout the year.

48.     For 2019, the sales forecast process started in the third quarter of 2018.  ***During the third quarter of 2018***, CW3 and the Individual Defendants, among others, attended the quarterly business review meeting where CW3 presented a slide deck explaining why the proposed 2019 sales forecast for mass cytometry sales in North America was unattainable, and yet no adjustments were made to reduce the forecast.

49.     In addition to CW3's slide deck presentation, according to CW1, ***an internal strategic planning session was held on October 29 and 30, 2018***, in Markum, Canada and attended by senior executives, including defendant Linthwaite.

50.     A 2019 Company outlook document was emailed to CW1 and a number of top executives, including Linthwaite, for presentation and discussion at the October 2018 planning session meeting.  The document was prepared by the Senior Finance Manager with involvement from the SVP of Marketing and Senior Director of Marketing.  The document contained data, analysis, graphs, and commentary about "the whole outlook for 2019."  According to CW1, the document included a spreadsheet for all projects planned for 2019 with executives responsible for each; revenue data for 2016 through 2018; and 2019 revenue projections.  The outlook document showed "all the numbers, growth drivers, and success initiatives."  CW1 stated that the revenue data showed "2016, 2017, 2018, 2019 (trending) up . . . ***but the second half of 2019 is down.***"

51.     Indeed, defendant Linthwaite eventually acknowledged at the end of the Class Period that the decline in mass cytometry sales was readily apparent to Defendants during the Class Period, but it was not disclosed to investors.  Specifically, during the November 5, 2019 earnings conference call, in responding to an analyst question regarding why third quarter 2019 revenue was so low and

whether customers were considering alternatives, Linthwaite admitted that "***we have seen a shift [in the sales cycle] in the last few quarters in particular*** and more scrutiny of expense above or capital equipment investments above the $500,000 mark."

*During the First Two Quarters of 2019 Defendants Had Further Indications that the Sales During the Second Half of 2019 Would Decline*

52.     According to CW3, the first quarter 2019 business review meeting took place during the ***third week of January 2019***.  For this meeting, CW3 (who oversaw the sales division and all sales representatives in North America) again adjusted down the sales goals for the second quarter of 2019 due to ***increasing indications*** that the current forecast would never come to fruition.  Again, there were no adjustments made to the sales forecast.

53.     CW1 also confirmed that all sales were suffering in 2019.  As an Executive Assistant, CW1 attended the weekly executive meetings held between the Individual Defendants and the SVP of Marketing.  At these weekly meetings, the Individual Defendants and SVP of Marketing would discuss the Company's sales, and the agenda items for these weekly meetings always included the topic of comparing projected versus actual performance and guidance for future performance of sales.  ***During 2019***, CW1 stated that at these weekly meetings, the Individual Defendants always discussed sales performance and how it was falling short.  "We were not going to hit our goal and that was something commonly known among the leadership," according to CW1.  Indeed, CW1 noted that ***throughout 2019***, a cap was set on travel expenses, executive meals, and other expenses to compensate for lagging sales.

54.     Several CWs stated that the increasing loss of sales was due to competition.  CW3 stated that there was significant new competition in the mass cytometry business, specifically in North America, stating that Cytek Biosciences Inc. ("Cytek"), was one of the Company's new competitors and several "significant" deals fell apart in 2019.

55.     CW4 was employed with Fluidigm as a Field Application Scientist from July 2017 until July 2020, supporting both sales staff and customers on the technical use of Fluidigm products, as well as troubleshooting current customer problems that arose, and focusing on the mass cytometry line.  CW4 stated that ***in 2019***, a new mass cytometry competitor, Cytek, caused disruption in Fluidigm's

sales, pursuing the same customers as Fluidigm and causing them to pause, unsure if Fluidigm's technology was still optimal.  "We had a lot of cautious customers" and it "*lengthened our sales cycle*," stated CW4.  Some of these customers postponed sales to Q4 2019 or Q1 2020, and other sales that had been counted on prior to Cytek's product launch *never materialized* according to CW4.  Notably, CW4 confirmed that the introduction of the Cytek product was something everyone at the Company knew about.

56.     CW5 was employed with Fluidigm from November 2015 until June 2018 as Vice President of Cellular Proteomics, and then as Director of Mass Cytometry Market (CW5's job title changed due to the Company's restructuring, but job responsibilities were the same throughout CW5's tenure), serving as the chief support for the sales department on cytometric technical expertise, as well as assisting the marketing department and the research and development department, and recruiting key opinion leaders to speak on the Company's behalf.  CW5 also remarked on the wide-spread knowledge of Cytek's emerging competitive product due to the fact that at least twenty Fluidigm employees, including defendant Linthwaite, attended the June 2017 CYTO conference in Boston where the product was officially debuted.

57.     CW5 further explained that the Company's mass cytometry products were new technology, abandoning the industry use of florescent dye and instead using plasma to analyze cells, *requiring customer education and persuasion on the merits of the technology, which sometimes made it difficult for sales*.  Cytek's technology, on the other hand, used the industry known and accepted florescent technology, but improved on it.  CW5, like CW4, specifically attributed the Company's decline in sales to Cytek's competing product.

58.     In fact, on December 20, 2018, Cytek announced that it had "shipped 100 of its advanced flow cytometry systems."  Less than one year later, while Fluidigm's mass cytometry sales were declining, on November 1, 2019, Cytek stated that "its advanced flow cytometry systems have been purchased by scientists in over 20 countries across five continents.  Additionally, robust global sales have led Cytek to expand operations in order to keep up with demand: the company has new offices in Tokyo and Amsterdam . . . ."

59.     CW2 added that Fluidigm's sales personnel were expected to list the reason why any sale fell through in the Company's Salesforce application and it was often because the Company lost the potential sale to a competitor.

60.     CW3 also stated that Fluidigm's sales issues were in part a result of the Company's marketing approach, stating: "The technology had a strong positioning among early adopters, but the forecast plan, the sales plan, the language was all geared toward the mainstream market."  Defendant Linthwaite **admitted** this on the last day of the Class Period, stating during the November 5, 2019 earnings call that actions "are ongoing in Q4 [with] ***tweaks in sales coverage, particularly in the U.S. as well as adaption of our selling process and marketing to better address new segments***."

61.     Whether due to a flawed marketing approach and/or increased competition, Defendants knew prior to the Class Period that sales revenue for the second half of 2019 would decline, but Defendants omitted this material fact during the Company's public statements made during the Class Period.  Additionally, Defendants admitted they knew for ***multiple quarters prior to*** the end of the Class Period that the Company's customers were extending the already lengthy sales cycle, but omitted this material fact from pipeline and guidance discussions.

*Defendants Make False Statements and Omit Known Material Facts About Fluidigm's Sales*

62.     During the third quarter 2018 earnings conference call on November 1, 2018, Defendants set the stage for their fraudulent conduct, claiming that they "are seeing a significant pipeline of prospects over the coming quarters, contributing to a larger funnel compared to last year at this time."  This statement was never corrected and the "significant pipeline" continually promoted until last day of the Class Period.

63.     On February 7, 2019, the first day of the Class Period, Fluidigm issued a press release, attached as Exhibit 99.1 to a Form 8-K filed with the SEC, titled "Fluidigm Announces Fourth Quarter and Full Year 2018 Financial Results," announcing the Company's financial results for the quarter and year ended December 31, 2018 (the "February 2019 Press Release").  The February 2019 Press Release stated in relevant part:

SECOND AMENDED CLASS ACTION COMPLAINT

**Financial Highlights**

*Fourth Quarter 2018*

- Total revenue increased 17 percent to $32.3 million from $27.7 million in the fourth quarter of 2017, with mass cytometry revenue growth of 48 percent compared to the year ago period.

- GAAP [generally accepted accounting principles] net loss was $14.8 million, compared with a GAAP net loss of $10.5 million for the fourth quarter of 2017. GAAP net loss was higher in the fourth quarter of 2018 primarily due to non-cash interest associated with the convertible debt exchange in 2018 and the impact of a favorable litigation settlement in the fourth quarter of 2017.

- Non-GAAP net loss was $2.4 million, compared with a $3.0 million non-GAAP net loss for the fourth quarter of 2017.

*Full Year 2018*

- Total revenue increased 11 percent to $113.0 million from $101.9 million in full year 2017.

- GAAP net loss was $59.0 million, compared with a GAAP net loss of $60.5 million for the full year 2017.

- Non-GAAP net loss was $20.7 million, compared with a $30.2 million non-GAAP net loss for the full year 2017.

*       *       *

**First Quarter 2019 Guidance**

- Total revenue of $28 million to $31 million.

- GAAP operating expenses of $29.5 million to $30.5 million.

- Non-GAAP operating expenses of $26.5 million to $27.5 million excluding stock-based compensation and depreciation and amortization expenses of approximately $2 million and $1 million, respectively.

- Total cash outflow of $20 million to $22 million, including total annual incentive compensation and retention bonus payments of $10.8 million, and a semi-annual interest payment of $2.8 million.

64.     That same day, Defendants held an earnings conference call during which the Individual Defendants reiterated the financial results for the quarter and year ended December 31, 2018, as well

SECOND AMENDED CLASS ACTION COMPLAINT

as the 2019 financial projections.  The Individual Defendants both emphasized the Company's revenue growth and the continuation of mass cytometry revenue growth in 2019.

65.     During the February 7, 2019 earnings conference call, Paul Knight, an analyst with Janney Montgomery Scott LLC, asked of defendant Linthwaite, "could you talk to the level of backlog build, nature of backlog as it – as you wrapped up the quarter?"  Defendant Linthwaite responded:

> We did not address that question or that topic specifically on our prepared remarks, but I can assure you that this was not a situation which we burn backlog.  *Really, we feel very comfortable with what we're setting up to come into the year.*  And were just -- *we have certainly strong growth throughout the back half of the year in general*.

66.     Defendants' statements in ¶¶ 63-65 were materially false and misleading and omitted material facts because:  (a) Defendants knew as of late 2018 that the outlook for sales in the second half of 2019 was negative; (b) Defendants were not "comfortable" with the outlook for 2019 and had actually set caps on travel expenses, executive meals, and other expenses to compensate for lagging sales; and, (c) Defendants received further indications of the negative outlook during January of 2019 showing that there *would not be* "strong growth through the back half of the year," but a decline instead.

67.     Fluidigm filed its 2018 10-K on March 8, 2019.  The 2018 10-K was signed by the Individual Defendants and affirmed the previously reported financial results.  The 2018 10-K included a "Risk Factors" section, purporting to warn investors of things that "may" or "could" occur, including the following:

- Our revenue, results of operations, and revenue growth rates have varied in the past and *may continue to vary significantly from quarter-to-quarter or year-to-year.*

- *We may experience substantial variability in our product mix from period-to-period as revenue from sales of our instruments relative to sales of our consumables may fluctuate or deviate significantly from expectations.*

- For example, our revenue declined year-over-year in 2016 compared to 2015, and in 2017 compared to 2016. In 2018, we returned to revenue growth, but *we may not be able to achieve similar revenue growth in future periods.*

- Variability in our quarterly or annual results of operations, mix of product revenue, including any decline in our mass cytometry revenue, or variability in rates of revenue growth, if any, *may lead to volatility in our stock price as research analysts and investors respond to these fluctuations.*

- The foregoing factors, as well as other factors, *could materially and adversely affect our quarterly and annual results of operations and rates of revenue growth, if any*.

- We have experienced significant revenue growth in the past but *we may not achieve similar growth rates in future periods.*

68.     These generalized risk factors failed to account for the specific knowledge the Defendants had at that time regarding Fluidigm's 2019 mass cytometry revenue and that Defendants had been told the forecasts were unattainable.   Instead, the risk factors were merely generalized boilerplate laundry lists of numerous issues that "could" occur when in fact it was known that those issues *would* occur or had occurred – the risks were not a possibility but a reality.  For example, at the time of the 2018 10-K issuance, the Defendants *knew* the Company would not achieve "similar growth rates" in the second half of 2019.  Notably, even though the Defendants knew starting in the third quarter 2018 that the sales for the second half of 2019 would decline, the risk factors in the 2018 Form 10-K, issued over four months later, were substantially unchanged from the risk factors listed in the Forms 10-K for the prior three years.

69.     Defendants' emphasized statements in ¶ 67 were materially false and misleading and omitted to state adverse material facts necessary in order to make the statements not misleading. Specifically, these statements omitted the following:  (a) that due to the nature of the Company's business, future sales for the first three quarters of 2019 (at a minimum) were determinable as of the date of the statements and it was known that the pipeline for the second half of 2019 showed a decline; (b) that internal reports as of late 2018 showed a decline in revenue for the second half of 2019; (c) that during January 2019 there were further indications of declining sales for the second half of 2019; (d) that customers were extending their sales cycles; and, (e) that, as a result, the risk factors failed to account for the specific knowledge the Defendants had at that time regarding Fluidigm's 2019 mass cytometry revenue, misrepresenting that revenue "*may* . . . deviate significantly from expectations" and that rates of revenue growth "*could*" be "adversely affected" when in fact it was known that revenue *would* decline.

70.     On May 2, 2019, Fluidigm announced its first quarter 2019 earnings results in a press release titled, "Fluidigm Announces First Quarter 2019 Financial Results" (the "May 2019 Press Release"), attached as Exhibit 99.1 to a Form 8-K filed with the SEC.  The May 2019 Press Release stated, in relevant part:

**Financial Highlights**

*First Quarter 2019*

- Total revenue increased 19 percent to $30.1 million from $25.2 million in the first quarter of 2018, with mass cytometry revenue growth of 110 percent compared to the year ago period.

- GAAP net loss was $25.5 million, compared with a GAAP net loss of $13.2 million for the first quarter of 2018.  GAAP net loss was higher in the first quarter of 2019 primarily due to a loss of $9.0 million associated with extinguishment of $150 million principal value of convertible debt, as well as higher employee-related and business development expenses.

- Non-GAAP net loss was $8.2 million, compared with a $6.3 million non-GAAP net loss for the first quarter of 2018.

                                *        *        *

*Revenue by market:*

- Mass cytometry revenue increased 110 percent to $18.8 million from $9.0 million in the prior year period.  Mass cytometry product revenue increased 134 percent to $15.5 million from $6.6 million in the prior year due to higher sales of instruments and consumables.

- Microfluidics revenue decreased 30 percent to $11.4 million from $16.3 million in the prior year period.  Microfluidics product revenue decreased 32 percent to $9.4 million from $13.9 million in the prior year period due to lower sales of instruments and consumables.

                                *        *        *

**Second Quarter 2019 Guidance**

- ***Total revenue of $28 million to $31 million***.

- GAAP operating expenses of $29.5 million to $30.5 million.

- Non-GAAP operating expenses of $25.5 million to $26.5 million excluding stock-based compensation, including severance and depreciation and amortization expenses of approximately $3 million and $1 million, respectively.

- Total cash outflow of $4 million to $6 million.

71.     Defendants also held an earnings conference call for the first quarter 2019 financial results on May 2, 2019.  The Individual Defendants reiterated the financial results for the quarter ended

March 31, 2019, as well as the second quarter 2019 financial projections.  Defendant Linthwaite

stressed growth in the mass cytometry business, stating, in relevant part:

> We extended our streak of consecutive double-digit growth quarters to 4.  Mass
> cytometry adoption continues at a brisk pace, including an uptick in new customer
> adoption of the technology.

*       *       *

> Turning to the details.  First, revenue performance.  We kicked off the year on a strong
> note, delivering 19% top line growth over Q1 2018 with total revenue of $30.1 million.
> The clear standout number of the quarter is the impressive 110% growth in mass
> cytometry powered by sales at instrument systems, both the imaging and suspension
> configurations.  We secured new placements across all geographies and customer
> segments.

*       *       *

> Shifting to the Americas.  The region delivered 20% growth.  Building on a now-familiar
> narrative, we had a strong quarter with mass cytometry systems leading the way.

72.     Defendant Jog provided details on the guidance for the second quarter of 2019:

> And finally, moving on to guidance for the second quarter of 2019.  ***Total revenue is
> projected to be between $28 million and $31 million.***  GAAP operating expenses are
> projected to be $29.5 million to $30.5 million.  Non-GAAP operating expenses are
> projected to be $25.5 million to $26.5 million, excluding stock-based compensation of
> approximately $3 million and depreciation and amortization expense of approximately
> $1 million.  Total cash outflow is projected to be between $4 million to $6 million.

73.     When questioned about the second quarter 2019 guidance, both of the Individual

Defendants avoided and/or vaguely answered as follows:

> **Adam Joseph Wieschhaus Cowen and Company, LLC, Research Division –
> Associate**
>
> This is Adam on for Doug.  We can get to the high end of your Q2 revenue guidance by
> simply setting instrument placements flat sequentially and full throughout the midpoint
> of the range.  So acknowledging that you don't provide placement guidance numbers,
> can you directionally or qualitatively frame how you expect the mass cytometry and
> genomics instrument segments to perform in Q2 relative to last quarter?
>
> **Stephen Christopher Linthwaite Fluidigm Corporation - President, CEO &
> Director**
>
> Well, Adam, thank you very much for the question. First off, so I think -- I have to think
> about that, I think as far as the mass cytometry instrument placements are concerned, as
> you said, we have not been giving kind of broken-down guidance as it relates to specific
> unit placements nor mix related to that.  As you well know, there's a significant -- there

SECOND AMENDED CLASS ACTION COMPLAINT

can be a bit of sensitivity related to the mix and ASPs related to the mix in which [they - - we place.]  So I think at this time, I just kind of wouldn't provide any additional color as it relates to the specific number of instrument placements over the period.

**Vikram Jog Fluidigm Corporation - CFO & Principal Accounting Officer**

Maybe, Adam -- hi, this is Vikram.  I think something to note, not specifically responding to your question on instruments per se, but we did make a statement about the mass cytometry consumables issue that we experienced in Q1 that should normalize in Q2.  And then likewise, we talked about a blip in Europe in microfluidics consumables, which would also come back into more normal conditions.  So perhaps that might give you additional color as to the mix of revenues that we're expecting in Q2 should be slightly less instrument focused than it was in Q1.

74.     Additionally, an analyst with UBS Investment Bank asked for "color regarding Hyperion versus Helios" to which defendant Jog responded that demand for Fluidigm's mass cytometry imaging instruments was not expected to change:

. . . . And we continue to be very encouraged by the demand that we've seen for imaging in Q1, and we would expect to get periodic updates on the lines of the information we provided at the beginning of the year.

75.     Defendants' statements referenced in ¶¶ 70-74 were false because while emphasizing increasing mass cytometry revenue and demand, including second quarter 2019 total revenue projections of $28 million to $31 million, Defendants omitted material adverse facts necessary in order to make the statements not misleading.  Specifically, the statements omitted the following:  (a) that due to the nature of the Company's business, sales revenue for the following six to twelve months was determinable as of the date of the statements and it was known that revenue for the second half of 2019 would decline; (b) that internal reports as of late 2018 showed a decline in revenue for the second half of 2019; (c) that during first quarter of 2019 there were further indications of declining sales for the second half of 2019; (d) that the Individual Defendants were discussing the dismal sales performance on a weekly basis internally; (e) that customers were extending their sales cycles; and, (f) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

76.     On the May 2, 2019 earnings call, the Individual Defendants not only omitted material negative information, but also falsely denied that there was any decline in sales, misrepresenting that there continued to be "strong demand," as follows:

SECOND AMENDED CLASS ACTION COMPLAINT

**Sung Ji Nam BTIG, LLC, Research Division - Director**

Maybe kind of a different way to ask Adam's question earlier. *If you look at your second quarter guidance at the midpoint, it kind of implies a sequential decline.* And you talked about -- and there are a lot of moving pieces here, but you talked about mass cytometry consumable improvement and then also the EU microfluidics consumable should also normalize, et cetera. So I was curious as to kind of what's underlying that assumption of a sequential slight decline? Is that also due to the more [accounting] comp in Japan?

**Stephen Christopher Linthwaite Fluidigm Corporation - President, CEO & Director**

Well, we did signal as you said. I mean, Japan was a very strong period -- or a very strong quarter for us. It was a strong instrument placement quarter also in Japan in the first quarter, and there's no reason to anticipate -- generally second quarter is the weakest quarter of the year and will pull down the APAC number. So thus we had an inversion of particular cycle in which APAC exceeded EMEA in total sales for the first time for us, which is great, but it's not likely to be sustained in the near term. I think that's the short answer. I think there's a mix in the instruments. There's no reason necessarily. We still have instrument placements that could be lumpy from cycle to cycle, but I think I understand that kind of root of your real question.

**Vikram Jog Fluidigm Corporation - CFO & Principal Accounting Officer**

Yes, so Sung Ji, this is Vikram. Our guidance for Q1 was $28 million to $31 million, so the midpoint was $29.5 million and we came in at $30.1 million. So I think the numbers between the midpoint that would signal the decline, I think, are so small within the ASP of one instrument or even less. *So I wouldn't over-interpret the guidance as to signal a decline.* It's, I think, within the margin position that we can have given our mix of products and the relative ASPs.

**Stephen Christopher Linthwaite Fluidigm Corporation - President, CEO & Director**

That's one of the areas we stayed pretty disciplined on, was maintaining this kind of $3 million swing for the very reasons that Vikram highlighted. And so I could imagine if you deconstruct it, you could see -- would reach kind of some of the conclusions we are reaching, but again, *I'll fundamentally reassert what we said, we see strong and steady demand. We don't really reveal backlog numbers, but we continue to see very strong demand for our instruments.* And on the consumable side, we see no reason why the trend lines won't continue to revert back towards the norm. With the caveats, what we described with perhaps on the mass cytometry side, we've seen some impact from this significant introduction or wave of new to the technology users.

77.    Defendants' emphasized statements in ¶ 76 were materially false and misleading and

omitted material facts necessary to make the statements not misleading. Specifically, the statements

omitted the following:  (a) Defendants knew as of late 2018 that the outlook for sales in the second half of 2019 was negative and thus a "decline" in revenue was expected; and, therefore, (b) Defendants were not seeing "strong and steady demand," they were seeing declining demand.

78.    On May 7, 2019, Fluidigm filed its quarterly report for the period ending March 31, 2019 on Form 10-Q with the SEC (the "1Q19 10-Q"), signed by the Individual Defendants and affirming the information provided in the May 2019 Press Release and accompanying earnings conference call.  The 1Q19 10-Q included identical statements regarding the "Risk Factors" as the 2018 10-K (*see* ¶ 67 above) and ***did not disclose any new risks or material changes***, even though it had become increasingly clear during the first quarter of 2019 that the purported "risks" were not something that ***may*** or ***could*** occur but ***were in fact occurring*** at the time of the issuance of the 1Q19 10-Q.

79.    More specifically, Defendants' emphasized risk statements were materially false and misleading and omitted material facts necessary to make the statements not misleading as follows:  (a) that due to the nature of the Company's business, sales revenue for the following six to twelve months was determinable as of the date of the statements and it was known that the pipeline for the second half of 2019 showed a decline; (b) that internal reports as of late 2018 showed a decline in revenue for the second half of 2019; (c) that during the first quarter of 2019 there were further indications of declining sales for the second half of 2019; (d) that the Individual Defendants were discussing the dismal sales performance on a weekly basis internally; (e) that customers were extending their sales cycles; and, (f) that, as a result, the risk factors failed to account for the specific knowledge the Defendants had at that time regarding Fluidigm's 2019 mass cytometry revenue, mispresenting that revenue "***may*** . . . deviate significantly from expectations" and that rates of revenue growth "***could***" be "adversely affected" when in fact it was known that revenue ***would*** decline.

80.    Fluidigm's first quarter 2019 results were positive as expected as the Company's internal reports and long sales cycle did not show the decline until the second half of 2019.  But, the known decrease for the second half of 2019 began to show during second quarter of 2019 even though Fluidigm still met its quarterly earnings projections.

81.    As stated above at ¶¶45-61, Defendants' internal reports from the third quarter of 2018 forward showed expected sales declines for the second half of 2019.  *See also* ¶¶ 117-23  This expected

sales decline was discussed weekly by the Individual Defendants *during 2019*, and was so concerning to Defendants that *throughout 2019*, a cap was set on travel expenses, executive meals, and other expenses to compensate for lagging sales.  Thus, when reporting Fluidigm's second quarter 2019 earnings, the predicted revenue decline was only more salient to Defendants.

82.  Tellingly, with sales continuing to slip as CW3 knew they would by the third quarter of 2019, CW3 recalled going into a break-out room during the quarterly business review meeting with the CCO and finance department employees to develop "strategic pricing" that would allow CW3 to discount products for customers and move product without technically repricing product or using traditional marketing.

83.  On August 1, 2019, after the market closed, Fluidigm issued a press release, attached as Exhibit 99.1 to a Form 8-K filed with the SEC, announcing the Company's financial results for the quarter ended June 30, 2019, titled "Fluidigm Announces Second Quarter 2019 Financial Results" (the "August 2019 Press Release").[1]  It was revealed that second quarter 2019 revenue was only $28.2 million, well below analysts' expectations of $32 million.  The August 2019 Press Release stated, in relevant part:

**Financial Highlights**

*Second Quarter 2019*

- Total revenue increased 7 percent to $28.2 million from $26.4 million in the second quarter of 2018, with mass cytometry revenue growth of 28 percent compared to the year ago period.

- GAAP net loss was $13.8 million, compared with a GAAP net loss of $16.2 million for the second quarter of 2018.

- Non-GAAP net loss was $7.1 million, compared with a $6.8 million non-GAAP net loss for the second quarter of 2018.

*       *       *

---

[1]  This press release was corrected and released again on August 2, 2019, "to correct a typographical error."

*Revenue by market*:

- Mass cytometry revenue increased 28 percent to $17.5 million from $13.7 million in the prior year period.  Mass cytometry product revenue increased 28 percent to $14.4 million from $11.3 million in the prior year due to higher sales of both instruments and consumables.

- Microfluidics revenue decreased 16 percent to $10.7 million from $12.8 million in the prior year period.  Microfluidics product revenue decreased 16 percent to $8.9 million from $10.5 million in the prior year period due to lower sales of both instruments and consumables.

\*       \*       \*

**Third Quarter 2019 Guidance**

- ***Total revenue of $27 million to $30 million***.

- GAAP operating expenses of $30 million to $31 million.

- Non-GAAP operating expenses of $26 million to $27 million excluding stock-based compensation, and depreciation and amortization expenses of approximately $3.5 million and $1 million, respectively.

- Total cash outflow of $7 million to $9 million.

84.     On this news, the Company's share price declined by $4.10 per share, or 33.74%, on heavier than usual trading volume, from a closing price on August 1, 2019 of $12.15, to close on August 2, 2019 at $8.05 per share.

85.     Defendants also participated in an earnings conference call on August 1, 2019, reiterating the financial results from the August 2019 Press Release, as well as adding color to the surprisingly low revenue, while continuing to make materially false and misleading statements and omitting material adverse facts.

86.     Defendant Linthwaite continued to tout Fluidigm's mass cytometry segment, stating that "[m]ass cytometry adoption is robust," that "[c]learly, mass cytometry is thriving," and noting that while sales in the Americas "lagged other regions . . . .  [I]t is still worth mentioning that first half growth in Mass Cytometry products exceeded 35%."

87.     When asked about the "sales funnel" for the mass cytometry line, defendant Linthwaite once again touted its strength:

**Robert Amparo - UBS Investment Bank, Research Division**

This is Rob on for Dan. I know you guys don't give a precise breakdown between Helios and Hyperion, but I was wondering if you could give us some directional commentary with how those are placed in the quarter? And also if you could provide some color about the sales funnel and kind of what the indicators you can share with us.

**Stephen Christopher Linthwaite - Fluidigm Corporation - President, CEO & Director**

Yes. So thanks, Rob. So I mean I think one of the key things we've got to keep putting attention on is that the mass cytometry portfolio has done outstanding. When you step back and look at the performance through the first half of the year, mass cytometry is doing north of 60%, 65% growth, I think it's 67% specifically, but it's north of 65% growth. And we're seeing growth across both platforms. They're almost moving relatively lockstep. So we're seeing really tremendous sustained adoption for Helios. In particular, that driver relates to kind of things like our Maxpar Direct Immune Profiling Panel, which is doing extraordinarily well and is bringing new users to the platform. We had one of our recent user talks. We had a profile high-volume flow core that has now, I think, successfully increased their recruitment up until something north of 80-or-so principal investigators on that platform, and so they keep triggering new consumptions. Overall, we're really pleased with how unit volume on both platforms has been moving up. Unfortunately, we don't break out the 2 for you. So I think overall, that's kind of how the status is on units.

Now as far as the funnel looks like, it's been really strong. It's in all 3 geographies. So as we continue to reinforce, I mean, we saw net growth in the first half through the Americas. We saw net growth in all 3 regions. We had extraordinary growth in APAC. You remember last quarter, Greater China and Japan had just extraordinary eye-popping numbers in the first quarter -- correction, in the first quarter. And in the second quarter, we had Europe that did extraordinarily well, and China continued to do very well, and we placed new units in Korea in addition. So our funnel continues to mirror that pattern. We're seeing really strong global funnel development across both platforms, both imaging and suspension.

88.     Defendant Jog stated that guidance for the third quarter of 2019 was as follows:

***Total revenue is projected to be between $27 million and $30 million.*** GAAP operating expenses are projected to be between $30 million and $31 million. Non-GAAP operating expenses are projected to be $26 million to $27 million, excluding stock-based compensation of approximately $3.5 million and depreciation and amortization expense of approximately $1 million. Total cash outflow is projected to be between $7 million and $9 million, including a semi-annual interest payment of $700,000 and working capital investments to support revenue growth.

89.     Defendants' statements above at ¶¶ 83, 85-88 were false because while emphasizing mass cytometry revenue and demand, including third quarter 2019 expected revenue of $27 million to

$30 million, Defendants omitted material adverse facts necessary in order to make the statements not misleading. Specifically, these statements omitted that: (a) due to the nature of the Company's business, sales revenue for the following six to twelve months was determinable as of the date of the statements and it was known that revenue for the second half of 2019 would decline; (b) internal reports as of late 2018 showed a decline in revenue for the second half of 2019; (c) during the first and second quarters of 2019 there were further indications of declining sales for the second half of 2019; (d) the Individual Defendants were discussing the dismal sales performance on a weekly basis internally; (e) customers were extending their sales cycles; and, (f) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

90.     Instead of coming clean, Defendants falsely attributed the "surprisingly" weak revenue to microfluidics and funding delays for just a few mass cytometry orders, continuing to falsely assert that the mass cytometry pipeline would continue with positive revenue and failing to inform investors that they had **known for multiple quarters** that customers were extending the sales cycles and revenue would decline.

91.     Defendant Linthwaite stated during the August 1, 2019 earnings call, in relevant part:

Finally, the Americas declined 11%. ***Speaking plainly, we were surprised and disappointed by this performance.*** We have focused our management attention and energy in this area. The key takeaway is we do not see a structural problem, and ***microfluidics is the challenged area. A few mass cytometry systems pushed out into the second half of the year, some linked to funding delays, but that funnel is, on the whole, very deep.*** Our microfluidics business was weak, but the drivers were not new. The RNA-seq product configuration is a great fit for the larger genomics cores, which could include new Juno placements.

92.     Defendant Jog also purported to explain the revenue miss, stating, in relevant part:

The Americas declined 11%, driven by mass cytometry instruments and ***weakness in microfluidics***, partially offset by mass cytometry consumables. Notably, mass cytometry consumables pull-through was significantly higher than our overall guidance range of $73,000 to $78,000. ***Mass cytometry instrument weakness this quarter was primarily due to funding delays and related extension of sales cycles.***

93.     Defendant Linthwaite also stressed the limited nature of the mass cytometry sales push out during the Q&A session:

**William Robert Quirk - Piper Jaffray Companies, Research Division - MD and Senior Research Analyst**

And Chris, is there anything going -- I don't think there is, but obviously, we do have a couple of new competitive entrants. Is that causing your customer base to slow down their ordering patterns or the deal funnel just because they're simply kicking the tires on some of these alternatives?

**Stephen Christopher Linthwaite - Fluidigm Corporation - President, CEO & Director**

As always, this is very hard in the fog of war to understand exactly what's happening. We've had tremendous instrument placement cycle with mass cytometry, 67% growth to the first half of the year. These market entrants have been in place during that cycle and have been marketing their products. So there's not a fundamental change in the overall competitive landscape as we see it right now.

So I don't -- I can't -- we can't say that there's many new competitors that are necessarily extending out the ordering cycle. Our ordering cycle does tend to be 6 to 9 months, and that's been what our historic trends have been, and I think it's kind of -- and we're also seeing one of the changes from last year to this year, which I think is actually more -- perhaps contributing more than the mix or the -- those competitive dynamics, is the mix between new users to our technology and people who are buying incremental capacity. ***New people and technology take a little bit longer typically in the ordering cycle in the -- from the first meeting until the close and getting them up and running.*** And we saw a shift, as Vikram summarized, to the first half. We effectively saw about 2/3 of our instrument placements were new to the technology. I think that's fantastic. I think that bodes exceptionally well for the setup for the business over the long term. But in the near term, it could have some impact on the close cycle.

\*     \*     \*

**Adam Joseph Wieschhaus - Cowen and Company, LLC, Research Division – Associate**

This is Adam Wieschhaus on for Doug. I just want to clarify an earlier question about the mass cytometry instrument that are pushed out of Q2. Do you expect those slipped Q2 orders will fall into Q3 or will take longer? And are they contractually complete at this point or there's still risk they may not close?

**Stephen Christopher Linthwaite - Fluidigm Corporation - President, CEO & Director**

Adam, this is Chris. ***So I think the better way to characterize this, it's not many systems we're talking about. The systems that were involved happen to be in government institutions, and so some of them are waiting for final funding, I think, from the NIH, as I suspect.*** So -- and they have options for operating funds that they can use in the fourth quarter. So we see multiple shots on goal for how that may play out. Whether it's Q3 or Q4, we're not certain, but they certainly signaled their intent to purchase this year.

SECOND AMENDED CLASS ACTION COMPLAINT

94.     The Individual Defendants also responded to a question regarding guidance for the third quarter of 2019 as follows:

**William Robert Quirk - Piper Jaffray Companies, Research Division - MD and Senior Research Analyst**

Vikram, I guess first question for you on guidance.  At the midpoint for the third quarter, you're forecasting $28.5 million.  The Street is a little over $4 million higher than that.  And I appreciate that you guys don't get – don't tend to guide beyond the quarter, *but that's a pretty big disconnect.  So help us understand, I guess I'm just struggling here with that disconnect.*  And appreciate that there's some order slippage and such, but can you elaborate here on kind of, I guess, when you guys think that you could get some of these orders that slipped into the quarter.  And if it's not the third, is it the fourth?  Again, help us get comfortable with that.

**Vikram Jog - Fluidigm Corporation - CFO & Principal Accounting Officer**

Yes.  I can start and maybe Chris can jump in here.  So just to set things in perspective, Bill, we've had 5 quarters of revenue growth, including 4 quarters of double-digit revenue growth.  I would like to reiterate that the mass cytometry franchise has grown extremely strongly.  As Chris pointed out, even in this year, we've grown over 60% for the year-to-date period.  And we've grown strongly 28% in the most recent quarter.  *So we are now crossing the chasm and engaging a new class of customers that are -- that have longer decision cycles.  So that is something that we have factored in.*  And on the other hand, mass microfluidics remains volatile, and we are conscious of the volatility of that particular product.

I'd also like to point out that the issues that we are addressing are fairly localized.  It's in the Americas.  The other regions, Europe and EMEA, grew very strongly even in this quarter.  But regardless, I think from a quarter-over-quarter basis, things are harder to predict given our unit pricing of our instruments, *but we remain confident about the growth prospects for the business overall.*

**Stephen Christopher Linthwaite - Fluidigm Corporation - President, CEO & Director**

Yes.  I think, Vikram, you covered most of it.  The primary thing for Q3 is it's typically not a super large instrument placement cycle.  So given the swings in 1, 2 or 3 systems, that's solid.  I think you're really reflecting here, *I think we're seeing no real trend change in the mass cytometry business overall.  When we step back, we've got uncertainty related to end-of-year funding for the NIH, which will wrap up, as you know, in September, end of September.  And then we think Q4, given what's setting up right now, is going to be a very strong cycle for placements of instruments and order placements for overall based upon end of year money.*

SECOND AMENDED CLASS ACTION COMPLAINT

95.     While knowing prior to the beginning of the Class Period that mass cytometry revenue would decline in the second half of 2019, Defendants feigned surprise at the occurrence.  Instead of coming clean, Defendants instead misrepresented that the issues were "localized" and temporary.

96.     Furthermore, although Defendants focused on the microfluidics line in reporting the disappointing results in the second quarter of 2019, the decline in microfluidics year-over-year was actually one-half of the decline year-over-year in the first quarter of 2019 and roughly equivalent to the year-over-year declines in the last two quarters of 2018 (*see, e.g.*, ¶¶ 38, 70, 83).  Additionally, the decline in microfluidics revenue was in-line with repeated statements by Defendants during the Class Period and prior to regarding the state of the microfluidics business (*see* ¶¶ 36-38, 70, 91).  As stated above (*see* ¶¶ 35-44), due to the softening of the microfluidics segment, Fluidigm's main focus had shifted to mass cytometry, and tellingly, the increase in revenue for mass cytometry significantly changed from the previous four quarters which saw an average increase of 60%, something not lost on the analysts who attended the earnings conference call.

97.     Thus, Defendants' emphasized statements above at ¶¶ 91-94 were materially false and misleading and omitted adverse material facts.  Specifically, the statements omitted the following:  (a) that Defendants knew as of late 2018 that the outlook for sales in the second half of 2019 was negative and thus the disappointing second quarter 2019 results were not surprising as claimed and Q419 would not be "a very strong cycle for placement of instruments"; (b) that Defendants had known for multiple quarters that customers were extending the sales cycle; and, (c) that the revenue declines in mass cytometry were not just a few sales slipping into the next quarter or two, but an overall sales issue that was known as of late 2018, and only became more apparent throughout 2019.

98.     On August 7, 2019, Fluidigm filed its quarterly report for the period ending June 30, 2019 with the SEC (the "2Q19 10-Q"), signed by the Individual Defendants and affirming the information provided in the August 2019 Press Release and accompanying earnings conference call.  The 2Q19 10-Q included identical statements regarding the "Risk Factors" as the 2018 10-K (*see* ¶ 67 above), and ***did not disclose any new risks or material changes***, even though it had become increasingly clear during the first and second quarters of 2019 that the purported "risks" were not

something that *may* or *could* occur but ***were in fact occurring*** at the time of the issuance of the 2Q19 10-Q.

99.     More specifically, Defendants' emphasized risk statements were materially false and misleading and omitted material adverse facts necessary to make the statements not misleading as follows:  (a) that due to the nature of the Company's business, sales revenue for the following six to twelve months was determinable as of the date of the statements and it was known that the pipeline for the second half of 2019 showed a decline; (b) that internal reports as of late 2018 showed a decline in revenue for the second half of 2019; (c) that during the first and second quarters of 2019 there were further indications of declining sales for the second half of 2019; (d) that the Individual Defendants were discussing the dismal sales performance on a weekly basis internally; (e) that customers were extending their sales cycles; and, (f) that, as a result, the risk factors failed to account for the specific knowledge the Defendants had at that time regarding Fluidigm's 2019 mass cytometry revenue, mispresenting that revenue "*may* . . . deviate significantly from expectations" and that rates of revenue growth "***could***" be "adversely affected" when in fact it was known that revenue ***would*** decline.

*Disclosures at the End of the Class Period*

100.     As Defendants had known would occur since the third quarter of 2018, but failed to disclose, Fluidigm's third quarter 2019 sales revenue declined.  Fluidigm failed to meet the lower end of its third quarter 2019 sales guidance, but more importantly, ***total revenue fell 8.5% compared to third quarter of 2018*** and the Company's ***lifeboat mass cytometry segment revenue declined by 13% compared to third quarter of 2018 and by 8.9% compared to the prior quarter with instrument sales decreasing by 23% year over year***.  This occurrence was not only due to a few sales slipping quarters, but as can be seen below at ¶ 106, a permanent trajectory for the Company's mass cytometry segment.

101.     On November 5, 2019, after the market closed, Fluidigm issued a press release announcing its financial results for the quarter ended September 30, 2019, attached as Exhibit 99.1 to a Form 8-K filed with the SEC, titled "Fluidigm Announces Third Quarter 2019 Financial Results" (the "November 2019 Press Release").  The November 2019 Press Release disclosed, *inter alia*, that the Company's third quarter 2019 revenue had declined year-over-year, primarily due to mass cytometry instrument sales, stating, in relevant part:

**Financial Highlights**

- ***Third quarter revenue decreased 8.5 percent to $26.5 million from $29.0 million***, with consumables revenue growth of 11 percent, compared to the third quarter of 2018.

- Year-to-date total revenue increased 5 percent to $84.8 million, and mass cytometry revenue increased 28 percent to $51.8 million, compared to the same period in 2018.

- GAAP net loss for the quarter was $12.9 million, compared with a GAAP net loss of $14.8 million for the third quarter of 2018.

- Non-GAAP net loss was $6.2 million for the quarter, compared with a $5.2 million non-GAAP net loss for the third quarter of 2018.

"***Total revenue in the third quarter declined primarily due to mass cytometry instrument sales in the Americas***, partially offset by growth in mass cytometry and microfluidics consumables.  Double-digit recurring revenue growth from consumables and service, as well as disciplined financial management, were highlights for the quarter," said Chris Linthwaite, President and CEO.

*         *         *

*Revenue by market:*

- ***Mass cytometry revenue decreased 13 percent to $15.6 million from $17.9 million in the prior year period.  Mass cytometry product revenue decreased 23 percent to $11.8 million from $15.2 million in the prior year primarily due to lower sales of instruments*** partially offset by higher sales of consumables.

- Microfluidics (MFLU) revenue decreased 2 percent to $10.9 million from $11.1 million in the prior year period.  Microfluidics product revenue decreased 1 percent to $8.9 million from $9.0 million in the prior year period primarily due to lower sales of instruments partially offset by higher sales of consumables.

*Total revenue by geographic area:*

| Geographic Area | Revenue by Geography | Year-over-Year Change | % of Total Revenue |
|---|---|---|---|
| Americas | $11.1 million | (19%) | 42% |
| EMEA | $9.1 million | 4% | 34% |
| Asia-Pacific | $6.3 million | (4%) | 24% |

102.    That same day, the Individual Defendants held an earnings conference call to discuss the third quarter 2019 financial results.  During the call, defendant Linthwaite confirmed that Fluidigm's third quarter revenue fell below the Company's guidance, stating, among other things, that

"*suspension mass cytometry unit placements in Americas fell short of [the Company's] projections*" and admitting that it was not just a one-time occurrence but that "*we have seen a shift [in the sales cycle] in the last few quarters in particular* and more scrutiny of expense above or capital equipment investments above the $500,000 mark."

103.     Defendant Jog disclosed that the decline in mass cytometry revenue was "*due to lower instrument revenue primarily in the United States*" and that the Company **"*continue[d] to experience delays in mass cytometry instrument orders in the third quarter, similar to the previous quarter primarily due to longer sales cycles.***"

104.     On this news, the Company's stock plummeted 50.88%, from a closing price of to $5.11 per share on November 5, 2019, to close at $2.51 per share on November 6, 2019, on unusually heavy trading volume.  The price of the Company's common stock continued to decline over the next few days, falling another $0.18, to close at $2.33 on both November 8, 2019 and November 11, 2019, an overall drop of 54.4% from November 5, 2019 and *80.82%* from the first partial disclosure on August 1, 2019.

105.     The *Motley Fool* aptly noted in a report issued on November 6, 2019:

Shares of Fluidigm (NASDAQ:FLDM) fell more than 54% on Wednesday after the company reported third-quarter 2019 operating results.  The lab instrument developer, supposedly in the midst of a growth spurt, reported that revenue *declined* compared with the year-ago period.  ***Worse yet, the segment leading its growth trajectory saw declining sales as well.***

***The disappointing results shocked investors -- and for good reason.***  While the year-over-year decline in revenue serves as a reminder of the difficulty in building a successful lab instrument business, ***it also suggests that Fluidigm may be losing out to a rising tide of competition. Could that prove to be an existential threat to the company?***

## POST-CLASS PERIOD EVENTS

106.     The known, but undisclosed, negative trend in sales continued after the end of the Class Period.  Revenue for the fourth quarter of 2019 was flat year-over-year and revenue for the full year only increased 4% compared to an 11% increase in 2018.  Mass cytometry product revenue only increased 10% year-over-year whereas between Q2 2018 and Q2 2019, such quarterly increases were as follows: 31%, 48%, 50%, 134%, 28%, respectfully.  The full effect of the undisclosed issues

SECOND AMENDED CLASS ACTION COMPLAINT

continued throughout 2020 with mass cytometry product revenue decreasing year-over-year each quarter as follows:  (26%), (28%)[2], (3%), and (24%).

## ADDITIONAL SCIENTER ALLEGATIONS

107.    As alleged herein, each of the Individual Defendants acted with scienter in that they knowingly or recklessly disregarded that the information disseminated to the public contained materially false and/or misleading information and omitted material adverse information.  Throughout the Class Period, the Individual Defendants acted intentionally or in such a deliberately reckless manner as to constitute a fraud upon Lead Plaintiff and the Class.  Such actions caused the price of Fluidigm securities to be artificially inflated.

108.    In their respective roles as CEO and CFO of Fluidigm, the Individual Defendants were able to, and did, control the information disseminated to the investing public in the Company's various SEC filings, press releases, and other public statements during the Class Period.  As a result, each had the opportunity to falsify the information provided to the public regarding Fluidigm's business and performance.

**The Individual Defendants' Admissions and Hands-On Involvement in Fluidigm's "Core Operations" During the Class Period**

109.    The false and misleading statements and omitted material adverse facts at issue herein were part of the Company's core operations – mass cytometry sales revenue and forecasts.  Leading up to and throughout the Class Period, Defendants admitted that the microfluidics business line was experiencing weakness (*see, e.g.*, ¶¶ 35-44), making Fluidigm's emerging and increasing revenue in the relatively new mass cytometry business line top priority and of substantial import to the success of the Company, and to investors.  Consequently, Defendants' scienter concerning such core operations may be reasonably inferred based on such, in addition to the following considerations.

---

[2]  For the second and third quarters of 2020, Fluidigm only reported mass cytometry product and service revenue together, failing to break-out product revenue as it had previously done.  A direct comparison of the combined product and service revenue for 2018 and 2019 for those quarters are as follows:  for Q2 and Q3 2018, increases of 32% and 50%, respectively; and for Q2 and Q3 2019, and increase of 28% and decrease of 13% (the final corrective disclosure), respectively.

SECOND AMENDED CLASS ACTION COMPLAINT

110.     During the Class Period, Fluidigm was a relatively small company.  As disclosed in the Company's 2018 10-K, "[a]s of December 31, 2018, [Fluidigm] had 535 employees, of which 103 work in research and development, 107 work in general and administrative, 135 work in manufacturing, and 190 work in sales, technical support, and marketing."

111.     Because the Individual Defendants were the CEO and CFO of the Company during the Class Period, they had day-to-day operational control over and thorough knowledge of these core operations.  Defendants Linthwaite and Jog repeatedly admitted to having knowledge of Fluidigm's "core operations," and specifically its mass cytometry sales and sales forecasts, during the Class Period in connection with SEC filings and investor calls.

112.     Notably, defendant Linthwaite admitted that Defendants had known for multiple quarters prior to disclosing to investors that the mass cytometry sales cycle was changing and extending, stating during the November 5, 2019 earnings call that "*we have seen a shift [in the sales cycle] in the last few quarters in particular* and more scrutiny of expenses above or capital equipment investments above the $500,000 mark."

113.     Further, beyond the prepared remarks given by the Individual Defendants at earnings conference calls during the Class Period, each provided detailed descriptions of the Company's product, sales, customers, and forecasts in answering analyst questions, making clear their intimate familiarity with these topics.  *See, e.g.*, ¶¶ 65, 71, 73, 76, 87, 91-94.

114.     Additionally, for example, defendant Linthwaite discussed models the Company ran on consumables during the February 7, 2019 earnings conference call in response to an analyst question, stating, "I think we've talked about this in the past that *we had modeled* that there might be some potential deterioration in our pull-through, but as you can see from our recommended guidance that we're not seeing any declination or decrease in pull-through rates based between the mix of Hyperion imaging technology versus suspension."

115.     Defendant Jog exemplified his knowledge of the Company's financials and product sales during the May 2, 2019 earnings call in responding to a questions regarding gross margin trends, stating:

Yes.  So gross margins, I think, is - as we have talked multiple times in the past, is a function both of mix as well as capacity utilization.  Q4 generally tends to be the quarter in which

SECOND AMENDED CLASS ACTION COMPLAINT

capacity is utilized to the maximize.  And compared year-over-year, the margins were more or less in line with some mixed changes in Q1 '19 because of the consumables issue we talked about.  But I don't expect nor do we give guidance on gross margins in the future, but there's nothing in our business environment right now in the short run that should cause the margin profiles and individual products to be any different than we experienced in Q1.

116.    Furthermore, during the first quarter 2019 earnings conference call held on May 2, 2019, defendant Linthwaite explicitly stated that he had "traveled extensively in all of [the Company's] major regions over the past months," that he had "recently visited [Fluidigm's] team [in China] and a number of large customers," and had "visited a lot of new accounts [for mass cytometry] in the last 2 quarters."

**Internal Meetings and Reports**

117.    As discussed in ¶¶ 45-61 above, the Individual Defendants had access to, ***and reviewed***, certain reports and were involved in regular Company meetings where they were updated on crucial information indicating that the statements made herein were materially false and/or misleading and omitted material adverse facts.

118.    Additionally, according to CW2, who was employed with Fluidigm from March 2018 to September 2019 (*see* ¶ 41), sales quotas were continually missed during CW2's tenure.  CW2 stated: "Everyone was aware of it.  [Sales problems] were discussed every time we met."  The meetings CW2 referred to were sales team meetings and calls.  According to CW2, sales team conference calls occurred regularly, sometimes as often as weekly when the end of a quarter was drawing near, and which always included the CCO and sometimes defendant Jog.  In-person meetings were also held once per quarter at the Company headquarters and occasionally during industry conferences and were attended by the CCO and defendant Linthwaite.  CW2 stated that during ***all of the conference calls and in-person meetings***, disappointing sales were discussed and brainstorming about how to improve sales took place. Information directly from Salesforce was also discussed during the conference calls.

119.    CW2 explained that sales opportunities, progress, and preference were tracked electronically on Salesforce and sales staff were expected to keep it regularly updated so that leadership could generate a report with the click of a button.  "We were always told to put things in right away," stated CW2.  CW2 further explained that the information in Salesforce also included reasons why any deal fell through and it was often because Fluidigm lost out to a competitor.

120.   CW1 also commented on Fluidigm's use of Salesforce, stating that one of its key tools is its ability to run sales projections.  This ability to run sales projections in Salesforce was readily available to all executives at Fluidigm according to CW1 and the Individual Defendants and others "***had all of the tools . . . to predict a downward trend***."

121.   CW3 not only provided the Individual Defendants with the slide deck during the third quarter of 2018 showing reasons why North America mass cytometry sales would not meet expectations in 2019 (¶ 48), and again adjusted those sales forecasts down during January 2019 (¶ 52), but also provided the Individual Defendants with regular sales updates throughout the quarter, usually every three weeks, which detailed the current number of orders in, how many the Company still needed to meet its goals, which deals were being targeted and where they were in the sales process, what the date of the sales closing was, the probability of the sales closing, risk drivers, and any other mitigating factors.

122.   CW6, Senior Vice President of Global Business Operations from 2016 until 2018, reporting to defendant Jog (and employed with Fluidigm in other positions for 17 years), supervised business operations planning and set up the systems described herein which CW6 believes were in place during the Class Period.  CW6 stated that sales and potential deals were monitored closely by the executives using the system CW6 set up, which included quarterly business review meetings held the third week after a new quarter began that examined the sales in the channel in exacting detail.  Teams from Fluidigm's finance department, marketing department, sales departments, as well as senior leadership, including the Individual Defendants, went over "every win, every loss, every number." CW6 explained that "[i]t was a rich data set."

123.   There were also other updated sales projections sent to executive leadership and senior management three times a quarter according to CW6.  These updated sales projections included information about the likelihood of sales closing and where each deal was in the sales process.  CW6 stated that if a deal was falling apart, that would be communicated in a "probability index" on that report.

**Fluidigm Needed to Raise Capital for Operations**

124.    As noted in the 2018 10-K, Fluidigm is funded "primarily through equity offerings, the issuance of debt instruments, and from sales of our products."

125.    In January of 2014, in order to acquire DVS and its mass cytometry technology, the Company offered $175 million convertible senior notes.  No other offerings or issuances were made for over three years.

126.    Then, one and a half years before the start of the Class Period, in August of 2017, the Company significantly ramped up its equity offerings and debt instrument issuances with an at-the-market equity offering of 9.1 million shares of common stock for net proceeds of approximately $28.8 million.  The proceeds of this 2017 offering were for general corporate purposes and working capital and the Company's current cash and cash equivalents increased from $39.6 million as of June 30, 2017, to $60.9 million as of September 30, 2017.

127.    In March of 2018, the Company exchanged $150 million of its outstanding convertible notes for new convertible notes with a later initial "put" date and new conversion features which purportedly improved the Company's capital structure.

128.    A year after the Company's 2017 at-the-market offering, Fluidigm's cash position had once again fallen, with current cash and cash equivalents of only $35.8 million as of September 30, 2018.  Facing a need for cash to continue to operate, Fluidigm announced a public offering of 9.37 million shares (with over-allotment) of common stock on December 12, 2018.  The shares were priced at $6.75 per share and the Company received net proceeds of approximately $59.1 million.  The net proceeds were to be used for general corporate purposes, including working capital.

129.    During the first quarter of 2019, the Company extinguished $150 million in convertible debt.  As noted by *The Motley Fool*, in a May 3, 2019 article, this gave Fluidigm "financial flexibility" and "should save close to $4 million in annual interest expense.  Every little bit helps."  Indeed, as noted in the same article, for the first quarter of 2019, the Company had "higher-than-expected operating expenses after a surge in selling, general, and administrative costs.  That's not a great development for a company scratching and clawing its way to profitability."

SECOND AMENDED CLASS ACTION COMPLAINT

130.     The Company's "cash burn" was also noted in a *Seeking Alpha* article published shortly after the Class Period, on January 2, 2020.  The article noted, among other things, that Fluidigm "continues to burn through cash and a day of reckoning may come in the next five years."

131.     Towards the end of the first quarter of 2019, on March 18, 2019, Defendants filed with the SEC a Form S-3ASR, indicating another imminent public offering, giving Defendants motive to continue to omit the material adverse facts discussed herein.

132.     In sum, Fluidigm's cash needs provided ample motivation to maintain a false sense of the Company's pipeline.

**Corporate Scienter**

133.     The Individual Defendants were responsible for signing the financial statements, along with certain directors.  The Individual Defendants acted with apparent authority to speak on behalf of the Company and their statements were made with the imprimatur of the Company that selected them to speak on its behalf.  Moreover, as CEO and CFO, the Individual Defendants were highly involved in the preparation, review, finalization, and issuance of the Company's financial statements, and investors relied on their honesty and integrity.

134.     Based on the foregoing, the Individual Defendants' actions and scienter are imputable to Fluidigm at all times during the Class Period.  Each of the Individual Defendants acted as an agent of Fluidigm, both with respect to SEC filings they signed and also with respect to the SEC filings and earnings releases that they assisted in preparing and/or that they oversaw or participated in the accounting for.  Therefore, the Individual Defendants' states of mind are imputable to Fluidigm for all of the challenged statements in this Complaint, whether or not they personally signed those statements.

**LOSS CAUSATION**

135.     During the Class Period, as detailed herein, Defendants engaged in a fraudulent scheme to deceive the market that artificially inflated the price of Fluidigm securities and operated as a fraud or deceit on Class Period purchasers of Fluidigm securities.

136.     Defendants' materially false and/or misleading statements and omissions concealed, *inter alia*, Fluidigm's longer sales cycles due to the undisclosed issues detailed herein, resulting in

1    declining revenue.  As detailed above, when the truth was revealed, the price of Fluidigm securities
2    declined significantly as the prior artificial inflation was removed from the Company's stock price.

3        137.    As a result of their purchases of Fluidigm securities during the Class Period, at
4    artificially inflated prices, Lead Plaintiff and the Class suffered damages under the federal securities
5    laws.

6        138.    The artificial inflation created by Defendants' misrepresentations and omissions was
7    partially removed when on August 1, 2019, the Company reported second quarter 2019 revenue of
8    $28.2 million, well below analysts' expectations of $32 million, citing declining microfluidics revenue
9    and declining mass cytometry revenue in the Americas.  *See* ¶¶ 8, 83-88, 90-94.  Following this partial
10   disclosure, Fluidigm's share price declined by $4.10 per share, or 33.74%, on heavier than usual trading
11   volume, to close on August 2, 2019 at $8.05 per share.

12       139.    On November 5, 2019, the truth was fully revealed and the risk fully materialized when
13   the Company disclosed that its third quarter 2019 total revenue had declined 8.5% year-over-year,
14   primarily due to mass cytometry instrument sales.  *See* ¶¶ 11, 101-03.  This announcement caused
15   Fluidigm's share price to decline $2.60, or 50.88%, on heavier than usual trading volume, to close on
16   November 6, 2019 at $2.51 per share.  The price of the Company's common stock continued to decline
17   over the next few days, falling another $0.18, to close at $2.33 on both November 8, 2019 and
18   November 11, 2019, an overall drop of 54.4% from November 5, 2019 and ***80.82%*** from the first partial
19   disclosure on August 1, 2019.

20       140.    The timing and magnitude of the price decline in Fluidigm's stock on the date of the
21   disclosures above negates any inference that the losses suffered by Lead Plaintiff and the Class were
22   caused by changed market conditions, macroeconomic or industry facts, or Company-specific facts
23   unrelated to Defendants' fraudulent conduct.

24       141.    The damages suffered by Lead Plaintiff and the Class were the direct and proximate
25   result of Defendants' materially false and misleading statements and omissions that artificially inflated
26   the Company's stock price and the subsequent significant decline in the value of the Company's stock
27   when the truth concerning Defendants' prior misrepresentations and fraudulent conduct were revealed.

28

1

**CLASS ACTION ALLEGATIONS**

2    142.    Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil

3  Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons and entities that purchased or

4  otherwise acquired Fluidigm securities between February 7, 2019 and November 5, 2019, inclusive,

5  and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers

6  and directors of the Company, at all relevant times, members of their immediate families and their legal

7  representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a

8  controlling interest.

9    143.    The members of the Class are so numerous that joinder of all members is impracticable.

10  Throughout the Class Period, Fluidigm securities were actively traded on the NASDAQ exchange.  As

11  of March 13, 2019, Fluidigm had over 68.9 million shares of common stock issued and outstanding.

12  While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be

13  ascertained through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands

14  of members in the proposed Class.  Record owners and other members of the Class may be identified

15  from records maintained by Fluidigm or its transfer agent and may be notified of the pendency of this

16  action by mail, using the form of notice similar to that customarily used in securities class actions.

17    144.    Lead Plaintiff's claims are typical of the claims of the Class as all members of the Class

18  are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained

19  of herein.

20    145.    Lead Plaintiff will fairly and adequately protect the interests of the Class and has

21  retained counsel competent and experienced in class and securities litigation.  Lead Plaintiff has no

22  interests antagonistic to or in conflict with those of the Class.

23    146.    Common questions of law and fact exist as to all members of the Class and predominate

24  over any questions solely affecting individual members of the Class.  Among the questions of law and

25  fact common to the Class are:

26        •    whether the federal securities laws were violated by Defendants' acts as alleged

27            herein;

28

- whether statements made (or omissions) by Defendants to the investing public during the Class Period misrepresented (or omitted) material facts about the business, operations, and management of Fluidigm;

- whether Defendants acted knowingly or recklessly in issuing false and misleading statements (or omissions);

- whether the prices of Fluidigm securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

- to what extent the members of the Class have sustained damages and the proper measure of damages.

147. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in managing this action as a class action.

## PRESUMPTION OF RELIANCE; FRAUD-ON-THE-MARKET

148. The market for Fluidigm's securities was open, well-developed, and efficient at all relevant times. As a result of Defendants' materially false and/or misleading statements and material omissions, Fluidigm stock traded at artificially inflated prices during the Class Period. On March 19, 2019, the Company's share price closed at a Class Period high of $14.35 per share. Lead Plaintiff and the other members of the Class purchased or otherwise acquired the Company's securities relying on the integrity of the market price of such securities and on publicly available market information relating to Fluidigm, and have been damaged thereby.

149. During the Class Period, the artificial inflation of the value of Fluidigm's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint, thereby causing the damages sustained by Lead Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about the Company's business, prospects, and operations, causing the price of the Company's stock to be artificially inflated at all relevant times. When the truth was disclosed, it

1   drove down the value of the Company's securities, causing Lead Plaintiff and other Class members

2   that had purchased the securities at artificially inflated prices to be damaged as a result.

3       150.    Lead Plaintiff will rely, in part, upon the presumption of reliance established by the

4   fraud-on-the-market doctrine in that:

5           •   Fluidigm's shares met the requirements for listing, and was listed and actively traded

6               on the NASDAQ, a highly efficient market, and was covered by analysts;

7           •   As a regulated issuer, Fluidigm filed periodic public reports with the SEC and/or the

8               NASDAQ;

9           •   Fluidigm regularly communicated with public investors via established market

10              communication mechanisms, including through regular dissemination of press

11              releases on the national circuits of major newswire services and through other wide-

12              ranging public disclosures, such as communications with the financial press and

13              other similar reporting services;

14          •   Defendants made public misrepresentations or failed to disclose material facts

15              during the Class Period;

16          •   the omissions and misrepresentations were material;

17          •   the misrepresentations and omissions alleged would tend to induce a reasonable

18              investor to misjudge the value of the Company's securities; and

19          •   Lead Plaintiff and members of the Class purchased, acquired, and/or sold Fluidigm

20              securities between the time Defendants failed to disclose or misrepresented material

21              facts and the time the true facts were disclosed, without knowledge of the omitted

22              or misrepresented facts.

23      151.    Based upon the foregoing, during the Class Period, the market for Fluidigm's securities

24  promptly digested information regarding the Company from all publicly available sources and

25  impounded such information into the price of Fluidigm's shares.  Therefore, Lead Plaintiff and the

26  Class are entitled to a presumption of reliance upon the integrity of the market.

27      152.    Alternatively, Lead Plaintiff and the Class are entitled to the presumption of reliance

28  established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406

U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## NO SAFE HARBOR

153.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the statements alleged to be false and/or misleading herein.  The statements complained of herein were historical statements or statements of then-existing facts and conditions at the time the statements were made and/or were material omissions.

154.   To the extent that statements alleged to be false and/or misleading could be construed as forward-looking, the statutory safe harbor does not apply to such statements because they were not sufficiently identified as "forward-looking statements" when made, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statements, and/or Defendants had actual knowledge that the forward-looking statements were materially false or misleading at the time each such statement was made.

## CAUSES OF ACTION

## COUNT I

### Violations of Section 10(b) of the Exchange Act
### and SEC Rule 10b-5 Promulgated Thereunder
### (Against All Defendants)

155.   Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

156.   During the Class Period, Defendants carried out a plan, scheme, and course of conduct, which was intended to, and throughout the Class Period, did:  (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Fluidigm securities; and (iii) cause Lead Plaintiff and other members of the Class to purchase or otherwise acquire Fluidigm securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

SECOND AMENDED CLASS ACTION COMPLAINT

157.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period in an effort to maintain artificially high market prices for Fluidigm's securities in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

158.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal and misrepresent adverse material information about the Company's business, operations, and financial results, as specified herein.

159.    Pursuant to the above plan, scheme, and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases, and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Fluidigm securities.  Such reports, filings, releases, and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented Fluidigm's true condition.

160.    The Company and the Individual Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Lead Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

161.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As senior officers of Fluidigm, the Individual Defendants had knowledge of the details of Fluidigm's internal affairs.

162.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Fluidigm.  As senior officers of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Fluidigm's businesses, operations, financial condition, and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases, and public statements, the market price of Fluidigm securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Fluidigm's business and financial condition which were concealed by Defendants, Lead Plaintiff and the Class purchased or otherwise acquired Fluidigm securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

163.    During the Class Period, Fluidigm securities were traded on an active and efficient market.  Lead Plaintiff and the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued, or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Fluidigm securities at prices artificially inflated by Defendants' wrongful conduct.  Had Lead Plaintiff and the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Lead Plaintiff and the Class, the true value of Fluidigm securities was substantially lower than the prices paid by Lead Plaintiff and the Class.  The market price of Fluidigm securities declined sharply upon public disclosure of the facts alleged herein to the injury of Lead Plaintiff and the Class.

164.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and SEC Rule 10b-5.

165.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the Class suffered damages in connection with their respective purchases, acquisitions, and sales of the

Company's securities during the Class Period, upon the disclosure that the Company had been disseminating material misrepresentations to the investing public.

## COUNT II

### Violations of Section 20(a) of the Exchange Act
### (Against the Individual Defendants)

166.    Lead Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

167.    During the Class Period, the Individual Defendants participated in the operation and management of Fluidigm, and conducted and participated, directly and indirectly, in the conduct of Fluidigm business affairs.   Because of their senior positions, they knew the adverse non-public information about Fluidigm's misstatements and omissions of material fact.

168.    As directors and senior officers of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Fluidigm's financial condition and results of operations, and to correct promptly any public statements issued by Fluidigm which had become materially false or misleading.

169.    Because of their positions of control and authority as directors and senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases, and public filings which Fluidigm disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Fluidigm to engage in the wrongful acts complained of herein.  The Individual Defendants therefore, were "controlling persons" of Fluidigm within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged herein which artificially inflated the market price of Fluidigm securities.

170.    Each of the Individual Defendants, therefore, acted as a controlling person of Fluidigm. By reason of their senior management positions and/or being a director of Fluidigm, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Fluidigm to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Fluidigm and possessed the power to control the

specific activities which comprise the primary violations about which Lead Plaintiff and the other members of the Class complain.

171. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Fluidigm.

## PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiff prays for relief and judgment, as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiff as the Class representative;

B. Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial;

C. Awarding Lead Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees with interest, expert fees, and other costs; and

D. Awarding such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Lead Plaintiff hereby demands a trial by jury.

DATED: September 14, 2021                           Respectfully submitted,

**BRAGAR EAGEL & SQUIRE, P.C.**

/s/ *Marion C. Passmore*
Marion C. Passmore (#228474)
Melissa A. Fortunato (#319767)
580 California Street, Suite 1200
San Francisco, California 94104
Telephone: (415) 568-2124
Email: passmore@bespc.com
         fortunato@bespc.com

- and -

Lawrence P. Eagel (*pro hac vice*)
810 Seventh Avenue, Suite 620
New York, New York 10019
Telephone: (212) 308-5888

SECOND AMENDED CLASS ACTION COMPLAINT

Facsimile: (212) 504-3260
Email:  eagel@bespc.com

*Counsel for the Lead Plaintiff
and the Proposed Class*

Case No. 4:20-cv-06617-PJH

SECOND AMENDED CLASS ACTION COMPLAINT